No. 23-10228-A
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**
_____

LISA MCELHONE AND JOSEPH LAFORTE,
*Appellants*

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,
*Appellee*

and

RYAN K. STUMPHAUZER, RECEIVER,
*Court-Appointed Receiver-Appellee*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
No. 9:20-CV-81205-RAR
HON. RODOLFO A. RUIZ

---

**APPELLANT LISA MCELHONE'S BRIEF**

---

James M. Kaplan, Esq.
Noah E. Snyder, Esq.
KAPLAN ZEENA LLP
2 South Biscayne Boulevard
Suite 3050
Miami, Florida 33131
Tel: (305) 530-0800
James.Kaplan@kaplanzeena.com
Noah.Snyder@kaplanzeena.com
*Attorneys for Appellant Lisa McElhone*

## <u>APPELLANT'S CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to 11th Cir. R. 26.1-1, the undersigned, counsel for Appellant, Lisa McElhone, hereby certifies that the following is a complete list of the trial judge(s), attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1. Alfano, Gaetan J., Counsel for Appellee, Ryan K. Stumphauzer, as Court-Appointed Receiver for Complete Business Solutions Group, Inc. d/b/a Par Funding and the other Receivership Entities;

2. Berlin, Amie Riggle, Counsel for Plaintiff/Appellee Securities and Exchange Commission;

3. Bowers, John J., counsel for Plaintiff/Appellee Securities and Exchange Commission;

4. Bradylyons, Morgan, counsel for Plaintiff/Appellee Securities and Exchange Commission;

5. Complete Business Solutions Group, Inc. d/b/a Par Funding, Defendant;

6. Conley, Michael A., Counsel for Plaintiff/Appellee Securities and Exchange Commission;

7. Ferguson, David, Counsel for Defendant/Appellant Joseph LaForte;

8. Froccaro, Jr. James, former Counsel for Defendant/Appellant Joseph LaForte;

9.   Hardin, Tracey A., Counsel for Plaintiff/Appellee Securities and Exchange Commission;

10.  Johnson, Alise, Counsel for Plaintiff/Appellee Securities and Exchange Commission;

11.  Kaplan, James M., Counsel for Defendant/Appellant Lisa McElhone;

12.  Kolaya, Timothy A., Counsel for Appellee, Ryan K. Stumphauzer, as Court-Appointed Receiver for Complete Business Solutions Group, Inc. d/b/a Par Funding and the other Receivership Entities;

13.  Kopelowitz Ostrow Ferguson Weiselberg Gilbert, Counsel for Defendant/Appellant Joseph LaForte;

14.  LaForte, Joseph, Defendant/Appellant;

15.  L.M.E. 2017 Family Trust, Relief Defendant/Dismissed Appellant;

16.  McElhone, Lisa, Defendant/Appellant;

17.  Reinhart, Bruce, United States Magistrate Judge;

18.  Ruiz, Rodolfo A., U.S. District Court Judge, Southern District of Florida;

19.  Securities and Exchange Commission, Appellee;

20.  Snyder, Noah E., Counsel for Appellants Lisa McElhone and the L.M.E. 2017 Family Trust;

21.  Stumphauzer, Kolaya, Nadler & Sloman, PLLC, Counsel for Appellee Ryan K. Stumphauzer, Court-Appointed Receiver for Complete Business Solutions Group, Inc. d/b/a Par Funding and the other Receivership Entities;

22.  Stumphauzer, Ryan K., Court-Appointed Receiver for Complete Business Solutions, Group, Inc. d/b/a Par Funding and the other Receivership Entities, Appellee; and

23. Pietragallo Gordon Alfano Bosick & Raspanti, LLP, Counsel for Appellee Ryan K. Stumphauzer, Court-Appointed Receiver for Complete Business Solutions Group, Inc. d/b/a Par Funding and the other Receivership Entities.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rules of Appellate Procedure 26.1 and 11th Cir. Rule 26.1-3(b), counsel for the Appellant certifies that no publicly traded company or corporation has an interest in the outcome of this appeal. This Certificate of Interested Persons does not include all persons or entities who may be claimants in the receivership proceedings or Trusts or privately held entities now contained within the Receivership.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 11th Cir. R. 28-1, Appellant requests oral argument because this is a complex multi-party case involving extensive factual issues and record evidence developed over nearly three years of vigorous litigation. Moreover, the issues addressed in this brief pertain to, *inter alia*, constitutional Due Process considerations, as well as core questions about the permissible basis to calculate disgorgement in an SEC enforcement action and the District Court's ability to assess statutory penalties on a joint and several basis. Accordingly, the Appellant believes that oral argument will benefit the Court in its determination of the factual and legal issues presented.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS .....................................................C-1

CORPORATE DISCLOSURE STATEMENT ......................................................C-3

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF CITATIONS ..........................................................................iv

JURISDICTIONAL STATEMENT .............................................................ix

QUESTIONS PRESENTED AND STANDARD OF REVIEW .............................1

    I.     Questions Presented .....................................................................1

    II.    Standard of Review .....................................................................2

STATEMENT OF THE CASE .....................................................................3

FACT STATEMENT .................................................................................8

    I.     The Receivership And Expansion Order.............................................8

    II.    The Order On Disgorgement And Penalties And The Final Judgment .........................................................................................17

SUMMARY OF ARGUMENT ...................................................................23

ARGUMENT ........................................................................................25

    I.     The District Court Violated The Appellants' Due Process Rights When It Granted The Receiver's Expansion Motion Without First Permitting Discovery And An Evidentiary Hearing Or Oral Argument .................................................25

    II.    The District Court's Calculation Of Disgorgement And Penalties Constituted An Abuse Of Discretion.................................25

A.  The District Court Erroneously Held That The SEC Met Its Burden To Establish A Reasonable Approximation Of Appellants' Ill-Gotten Gains ........................................................27

B.  The District Court Abused Its Discretion By Adopting The SEC's Inaccurate Calculation Of The Net-Raise ......................31

C.  The District Court Abused Its Discretion By Refusing To Deduct Disgorgement Obtained From Other Defendants..........37

D.  The District Court Abused Its Discretion by Ordering Appellants To Pay Excessive Penalties, Jointly And Severally ......................................................................................38

III.  This Case Should Be Reassigned If It Is Remanded..........................47

CONCLUSION .........................................................................................47

CERTIFICATE OF COMPLIANCE........................................................49

CERTIFICATE OF SERVICE ................................................................50

# TABLE OF CITATIONS

**Cases**                                                                 **Page(s)**

*Allstate Ins. Co. v. Receivable Fin. Co.*,
    501 F.3d 398 (5th Cir. 2007) ...................................................................28

*Ameritas Variable Life Ins. Co. v. Roach*,
    411 F.3d 1328 (11th Cir. 2005) ......................................................................2

*CFTC v. Sidoti*,
    178 F.3d 1132 (11th Cir. 1999) ....................................................................28

*CFTC v. Tayeh*,
    848 Fed. Appx. 827 (11th Cir. 2021)............................................................28

*Crawford & Co. v. Apfel*,
    235 F.3d 1298 (11th Cir. 2000) ......................................................................2

*FTC v. Verity Int'l, Ltd.*,
    443 F.3d 48 (2d Cir. 2006)......................................................................27, 32

*FTC v. Vylah Tec LLC*,
    378 F. Supp. 3d 1134 (M.D. Fla. 2019)..................................................28, 32

*Honeycutt v. US*,
    581 U.S. 443 (2017)......................................................................................46

*Kern v. TXO Prod. Corp.*,
    738 F.2d 968 (8th Cir. 1984) ..........................................................................2

*Liberte Capital Grp. v. Capwill*,
    421 F.3d 377 (6th Cir. 2005) ..........................................................................2

*Liu v. SEC*,
    140 S. Ct. 1936 (2020)...........................................................25, 26, 29, 31

*Milam v. Comm'r.*,
    734 F. App'x 697 (11th Cir. 2018) .................................................................2

iv

*Rubber Co. v. Goodyear*,
    76 U.S. 788 (1870) ....................................................................................25

*SEC v. Aerokinetic Energy Corp.*,
    No. 08–CV–1409, 2010 WL 5174509 (M.D. Fla. Dec. 15, 2010) ................27

*SEC v. Aerokinetic Energy Corp.*,
    444 F. App'x 382 (11th Cir. 2011) ..............................................................27

*SEC v. BIH Corp.*,
    No. 2:10-CV-577-FTM-29, 2014 WL 7057748
    (M.D. Fla. Dec. 12, 2014) .............................................................................26

*SEC v. Blackburn*,
    15 F. 4th 676 (5th Cir. 2021) ........................................................................25

*SEC v. Blatt*,
    583 F. 2d 1325 (5th Cir. 1978) .....................................................................26

*SEC v. Calvo*,
    378 F. 3d 1211 (5th Cir. 2004) ........................................................27, 35, 36

*SEC v. Elliot*,
    2012 WL 2161647 (S.D.N.Y. June 12, 2012) .............................................40

*SEC v. Huff*,
    758 F. Supp. 2d 1288 (S.D. Fla. 2011) ........................................................28

*SEC v. iShopnomarkup.com, Inc.*,
    126 F. Supp. 3d 318 (E.D.N.Y. 2015) ...................................................40, 46

*SEC v. K.W. Brown & Co.*,
    555 F. Supp. 2d 1275 (S.D. Fla. 2007) ........................................................46

*SEC v. Levin*,
    849 F.3d 995 (11th Cir. 2017) ........................................................................2

*SEC v. Monterosso*,
    756 F. 3d 1326 (11th Cir. 2014) ..............................................................2, 26

*SEC v. Pentagon Capital Mgmt.,*
    725 F.3d 279 (2d Cir.2013)..........................................................................46

*SEC v. Revolutionary Concepts, Inc.,*
    No. 21-10984, 2022 WL 386085 (11th Cir. Feb. 9, 2022).....................27, 39

*SEC v. Shapiro*,
    No. 17-cv-24624, 2018 WL 7140669 (S.D. Fla. Dec. 27, 2018) ..................39

*SEC v. Shapiro,*
    No. 17-cv-24624, 2018 WL 7140359, (S.D. Fla. Dec. 27, 2018) ................39

*SEC v. Warde*,
    151 F.3d 42 (2d Cir. 1998)..........................................................................35

*SEC v. Warren*,
    534 F.3d 1368 (11th Cir. 2008) ...............................................................2, 27

*SEC v. Watkins,*
    No. 1:16-CV-3298-SCJ, 2019 WL 13026037 (N.D. Ga. July 5, 2019) ........46

*SEC v. Wealth Strategies Partners, LLP*,
    No. 8:14-CV-2427-T-27TGW, 2019 WL 2504600
    (M.D. Fla. May 17, 2019) ...........................................................................46

*SEC v. Wealth Strategy Partners, LLP*,
    No. 8:14-CV-2427-T-27TGW, 2019 WL 2503206
    (M.D. Fla. June 17, 2019)............................................................................47

*Tilghman v. Proctor*,
    125 U.S. 136 (1888)....................................................................................26

*U.S. v. Bajakajian*,
    524 U.S. 321 (1998)...............................................................................27, 39

*U.S. Sec. & Exch. Comm'n v. Knight*,
    694 F. App'x 853 (2d Cir. 2017).............................................................41, 46

*Zacharias v. SEC*,
    569 F.3d 458 (D.C. Cir. 2009) ....................................................................28

**Rules**                                                              **Page(s)**

11th Cir. R. 26.1-1 ....................................................................... C-1

11th Cir. R. 26.1-3(b) ................................................................. C-3

11th Cir. R. 28-1 ............................................................................. i

Fed. R. App. P. 26.1 ...................................................................... C-3

Fed. R. App. P. 32(a)(5) .................................................................. 49

Fed. R. App. P. 32(a)(6) .................................................................. 49

Fed. R. App. P. 32(a)(7)(B) ............................................................ 49

Fed. R. Civ. P. 54(b) ....................................................................... ix

**Statutes**                                                          **Page(s)**

15 U.S.C. § 77t(b) ........................................................................... ix

15 U.S.C. § 77t(d) ..................................................................... ix, 26

15 U.S.C. § 77t(d)(2) ............................................................... 26, 46

15 U.S.C. § 77v(a) ........................................................................... ix

15 U.S.C. § 78u(d) ................................................................... ix, 26

15 U.S.C. § 78u(d)(3)(A)(i) ........................................................... 38

15 U.S.C. § 78u(d)(3)(B) ............................................................... 26

15 U.S.C. § 78u(d)(3)(B)(i) ........................................................... 38

15 U.S.C. § 78u(d)(3)(B)(ii) ............................................... 39, 41, 42

15 U.S.C. § 78u(d)(3)(B)(iii) ................................................... 39, 43

15 U.S.C. § 78u(d)(5)..............................................................................26

28 U.S.C. § 1331 ...................................................................................ix

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this case arises under Sections 20(b), 20(d), and 22(a) of the Securities Act of 1934, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a) and Sections 21(d), 21(e), and Section 27 of the Exchange Act of 1934, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

This Court has jurisdiction of this appeal with respect to the District Court's Amended Final Judgment As To Defendants Lisa McElhone And Joseph LaForte (ECF 1451) and the Order producing that Final Judgment (ECF 1450) pursuant to 28 U.S.C. § 1331 because the Order and Final Judgment presented a full adjudication of all liability and damages issues as to the Appellant, and the District Court's decision was properly certified as final pursuant to Fed. R. Civ. P. 54(b). This Court also has jurisdiction of this appeal with respect to the District Court's interlocutory Order Granting Motion To Expand Receivership Estate (ECF 436) pursuant to the Collateral Order Doctrine.[1]

The District Court's Order and Final Judgment were entered on November 22, 2022, and the Appellant timely filed her Notice of Appeal on January 20, 2023. (ECF 1492).

_____

[1] The Appellant incorporates, by reference, her Response to this Court's Jurisdictional Questions (DE 22), which presented a more fulsome discussion of this Court's jurisdiction over the Final Judgment and Orders at issue. Appellant also refers the Court to the Appellee's Response to this Court's Jurisdictional Questions (DE 24), which presents potential alternate grounds for this Court's jurisdiction.

## QUESTIONS PRESENTED AND STANDARD OF REVIEW

**I.     Questions Presented**

1)      Whether McElhone's due process rights were violated when the District Court entered an order expanding the Receivership over her Trust, her personal residences, and her assets without permitting her to take discovery relating to the "commingling" allegations used to justify the expansion, or to respond to a flawed and error-ridden report prepared by the Receiver's consultant (which presented an inaccurate financial analysis that served as an alternate justification for the expansion), and without granting McElhone's request for an evidentiary hearing or oral argument pertaining to the proposed expansion of the Receivership.

2)      Whether the District Court abused its discretion by finding the SEC met its burden of proof to provide a reasonable approximation of McElhone's ill-gotten gains, and by entering a disgorgement award which adopted an inaccurate revenue calculation and denied her deductions to which she was entitled.

3)      Whether the District Court abused its discretion by imposing a maximum Tier 3 penalty against both McElhone and her husband, Joseph LaForte, for each outstanding promissory note issued by their companies without a showing that they engaged in identical (or equivalent) wrongful conduct and without tying their wrongful conduct to *any* of the outstanding notes, and then holding McElhone and LaForte jointly and severally liable for the amount of the combined penalties.

1

## II.    Standard of Review

This Court reviews the amount of a monetary remedy under the securities laws – including disgorgement and penalty awards – for an abuse of discretion. *SEC v. Warren*, 534 F.3d 1368, 1369 (11th Cir. 2008) (per curiam); *see also SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017) (We review for abuse of discretion a district court's calculation of disgorgement) (citing *SEC v. Monterosso*, 756 F. 3d 1326, 1337 (11th Cir. 2014)).

> [A]n abuse of discretion "can occur in three principal ways: [1] when a relevant factor that should have been given significant weight is not considered; [2] when an irrelevant or improper factor is considered and given significant weight; and [3] when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment."

*Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005) (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984)).

This Court's review of the Order Granting Motion To Expand Receivership Estate, and whether that Order violated Appellants' due process rights, is *de novo*. *See Milam v. Comm'r.*, 734 F. App'x 697, 699 (11th Cir. 2018) (Challenges to the constitutional sufficiency of a lower court's procedures are reviewed *de novo*) (citing *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1302 (11th Cir. 2000)); *see also Liberte Capital Grp. v. Capwill*, 421 F.3d 377, 382-83 (6th Cir. 2005).

2

## STATEMENT OF THE CASE

This appeal arises from an enforcement action the Securities and Exchange Commission ("SEC") brought against the Appellant, Lisa McElhone and her husband, Joseph LaForte (collectively the "Appellants"), their businesses, including Complete Business Solutions Group, d/b/a Par Funding ("CBSG" or "Par") and Full Spectrum Processing, Inc. ("FSP"), and various other defendants. At the outset of this case, Par was a thriving and profitable merchant cash advance ("MCA") business. But Par's operations were abruptly halted when the SEC commenced this action in July of 2020 and filed an emergency motion to place Par and FSP into Receivership.

The SEC's Complaint focused on Par's practice of issuing promissory notes to raise capital to fund MCA contracts, alleging that the promissory notes were unregistered securities and that the Appellants – as the actual or *de facto* principals of Par – made misrepresentations and omissions to investors in connection with the promissory notes. Based on the SEC's one-sided and misleading presentation of evidence, the District Court entered an emergency asset freeze order and appointed Ryan K. Stumphauzer as the Receiver – directing him to assume exclusive "custody, control and possession" of all "records, documents, and materials" belonging to Par and FSP. ECF 36 P. 3.

During six subsequent months of intense litigation, the Receiver successfully

3

resisted Appellants' repeated demands for access to the business and financial records necessary for their defense. In late October 2020, the Receiver filed a motion to expand the Receivership to include virtually all personal assets of Appellants and the L.M.E. 2017 Family Trust (the "LME Trust") – of which Appellant and her husband were the sole trustees and beneficiaries. ECF 357. To support this inequitable expansion, the Receiver alleged – based on an incomplete analysis to which Appellants were not given a fair or adequate opportunity to respond – that LaForte and McElhone had purchased their homes and tens of millions of dollars in investment properties with commingled funds traced to the proceeds of the securities offerings. *Id.* at 2.

Because the Receiver had exclusive control of Par's books and records at that time – but had refused to provide them to Appellants – the Appellants had no meaningful opportunity to rebut these allegations regarding the source of funds. To make matters worse, just three days before the expansion motion was ruled upon, the Receiver filed a report from its consultant which implied – through careful wording and incomplete analysis – that Par was operating a Ponzi scheme. ECF 426-1 (the "Sharp Report"). This unpled and demonstrably false notion provided an alternative justification for the expansion of the Receivership Estate – one which the District Court appeared to embrace at a status conference held on December 15, 2020, at which the Receiver was permitted to make an extensive and one-sided

presentation. The very next day, the District Court granted the expansion of the Receivership *without* permitting discovery or a hearing on the Receiver's allegations of commingling or the allegations presented in the Sharp report. ECF 436 (the "Expansion Order").

Following the expansion of the Receivership, the Appellants continued to defend the case, but they faced a hostile Court which ruled against them at every opportunity. The Appellants eventually elected to enter bifurcated consent judgments, whereby they conceded liability and accepted the allegations of the SEC's Amended Complaint as true (for purposes of the consent judgment only) and agreed to litigate the SEC's entitlement to disgorgement and penalties before the Court. ECF 1008 and 1010.

In its motion seeking damages, the SEC presented a one paragraph disgorgement calculation – asserting that Appellants should be ordered to disgorge the full amount of the proceeds raised from Par's noteholders less the amount repaid (hereafter, the "Net-Raise"), and less the amounts Par paid to two other defendants against whom the SEC also sought disgorgement. ECF 1252 P. 30.  The SEC also asked the Court to impose a $100 Million penalty against the Appellants. *Id*. at P. 36. In response to the SEC's motion – which presented no reasoning or analysis whatsoever, and evidenced a clear punitive intent – the Appellants presented a thorough brief demonstrating that the SEC had failed to meet its burden, detailing

the legitimate business expenses of Par and other equitable deductions which the District Court was required to deduct from the SEC's Net-Raise model of disgorgement (assuming it embraced that model at all), and presenting a reasoned penalties analysis. ECF 1329.

After receiving the parties' submissions, the District Court conducted an evidentiary hearing during which the Court repeatedly spoke about the material defects with the SEC's brief. Indeed, Judge Ruiz stated: "**it would almost be impossible for me to write an order that will withstand appellate review if I didn't make the SEC go back and write it over again the right way**." (9.14.22 Tr., ECF 1419 at P. 110:21-23). But despite this observation, the Court *did not* make the SEC rewrite its brief, nor did it award the Appellants the full array of business deductions and offsets they were entitled to. Instead, the Court issued an Order Granting in Part Plaintiff's Amended Omnibus Motion for Final Judgment (the "Disgorgement Order"), which embraced the fiction that the SEC had "satisfied its burden to provide a reasonable approximation of the requested disgorgement" and granted Appellants only *some* of the legitimate deductions to which they were entitled. ECF 1450, P. 13.

As a result of all of these errors, the Appellants are now subject to a final judgment which holds them jointly and severally liable for $142,529,980 in disgorgement, $43,700,000 in civil penalties and $10,694,758.24 in pre-judgment

interest – making their total obligation approximately $197 Million, excluding post-judgment interest. ECF 1451 (the "Final Judgment").[2] To make matters worse, Appellants' personal assets remain under the Receivership pursuant to the Expansion Order and – according to the SEC, the Receiver, and the Court – cannot be used to satisfy the Final Judgment! ECF 1531, 1538, 1539 and 1540.

This appeal challenges both the Expansion Order and the Disgorgement Order and Final Judgment. As McElhone will demonstrate, the District Court denied Appellants a meaningful opportunity to defend their property rights by granting the Expansion Order without permitting discovery or a hearing on the Receiver's allegations of "commingling" or the Sharp Report. Because the District Court's procedures did not comport with due process, the Expansion Order should be reversed and the matter remanded with appropriate instructions.

McElhone will also demonstrate that the District Court's findings in its Disgorgement Motion resulted in an excessive and legally unsupportable award of disgorgement and civil penalties, and that the Final Judgment must therefore be vacated and remanded with appropriate instructions.

---

[2] The Court's first disgorgement order and final judgment (ECF 1432 and 1433) also overstated Appellants' disgorgement obligation by $20,554,206 due to an apparent mathematical error, which the Appellants had to correct by filing a motion to amend the Final Judgment (ECF 1444). While the Court acknowledged and corrected this discrepancy (ECF 1449), it's error is indicative of the Court's mindset and approach in assessing disgorgement and penalties against the Appellants.

## FACT STATEMENT

### I.    The Receivership And Expansion Order

The SEC's Complaint focused on Par's fundraising practices rather than its MCA operations. The SEC accused the Appellants and others of fraudulent "misrepresentations and omissions" connected to the "offer and sale of . . . [Par] promissory notes" and claimed that the sales of the notes violated the registration requirement of Section 5 of the Securities Act of 1933. ECF 1 at ¶¶ 48, 50, and 286-89; *see also* ECF 14 at P. 79. The SEC *did not* allege that the noteholders sustained losses related to their investment in the company or that Par was anything other than profitable. *See* 8/17/2020 Tr., ECF 193 at P. 46 (the Court acknowledges that Par's "many" investors received "their monthly payouts and . . . principal returns" from the company).

The SEC paired its Complaint with an emergency motion to place Par and other corporate defendants into receivership. ECF 4. The rationale that the SEC offered for seeking this draconian remedy was, if nothing else, straightforward. Relying on the Complaint's allegations and an incomplete examination of Par's bank accounts, the SEC wrote that "the appointment of a Receiver is a well-established equitable remedy available to the Commission in civil enforcement proceedings . . . [and] particularly appropriate in cases such as this where a corporation, through its management, has defrauded members of the investing public." *Id.* at P. 2-4.

8

The District Court granted the motion on July 27 (the day it was filed), before Appellants and their codefendants could submit a response to the SEC's application. ECF 36 and 42. Within days, the Receiver had secured exclusive "custody, control, and possession of" all Par's business and financial records. ECF 36 at 3; *see* ECF 84 at P. 6 (reporting, as of August 4, 2020, that all Par "employees [had been] barred from the business premises for the last week").

Just over two weeks later, the Court entered an Amended Order Appointing Receiver. ECF 141. The Amended Order imposed a broad "[f]reeze" on the Appellants' assets and granted the Receiver "exclusive . . . possession" of Receivership property. ECF 141 at P. 2, 13. It also directed the Receiver to "use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Entities." *Id.* at P. 3.

On October 30, 2020, the Receiver filed a motion to "Expand the Receivership Estate," asserting that more than two dozen "additional entities and properties" – including the LME Trust and Appellants' personal residences – "should be added to the Receivership Estate." ECF 357 at P. 1. The Receiver's position boiled down to a generalized assertion of "commingling." Citing a trio of declarations from an SEC-retained accountant named Melissa Davis ("Davis Declarations"), he maintained that Par made payments to Appellants from bank accounts that held proceeds from the allegedly fraudulent sales of promissory notes. *Id.* at P. 8-9. Any entity that received

9

a payment from Par on Appellants' behalf, the Receiver argued, was "funded with commingled investor proceeds" and properly included in the Receivership. *Id.* at P. 5.

In fact, the Davis Declarations offered little or no support for the Receiver's sweeping allegations. The first Declaration, dated July 23, 2020, identified 14 bank accounts belonging to Par and reported that the company had received a total of $492,398,894 from the sale of promissory notes between 2015 and 2020. ECF 21-1 at ¶¶ 3(a), 10. It also identified transfers of $11.3 million and $14.3 million to McElhone and the LME Trust, respectively. *Id.* at ¶¶ 12, 16. The second Davis Declaration, dated August 4, 2020, provided further details concerning Par's bank accounts and identified $84,643,174 in transfers to McElhone-controlled entities, Heritage Business Consulting and Eagle Six Consulting. ECF 177-50 at ¶ 4.

Only the final Davis Declaration, dated August 26, 2020, attempted to trace funds Par received from the sales of promissory notes. This narrative was unconvincing. At the outset of her Declaration, Davis observed that the $492 million that Par had received from note-holders represented a modest fraction of the "$1.6 billion" deposited into the company's accounts since 2015. ECF 290-8 at ¶ 5. Davis went on to examine two discreet instances in which Par had transferred money to the LME Trust or McElhone. Her findings were as follows:

- Between July 19 and September 20, 2018, LME Trust received $10.5 million from Par accounts that contained $1.6 million traceable to sales of promissory

notes and *over $13 million* from Par's profit-generating activities. *Id.* at ¶¶ 7-18.

- In September 2019, McElhone received $4.3 million from Par accounts that contained approximately $22 million traceable to sales of promissory notes and *over $14.2 million* from Par's profit-generating activities. *Id.* at ¶¶ 19-24.

In both cases, then, the Par accounts in question had more than enough money from legitimate (*viz.* sources other than ill-gotten gains) to fund the transfers to McElhone and the Trust.

Undeterred by these facts, the Receiver's motion treated every penny Appellants received from Par as if it had been traced to so-called "commingled proceeds from the fraud scheme." ECF 357 at P. 11. On this reasoning, the Receiver declared that the LME Trust, along with the Appellants' personal residences and "over nineteen (19) real estate entities that purchased [on Appellants' behalf] twenty-six (26) income producing properties" should be "added to the Receivership Estate." *Id.* at 11-20.

Appellants' written opposition to the expansion motion pointed out the deficiencies in the Receiver's reasoning. *See* ECF 401 at P. 13 (observing that proceeds from Par's MCA business "exceeded [] deposits" from Par's fundraising activities in the relevant accounts). Appellants could not, however, directly refute the Receiver's allegations of commingling because, as Appellants' papers explained, the Receiver had not yet permitted them access to "Par Funding's books and

records." *Id.* at P. 13 fn.12.[3] Appellants urged the District Court to order "discovery and an evidentiary . . . hearing" before ruling on the expansion motion. *Id.* at P. 4.

The commingling issue was effectively sidetracked on December 13, 2020, when the Receiver presented his "report . . . regarding the financial status of the Receivership Entities." (*viz.* the Sharp Report, ECF 426-1 at P. 1). Filed on a Sunday in anticipation of a status conference scheduled two days later, the Sharp Report purported to set out "preliminary" findings and conclusions regarding Par's finances. *Id.* at ¶ 5. In reality, the report was an ambitious piece of advocacy that implied – without actually asserting – that Par was a Ponzi scheme.

The numbers presented in the Sharp Report were unremarkable. Looking only at Par's books for "calendar years 2012 through 2019," Sharp ventured "*preliminary* conclusions" about the business's performance. *Id.* at ¶ 13. For example, comparing the amount that Par had advanced to merchants to the amount of its collections "through 2019," the Report proclaimed that the company "generated only $6.6 million in cash from MCA activity" and had sustained a "cash loss from operations of $135.6 million." *Id.* at ¶¶ 6, 9. Whether these figures provided a useful means of

---

[3] Months later, after the Expansion Order was entered, the Appellants finally obtained access to Par's books and records and were able to have their own CPA expert, Joel D. Glick, perform an exhaustive flow of funds analysis which required an examination of over 3.8 million booked transactions between 2012 and 2020. Glick concluded that "consulting fees were not paid with Investor Funds" and that payments to note holders came exclusively from monies paid by MCA borrowers. ECF 1330-16 P. 4; ECF 1330-17, at P. 71-73 and 100.

measuring the profitability of a company that had well over $400 million in receivables and daily revenues of $1.5 million in 2020, the Report did not say.

The Report also noted that, as of the end of December 2019, Par had "only collected 86%" of funds advanced to ten of the largest merchants in its portfolio. *Id.* at ¶ 48. Treating the 86% figure as if it reflected the final outcome of all of Par's transactions with all of its merchants, Sharp opined that Par "would not have been able to continue to provide payments to investors, or to continue to operate, without additional funds from investors." *Id.* at ¶ 53. The Report failed to acknowledge that Par engaged in no fundraising activity after February 2020, yet it continued to collect an average of $1.5 million per day from merchants, including those in the so-called top ten. *See* ECF 84 at P. 9-10.

Blindsided by the Sharp Report, Appellants and several codefendants moved to postpone the status conference, which was scheduled for the next day. ECF 430. Citing a concern for "fundamental fairness and due process," the submission argued that "[d]efendants should be permitted to respond" to the Report "prior to its consideration by the [c]ourt and the discussion of its contents in open court." *Id.* at 1. In a paperless order posted to the docket later that day, the court denied the defense's request, reminding the parties that "the Receiver is an officer of the Court" and indicating that it would "not entertain oral argument regarding the disputed

13

contents of the [Sharp Report]." ECF 431 (internal quotation marks and modifications omitted).

Consistent with the paperless order, there was no oral argument at the conference. Instead, the court engaged in a lengthy discussion with the Receiver and his counsel about the Sharp Report, which the court characterized as "perhaps" the "clearest picture . . . of the financial state of [Par]" to date – although the Report had only been filed two days earlier and spoke only to select financial issues that were by then almost a year old. 12/15/2020 Tr., ECF 445 at P. 13. According to the Court, that "picture" depicted something "akin to . . . a Ponzi scheme." *Id.* at P. 14.

The Receiver made no effort to dispel the Court's misunderstanding of the Report. Instead, he made an impassioned presentation – lasting an uninterrupted 26 minutes – in which he directly accused the Appellants of deceit and other wrongdoing and stated that he would "stake [his] credibility" on the Sharp Report. *Id.* at P. 16-30. During this presentation, the Receiver initially asserted that Sharp had declined to explicitly characterize Par as a "Ponzi scheme" for clarity's sake, there being "no[] a single definition" for that term. *Id.* at P. 16-17. Only later did the Receiver note, in passing, that the Sharp Report was only "an analysis of cash in and cash out, which is not the same as profit." *Id.* at P. 19-20.

Heedless of this qualification, the Court expressed its frustration with what it characterized as the Appellants' attempt to create "alternative realities" that

conflicted with the "straight numbers" from the Receiver, who was "an extension of the Court." *Id.* at P. 32. In the immediate wake of the Sharp Report, the court jumped to the conclusion that the Appellants' arguments were "starting to fall apart." *Id.* at P. 33. The court opined that:

> [I]t doesn't take an economics major or CPA to look at Mr. Sharp's findings and figure out that at the very bottom, the model that we had here was not self-funding it just wasn't, and the loans were not over-performing. I don't even know if they can even say they were performing, period. *Id.*

Remarkably, the Appellants were neither invited nor permitted to comment on the Report. To the contrary, the Court repeatedly forbade the defense attorneys from intruding upon its long "discussion" with the Receiver – and even placed McElhone's counsel on "mute" to prevent "any [] interruptions." *Id.* at P. 36-37, 40, 44, 55. When Appellants' counsel finally were allowed to speak, it was only to address the Receiver's refusal to produce Par's books and records (which were the basis for the Sharp Report), and to implore the Court to give them an opportunity to test the Receiver's allegations and present their own expert report. *Id.* at P. 57-59, 60-62, 69-70 and 97-100. The District Court acknowledged that Appellants needed access to the records sought in order to provide "any kind of merit-based response" to the Receiver's allegations, before returning to the Receiver and soliciting his view on whether the expansion would "protect investors" and "enable us to make a larger potential recovery for all investors." *Id.* at P. 71, 72, 80, 83. Satisfied with the

Receiver's affirmative responses, the Court informed the parties that it would rule on the expansion "as soon as possible." *Id.* at P. 86.

Near the conclusion of the hearing, counsel for LME Trust ventured to point out that the defense had not yet been granted "access to the documents" necessary to respond to the Receiver's expansion motion. *Id.* at P. 97. Aside from the "due process" concerns implicated by the lack of discovery, counsel suggested that "since the receiver, and to some degree, the SEC has had an opportunity to weigh in" during the day's conference, "oral argument" on the expansion motion was appropriate. *Id.* at P. 99-100. The court denied that application. Although it had earlier observed that the lack of discovery forced defendants to litigate with "one hand tied behind their back," the court explained that it "was trying to keep the train moving, making it fair and not spending too much more time and money when the pleadings are very thorough." *Id.* at P. 93, 101.

The day after the status conference, the court granted the expansion motion. ECF 436. The Expansion Order did not specify the grounds on which the motion was granted, remarking only that the "Receiver has made a sufficient and proper showing in support of the relief requested" and noting "that tainted funds, which ***could*** be the subject of disgorgement, ***may*** be found in the entities and properties identified herein." *Id.* at P. 2. (Emphasis supplied). Upon entry of the Order, the Receiver assumed the management of Appellants' commercial properties and took

16

possession and control of Appellants' three residences, requiring them to pay rent on their principal residence and carrying costs on all three properties as a condition of their being permitted to continue to reside in their principal residence.

## II.  The Order On Disgorgement And Penalties And The Final Judgment

Following the entry of the Expansion Order, the Appellants decided – for tactical reasons – to enter a bifurcated settlement, whereby they consented to liability and allowed the Court to determine disgorgement and penalties.

This agreement was memorialized in a Judgement of Permanent Injunction entered against McElhone and LaForte on November 21, 2021 (the "Consent Judgments"). ECF 1008 and 1010. The Consent Judgements provided that Appellants would "pay disgorgement of ill-gotten gains, prejudgment interest on disgorgement, and a civil penalty" in an amount to be determined by the Court "upon motion of the Commission." *Id*. at 5.  They also provided that the allegations of the Amended Complaint would be deemed true "solely for the purposes of such motion[,]" and that the Court would be permitted to determine the issues raised in the motion "on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." *Id*. The Consent Judgments also permitted the parties to take discovery, including from non-parties, in connection with the motion. *Id.*

Approximately five months after the Consent Judgements were entered, the SEC filed the first iteration of its motion for disgorgement and penalties, which was replete with unfounded and conclusory allegations that Par had been operating as a Ponzi scheme – allegations that *were not* pled in the Amended Complaint and were not properly at issue. ECF 1214. Faced with these new and unpled liability allegations (at a phase of the case where only damages were at issue), the Appellants filed a motion to strike the scurrilous Ponzi allegations or, alternatively, to be relieved from their Consent Judgments so they could contest these allegations at trial. ECF 1224.

After the motion to strike was fully briefed, the District Court conducted a hearing during which the Court acknowledged the Appellants' concerns and inquired why the SEC had waited until this juncture in the case to present Ponzi scheme allegations – observing that this issue had been a "third rail" no one wanted to touch, and that inserting the issue at this stage was "kind of lobbying [*sic*] a grenade into the disgorgement phase." 5.19.22 Tr., ECF 1272 at P. 27-28. Judge Ruiz acknowledged that these allegations were not raised in the pleadings (*id*. at P. 12), but stated that they had been "lurking in the ether" from the beginning of the case (*id*. at P. 7). Stressing that the case had been "a heavy lift for the Court" and that he was "trying to get it to some finish line" (*id*. at 30), the Court strongly suggested that the term "Ponzi scheme" should be stricken or excised from the SEC's motion, but

18

the SEC should be permitted to argue that Par had paid old investors with new investor money in its motion. The Court later denied Appellants' motion to strike as moot on the grounds that the SEC had agreed to file an amended motion for disgorgement which would omit the term "Ponzi scheme." ECF 1251.

A few days after this ruling, the SEC filed the Disgorgement Motion – which was materially the same as its predecessor except for the omission of the prohibited phrase. The motion included an 18-page summary of the Amended Complaint (ECF 1252, P. 3-21), but dedicated only one short paragraph to the disgorgement analysis. *Id.* at P. 30. The SEC asserted that Appellants should be ordered to disgorge the amount Par raised from investors (allegedly $550,325,596) minus the amount Par repaid in interest and principal (allegedly $300,108,117) – citing as support a two-page Declaration by the Receiver which purported to vouch for these figures. ECF 1214-1. The SEC also stated that the Court should deduct the amounts Par paid to defendants Cole and Abbonizio (allegedly $13,247,011 and $10,498,581, respectively), but provided no support whatsoever for these figures.

Because the SEC relied solely upon the Receivers' Declaration to support its disgorgement figures, the Appellants subpoenaed the Receiver for documents and deposition testimony. ECF 1289-1. After the Receiver objected to the subpoena, the dispute was submitted to Magistrate Judge Reinhardt. As Appellants explained in a joint submission to the Magistrate, they sought this discovery because the figures

contained in the Receiver's Declaration, which were the cornerstone of the SEC's disgorgement calculation, were in conflict with figures presented by the Receiver in his most recent quarterly report. ECF 1289 P. 4-5. This discrepancy was not inconsequential, as the most recent figures would result in $3.8 Million less in disgorgement (under the SEC's Net-Raise analysis). At a hearing on this discovery dispute, the Receiver's counsel represented to the Court that the most recent figures came from a more "in-depth" analysis which included a "reconciliation from bank account statements." *See* ECF 1330-2, P. 11:2-11 and P. 10:10-15. Given these facts, the Appellants clearly should have been permitted to depose the Receiver to inquire why he used the figures presented in his Declaration when he knew that more accurate figures – which could have reduced the Appellants' disgorgement obligation – existed. However, the Magistrate found that this discovery was not "proportional to the needs of the case" (*id.* P. 19) and entered an order quashing the Appellants' subpoena. ECF 1292.

As a result of the Magistrate's ruling, Appellants were denied the opportunity to conduct discovery regarding the SEC's disgorgement calculation. Notwithstanding, Appellants presented the Court with a detailed brief demonstrating that the SEC had failed to meet its burden to provide a reasonable approximation of Appellants' alleged unjust-gains in its Disgorgement Motion. ECF 1329. Appellants' response brief presented a thorough analysis of Par's legitimate business

expenses (none of which had been addressed by the SEC) supported by ample record evidence, explained why the SEC's impermissible Net-Raise computation (if adopted by the Court) should have been based on the more recent and more accurate figures rather than the figures contained in the Receiver's Declaration, and analyzed several other equitable deductions which the District Court should have applied. *Id.* at P. 14-27. Appellants also presented a detailed and reasoned penalties analysis, which included an examination of all available civil penalty awards imposed by the District Courts of this Circuit since May of 1999 for comparison purposes. *Id.* at 29 to 49 and ECF 1330-27.

After receiving the parties' submissions, the District Court conducted an evidentiary hearing, during which it directly and repeatedly acknowledged that the SEC had not met its burden, and that the Disgorgement Motion was deficient:

> Reasonable approximations and estimates, which is your burden, does not mean taking shortcuts. **It does not mean giving me a motion that is substandard**. It requires you to point to evidence in the record to support your calculations.
>
> \*       \*       \*
>
> I have to say, this motion, I think, had some glaring, glaring deficiencies in it, deficiencies that I have had a problem overcoming, and I'm getting a lot of gap filling today, some of which I think is well taken, some of which I really would have appreciated had it be [*sic*] formally or properly framed for me in the initial pleading… I am now being presented with a bunch of new points and evidentiary support that was never – I mean, I'm sorry – it was never in the SEC's motion. **I don't think objectively anyone can look at this SEC motion and think that it gave the Court what it needed to make a proper ruling**.
>
> \*       \*       \*

I don't want to find myself rebooting and necessarily going all the way back to the beginning here after all this work. But at the same time, I have to say, **I have a pleading in front of me right now that I honestly find deficient**. I don't know any other way to put it. I do not believe that having a pleading like this, that is lacking record cites, that does not make use of an expert report fulsomely, and does not give me the opportunity to make sure that these numbers are supported is very, very challenging for the Court. Because without that, without someone framing it, not only can I cannot [sic] get the defense position clarified, but **I can't really feel comfortable with numbers that I believe are falling within the parameters of existing case law**.

9/14/22 Tr., ECF 1419 at P. 45:19-23; 81:10 to 82:3; 108:17 to 109:5.

Indeed, Judge Ruiz stated: "**it would almost be impossible for me to write an order that will withstand appellate review if I didn't make the SEC go back and write it over again the right way**." *Id*. at P. 110:21-23. Nevertheless, the Court *did not* make the SEC rewrite its brief, nor did it award the Appellants the full array of business deductions and offsets they were entitled to. Instead, the Court issued its Disgorgement Order, which embraced the fiction that the SEC had "satisfied its burden to provide a reasonable approximation of the requested disgorgement[,]" adopted the SEC's Net-Raise analysis (and inaccurate calculation of the Net-Raise), and denied Appellants numerous deductions they had demonstrated entitlement to. ECF 1450, P. 13.

Additionally, the District Court held that McElhone and LaForte should each be assessed the maximum Tier 3 penalty for each of Par's 115 outstanding promissory notes (230 Tier 3 penalties total), and that they should then be held

22

jointly and severally liable for the combined penalty amount ($43.7 Million). *Id.* at P. 42. Remarkably, the District Court came up with this analysis itself – since the SEC had simply asked the Court to impose a $100 Million penalty without providing any reasoned calculation. Moreover, the Court invented entirely different methods to calculate penalties for the other defendants in this case, which resulted in radically different penalties for the same alleged conduct.

As a result of the District Court's clear legal errors in its calculation of both disgorgement and penalties, Appellants are now jointly and severally liable for a $196,924,738.24 Final Judgment. ECF 1451.

## SUMMARY OF ARGUMENT

The Receiver, through its motion to expand the receivership estate, sought possession and control of virtually all of Appellants' earthly possessions, including their homes. Given the scope of the relief sought in the motion, due process principles obliged the court to afford Appellants a meaningful opportunity to contest the Receiver's allegation of commingling through discovery of relevant documents and, if necessary, an evidentiary hearing. To the extent the court granted the expansion motion on the basis that the alleged commingling had occurred, the failure to provide Appellants with an opportunity to conduct discovery on that claim violated due process. The Sharp Report's *soto voce* suggestion that Par was a Ponzi scheme gave the Court the cover it needed to grant the Receiver's expansion motion.

The court's refusal to permit Appellants to contest the Report – or even to voice a competing view of its conclusions – dispensed with concerns for accuracy and fairness that are at the root of due process's requirements in favor of expediency. Whatever the reasoning behind the Expansion Order, it was the product of gross deviations from all traditional notions of fair play and due process and cannot be permitted to stand.

Likewise, the District Court's calculation of Appellants' disgorgement and penalty obligations were marred by clear legal error and constituted an abuse of discretion. The Court's legal errors include: 1) erroneously holding that the SEC met its burden to provide a reasonable approximation of Appellants' unjust-gains; 2) using a demonstrably inaccurate Net-Raise figure as the starting point for its disgorgement calculation; 3) failing to deduct the disgorgement sought or entered against other defendants who participated in Par's note offering from the Net-Raise calculation; 4) calculating penalties using an arbitrary and capricious method (which the SEC had not advocated for) which yielded a clearly excessive penalty; and 5) holding the Appellants jointly and severally liable for a clearly excessive penalty without a shred of evidence demonstrating equivalent or identical conduct.

McElhone requests that the District Court's Expansion Order, Disgorgement Order and Final Judgement be vacated and remanded with instructions.  She also

requests that, upon remand, this matter be reassigned to a different district court judge.

## **ARGUMENT**

### I.     **The District Court Violated The Appellants' Due Process Rights When It Granted The Receiver's Expansion Motion Without First Permitting Discovery And An Evidentiary Hearing Or Oral Argument**

McElhone adopts by reference, and incorporates as if set forth more fully herein,  all factual statements and legal arguments presented in the Appellant brief filed by her husband, Joseph LaForte, regarding the Expansion Order and the District Court's denial of Appellants' Due Process rights.

### II.    **The District Court's Calculation Of Disgorgement And Penalties Constituted An Abuse Of Discretion**

The District Court's calculation of Appellants' disgorgement and penalties represents an abuse of discretion because the Court made numerous legal and factual errors which rendered the disgorgement award punitive, and the penalties arbitrary, capricious and excessive.

Disgorgement is an equitable remedy which must be limited to "the gain made upon any investment, when both the receipts and payment are taken into account. *See Liu v. SEC*, 140 S. Ct. 1936, 1946 (2020) (citing *Rubber Co. v. Goodyear*, 76 U.S. 788, 804 (1870))., 19 L. Ed. 566 (1869) *See SEC v. Blackburn*, 15 F. 4th 676, 682 (5th Cir. 2021) (to keep an award from becoming punitive, disgorgement "cannot exceed the defendants' net profits and must be awarded for victims") (citing

*Liu*); *SEC v. Blatt*, 583 F. 2d 1325, 1335 (5th Cir. 1978) ("Disgorgement is remedial and not punitive. The Court's power to order disgorgement extends only to the amount with interest by which the defendants profited from his wrongdoing. Any further sum would constitute a penalty assessment"). *Liu* recognizes that, absent a limited exception, "courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *See Liu*, 140 S. Ct. at 1950. The *Liu* Court also noted that "[a] rule to the contrary that makes no allowance for the cost and expense of conducting a business would be inconsistent with the ordinary principles and practice of courts of chancery." *Id.* (citing *Tilghman v. Proctor*, 125 U.S. 136, 145, 8 S. Ct. 894, 899, 31 L. Ed. 664 (1888)) (internal quotations omitted).

Section 20(d) of the Securities Act and section 21(d)(3) of the Exchange Act authorize three tiers of monetary penalties for statutory violations:

> The first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third-tier penalty may be imposed when the second-tier requirements are met and the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons[.]" *See Monterosso*, 756 F.3d at 1338 (*quoting* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B)).

The amount of a civil penalty is determined "in light of the facts and circumstances" of the case and subject to statutorily prescribed maximums. *See SEC v. BIH Corp.*, No. 2:10-CV-577-FTM-29, 2014 WL 7057748, at *3 (M.D. Fla. Dec. 12, 2014) (*quoting* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)).

26

> In evaluating the facts and circumstances of the case, the Court looks to factors such as: (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing, (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons, (6) defendants' lack of cooperation and honesty with authorities, if any, and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*Id.* (*quoting SEC v. Aerokinetic Energy Corp.,* No. 08–CV–1409, 2010 WL 5174509, at *5 (M.D. Fla. Dec. 15, 2010) (quotation omitted), *aff'd,* 444 F. App'x 382 (11th Cir. 2011)).

Civil penalties, if imposed, are within the sound discretion of the district court. *See Warren,* 534 F.3d at 1369. However, a penalty is deemed excessive "if it is grossly disproportional to the gravity of a defendant's offense." *SEC v. Revolutionary Concepts, Inc.,* No. 21-10984, 2022 WL 386085, at *11 (11th Cir. Feb. 9, 2022) (citing *U.S. v. Bajakajian*, 524 U.S. 321, 336-39 (1998)).

### A.   The District Court Erroneously Held That The SEC Met Its Burden To Establish A Reasonable Approximation Of Appellants' Ill-Gotten Gains

In order to obtain disgorgement, the law requires the SEC to carry its initial burden of proof by providing a reasonable approximation of the Appellants' ill-gotten gains. *See SEC v. Calvo*, 378 F. 3d 1211, 1217 (5th Cir. 2004) (citations omitted); *see also FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 68 (2d Cir. 2006) ("The two-step burden shifting framework for establishing the size of disgorgement relief

27

requires the plaintiff to show that its calculations reasonably approximated the amount of the defendants' unjust gains") (citations omitted);  *see also CFTC v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999); *CFTC v. Tayeh*, 848 Fed. Appx. 827, 828 (11th Cir. 2021).

Although this standard does not require exactitude, it also does not mean that the SEC is free to put together *any* calculation, contend that it is reasonable, and then shift the burden to a defendant. *See FTC v. Vylah Tec LLC*, 378 F. Supp. 3d 1134, 1141 (M.D. Fla. 2019) (finding disgorgement calculation unreasonable when government failed to use the best records available, the calculation was a moving target, and non-party funds were included); *Zacharias v. SEC*, 569 F.3d 458, 473 (D.C. Cir. 2009) (Judge Williams dissenting) (finding SEC had not met its burden because its disgorgement calculation "did not attempt even a superficial showing of petitioner's profits; instead it pointed simply to their proceeds from sales, after an arbitrary deduction of some costs but not others").

Furthermore, the SEC must establish *some* causal connection between the ill-gotten gains and the charged violations of the securities' laws to meet its burden. *See SEC v. Huff*, 758 F. Supp. 2d 1288, 1359 (S.D. Fla. 2011) ("disgorgement need only be a reasonable approximation of profits ***causally connected*** to the violation[.]") (citations omitted) (emphasis supplied); *see also Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007).

28

Here, the SEC failed to provide a reasonable approximation of the profits Appellants received from the wrongful conduct alleged. The SEC merely took the Net-Raise (*i.e.*, 100% of the amount Par raised from investors from its inception in 2012 less the amount repaid) and then subtracted amounts that the SEC obtained in disgorgement from two Defendants, Cole and Abbonizio, while ignoring disgorgement sought or obtained from other parties. The SEC's analysis is severely flawed, as it seeks to hold Appellants jointly and severally liable for every dollar Par ever raised from investors without any showing that these sums were causally connected to the alleged wrongful conduct. Furthermore, the SEC's disgorgement calculation was rife with errors, including using inaccurate figures to calculate the Net-Raise (resulting in an additional $3.8 Million in disgorgement), refusing to acknowledge recoveries obtained from other participants in Par's business which ought to have been deducted, and failing to account for a single dollar of legitimate business expenses – as required by *Liu*. Indeed, the SEC's entire disgorgement analysis is less than 200 words long (including two footnotes, one of which terminates midsentence). ECF 1252 at P. 30.

At the hearing on the disgorgement motion, the district court repeatedly acknowledged the material defects with the SEC's brief. 9.14.22 Tr., ECF 1419 at P. 45:19-23; P. 81:10 to 82:3; P. 108:17 to 109:5. Indeed, Judge Ruiz directly stated that "**it would almost be impossible for me to write an order that will withstand**

29

**appellate review if I didn't make the SEC go back and write [its disgorgement brief] over again the right way**." *Id*. at P. 110:21-23. Notwithstanding his candid assessment in open court, Judge Ruiz did a complete about-face in his Disgorgement Order and embraced the fiction that the SEC had "satisfied its burden to provide a reasonable approximation of the requested disgorgement." ECF 1450 P. 13.[4] This conclusion simply cannot be reconciled with the Court's honest assessment that the SEC's brief suffered from "glaring deficiencies," that no objective reader could conclude that the SEC's brief gave the court "what it needed to make a proper ruling," and that the SEC had failed to provide an analysis that would allow the court to feel comfortable that the disgorgement numbers fall "within the parameters of existing case law." (*See* record cites, *supra*).  Accordingly, the District Court's finding that the SEC met its initial burden was nothing short of an abuse of discretion.

The fatal flaw with both the SEC's disgorgement analysis – and with the modified version of that analysis adopted by the District Court – is that the focus was solely on the amount needed to make Par's investors whole, rather than on ill-gotten gains the Appellants received from the specific securities violations alleged

---

[4] The Court appears to contradict itself in a subsequent passage of the Disgorgement Order, where it finds Appellants "met their burden to show that the SEC's disgorgement figure *is not reasonable* insofar as it does not deduct any legitimate business expenses." *Id.* at P. 19. (Emphasis supplied).

by the SEC. *Liu* made clear that disgorged funds must be distributed to investors when feasible – but it *did not* hold that a disgorgement calculation may be based on the amount required to make investors whole rather than ill-gotten gains. *Liu¸* 140 S. Ct. 1948-49. Instead, the Supreme Court affirmed that "[c]ourts may not enter disgorgement awards that exceed the gains made upon any business or investment, when both the receipts and payments are taken into account." *Id*. at P. 1949-1950. Here, the SEC made no attempt to demonstrate that the Net-Raise (i.e., the money Par raised from promissory notes less the amount paid back) inured to the Appellants as ill-gotten gains, or that such amounts were attributable to Appellants' alleged wrongful conduct.  Accordingly, the Court's decision to use the SEC's Net-Raise calculation as the baseline for Appellants' disgorgement does not comport with *Liu* and its progeny.

> **B.**    **The District Court Abused Its Discretion By Adopting The SEC's Inaccurate Calculation Of The Net-Raise**

The District Court also abused its discretion when it adopted the SEC's inaccurate calculation of the Net-Raise based on the principle that the risk of uncertainty falls on the wrongdoer.

The Court was presented with competing calculations of the Net-Raise: the SEC's figure of $250,217,479, which was taken from a Declaration by the Receiver that was based on an outdated (and admittedly incomplete) analysis performed by the SEC's expert, Melissa Davis; and Appellants' figure of $246,400,000, which

was based on a more recent and more complete analysis performed by the Receiver's consultant, Bradley Sharp of Development Specialists, Inc. ("DSI"), and adopted by the Receiver in his quarterly report. ECF 1289 P. 4-5.  The court adopted the SEC's figure – which resulted in an additional $3.8 Million in disgorgement for Appellants – based on the legal presumption that the risk of uncertainty falls on the wrongdoer with respect to disgorgement. ECF 1450, P. 16. However, this presumption would only have applied had the SEC met its burden to present a reasonable approximation of ill-gotten gains and shifted the burden to the Appellants to rebut its calculation. *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir. 2006) ("presumption against the wrongdoer should not have been invoked without first establishing a reasonable approximation of unjust gain because this presumption applies only in the second stage of the burden-shifting framework."). Because the SEC failed to meet its burden – for all the reasons discussed *supra* – the district court abused its discretion by applying the presumption against Appellants.

Furthermore, the presumption against the wrongdoer only applies when there is genuine uncertainty. *Id.* at P. 69-70 ("[T]he reasonableness of an approximation varies with the degree of precision possible"); *see Vylah Tec LLC*, 378 F. Supp. 3d at 1141 (holding the FTC could not "turn a blind eye" to data that would have allowed it to "more precisely" calculate disgorgement). No genuine uncertainty was

present in this case because the evidence clearly established that Appellants' figure was accurate, and that the SEC's figure was not.

Specifically, the representations of the Receiver's counsel – which was admitted in evidence at the disgorgement hearing – established that the SEC's Net-Raise calculation was based solely on Par's QuickBooks records, while the Appellants' figure was based on the same QuickBooks records after they were reconciled by the Receiver's financial consultant to account for additional un-booked transactions contained in Par's bank records. 9.14.22 Tr., ECF 1419 at P. 17:20 to 19:20. Likewise, Appellants' Response to the SEC's Omnibus Motion cited to prior statements made by the Receiver's counsel which also demonstrated that the $246.4 Million Net-Raise calculation was more accurate. ECF 1329, P. 15-16 and ECF 1330-2, P. 11. Importantly, these statements by the Receiver's counsel are the *sole* evidence explaining the discrepancy between the figures at issue – and this evidence credibly establishes that Appellants' figure is more accurate.

Indeed, after considering the Receiver's counsel's prior representations to the Magistrate Judge and the testimony he presented at the evidentiary hearing, the Court correctly observed that "the number that [Appellants] have from DSI is ***more accurate and captures more business activity*** than the number that the SEC's giving me." 9.14.22 Tr., ECF 1419 at P. 19:23-25 (Emphasis supplied). The Court also acknowledged that the SEC had failed to provide any analysis and support for its

33

Net-Raise calculation,[5] and directly stated that it would be "a complete abdication of my responsibility under the case law to just look at what the SEC's given to me in a declaration and rubber stamp it." *Id*. at P. 42: L. 15-17. But – inexplicably – the Court did exactly that, and rubberstamped the SEC's inaccurate, incomplete, and inflated Net-Raise figure.

The Court attempted to justify this about-face by observing (for the first time in its Disgorgement Order) that the SEC's Net-Raise calculation was based on the work of its expert, Ms. Davis, who "took two years to forensically analyze and reconcile Par's QuickBooks records, bank account records, and promissory note records when issuing her report." ECF 1450 at P. 15. However, Ms. Davis' report predates the DSI analysis and was created without the benefit of the adjustments and reconciliations performed by DSI. This is particularly important because Ms. Davis relied upon *prior* reconciliations to the QuickBooks records which were performed by DSI when she prepared her Report. (*See* Davis Report, ECF 843-1 at ¶ 21-25 and FN 22-23: reflecting that Ms. Davis performed her analysis using a copy of the QuickBooks that had been reconciled by the Receiver's financial consultants – *i.e.*,

_____

[5] *See Id.* at P. 9: L. 21 to P. 13: L. 22 (inquiring why the SEC objected to "the use of more accurate records to determine disgorgement" and noting that the SEC never provided an "actual explanation" for the discrepancy); *see also* P. 105: L 15-24 (stating that the Net-Raise calculation "from the receiver declaration has not been identified, absent in a stray footnote here or there, adequately enough for the Court to sit down and conduct a true, thorough disgorgement analysis…").

Bradley Sharp of DSI – as of July 27, 2020). Given that Ms. Davis relied on DSI's prior reconciliations in her report (thereby ratifying DSI's methodology and work), the SEC should not have been allowed to cast doubt upon Sharp's subsequent reconciliations simply because they yield a more favorable disgorgement number for the Appellants.[6]  Furthermore, the SEC presented Sharp to the Court as a reliable witness in the trial of Michael Furman, and utilized his data, analysis and testimony in various contexts throughout these proceedings. 9.14.22 Tr., ECF 1419 at P. 16:16 to 17:5 (recognizing that the Receiver's counsel had acknowledged in a hearing that Sharp's analysis presented the "best snapshot of the financial picture of Par").

Accordingly, the Appellants met their evidentiary burden to prove that their calculation of the Net-Raise was accurate, and the SEC's was not. *See SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998) (although the risk of uncertainty falls on the wrongdoer, "the wrongdoer is, of course, entitled to prove that the district court's measure is inaccurate") (cited with approval by *Calvo*, 378 F. 3d at 1211). Thus,

---

[6] At the disgorgement hearing, the SEC's counsel also sought to cast doubt on Sharp's analysis by observing that he is not a CPA. 9.14.22 Tr., ECF 1419 at P. 25:3-17. This statement was misleading because Mr. Sharp's staff included qualified accountants who conducted the relevant analysis. *See* Declaration of Bradley Sharp. ECF 426-1, ¶ 4 ("I have overseen my staff's analyses of CBSG's books and records and have reviewed their work. My staff includes experienced forensic accountants maintaining CPA, CFF and CFE certifications").  But even if this were not the case, the SEC's critique is not credible given Ms. Davis' reliance on Sharp's prior reconciliations and analysis when performing her work.

there is no genuine uncertainty that would warrant adoption of the SEC's inaccurate and inflated calculation of the Net-Raise.

Furthermore, even if the evidence did create a risk of uncertainty regarding which figure is accurate (it does not), it would be inequitable for the Court to adopt the SEC's figure under the facts of this case because – here – any potential risk of uncertainty was the result of Appellants being denied a full and fair opportunity to prove that the SEC's figure is inaccurate. Specifically, during the discovery period permitted by the Court for the disgorgement proceedings, Appellants issued a subpoena for deposition to the Receiver to address the discrepancy between the Net-Raise calculations presented in the Receiver's Declaration and Mr. Sharp's analysis. The Receiver moved to quash the subpoena, Appellants moved to compel, and the dispute was heard by Magistrate Judge Reinhart on July 1, 2022. At the conclusion of that hearing, Judge Reinhart quashed the subpoena, holding that the discovery sought regarding the discrepancy "was not proportional to the needs of the case." ECF 1330-2, P. 19:9 to 20:8. Because Appellants were denied an opportunity to depose the Receiver, which would have allowed them to present additional proof that Sharp's calculation of the Net-Raise is accurate (and that the SEC's calculation is not), the instant matter is distinguishable from *Calvo* and other cases holding that defendants bear the risk of uncertainty.

Accordingly, the Court's adoption of the SEC's calculation of the Net-Raise was clear error which caused manifest injustice by erroneously assessing an additional $3,817,479 in disgorgement against Appellants.

### C.    The District Court Abused Its Discretion By Refusing To Deduct Disgorgement Obtained From Other Defendants

The District Court abused its discretion by determining – without basis or record support – that the disgorgement awards entered against *some* Defendants in this case *should* be deducted from Appellants' disgorgement, while disgorgement assessed against other defendants (Furman, Gissas, and Vagnozzi) and non-parties (certain sales agents who are defendants in a separate SEC action – Camarda, McArthur and A.G. Morgan) should not be deducted. ECF 1450, P. 17-18.

These six (6) parties were all participants in the promissory note offering at issue in this case and are accused by the SEC of making misrepresentations to investors and engaging in other wrongful conduct. The SEC contends that the disgorgement sums obtained or sought from these defendants were all deducted from the Net-Raise calculation which is the basis for the SEC's calculation of disgorgement against Appellants. But, once again, the SEC's analysis on this issue in its briefings was sorely lacking – as the Court acknowledged at the disgorgement hearing. 9.14.22 Tr., ECF 1419 at P. 39:17 to 40:21 (stating that the Court had "been grasping at straws for a month because the [SEC's briefings] are so light on evidentiary support" and that "other than just conclusory [*sic*] telling me what

numbers I should take to the bank, there is no pointing or connecting to underlying evidence"). Furthermore, the Court acknowledged that Appellants had not been given a fair opportunity to address the SEC's contention because the SEC failed to provide any record support. *Id*. at P. 53 L. 7-11 ("the defendants should have known where these numbers were being drawn from, because they cannot respond in a vacuum, nor can I write in a vacuum"). Accordingly, the Court made a clear legal error when it found that the profits made by these six parties – which were derived from the same securities (promissory notes) Appellants are being held responsible for – had already been deducted in the SEC's calculation of the Net-Raise. ECF 1329 P. 15-16.

### D.    The District Court Abused Its Discretion By Ordering Appellants To Pay Excessive Penalties, Jointly And Severally

The Court abused its discretion by imposing excessive penalties against the Appellants using an arbitrary and capricious method of calculation which the SEC *did not* advocate for and which was not used in assessing penalties to the other defendants. The Court also abused its discretion by inexplicably holding the Appellants jointly and severally liable for the penalty amount.

Under the Exchange Act's three-tier penalty scheme, courts may impose civil penalties only "upon a proper showing" by the SEC. *See* 15 U.S.C. § 78u(d)(3)(A)(i). The penalty amount "is determined by the court in light of the facts and circumstances." *See* 15 U.S.C. § 78u(d)(3)(B)(i). The factfinder must make at least

38

two inquiries. The first is how many violations occurred. *Id.* (penalties may be assessed "[f]or each violation"). The second is whether "the gross amount of pecuniary gain to [a] defendant as a result of the violation" exceeded the base penalty set by Exchange Act Section 21(d). Then, any upward departure from the base penalty to a tier two or tier three penalty requires additional findings. Tier two penalties require an additional determination that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *See* 15 U.S.C. § 78u(d)(3)(B)(ii). Tier three penalties require these same factual determinations *plus* a determination that the defendant's conduct "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *See* 15 U.S.C. § 78u(d)(3)(B)(iii). A penalty is excessive "if it is grossly disproportional to the gravity of a defendant's offense." *Revolutionary Concepts, Inc.,* WL 386085, at *11 (citing *Bajakajian*, 524 U.S. at 336-39).

In its disgorgement motion, the SEC asserted that the Court should levy a $100 Million penalty against Appellants, citing the *Woodbridge* case (a factually and procedurally inapposite case which involved a $1.2 Billion scheme, and resulted in a $100 Million penalty on consent) as support. ECF 1252 P. 39; *see also SEC v. Shapiro*, No. 17-cv-24624, 2018 WL 7140669 and 2018 WL 7140359 (S.D. Fla. Dec. 27, 2018). At the hearing on disgorgement and penalties, the Court flatly

disagreed with the SEC's use of *Woodbridge*, noting that the conduct of the Defendants in this case simply did *not rise* to that level:

> It should come as no surprise that I respectfully disagree with the SEC. This is not *Woodbridge*. This is not 100 million civil penalty. It just, it's not. It doesn't make any sense. When you look at the equitable obligations of the court, that civil penalty to me just would not correspond with the conduct. 9.14.22 Tr., ECF 1419 at P. 114:1-8.[7]

Having declined the SEC's invitation to use *Woodbridge* as a benchmark, the Court decided to calculate Appellants' civil penalties by treating each of Par's 115 outstanding promissory notes as a separate securities law violation and then assessing a separate maximum Tier 3 penalty against both McElhone and LaForte for each note (230 penalties total). This resulted in a $21,850,000 penalty against both McElhone and LaForte ($43,700,000 combined), which was excessive and unduly punitive. *See SEC v. Elliot,* 2012 WL 2161647, at *11 (S.D.N.Y. June 12, 2012) (finding defendants' actions met the standard for 2nd or 3rd tier penalties, but declining to impose such penalties for each transaction because such an award would be "unduly penalizing"); *see also SEC v. iShopnomarkup.com, Inc.*, 126 F. Supp. 3d

---

[7] Notwithstanding the Court's acknowledgment that Appellants' conduct did not come close to the level of the *Woodbridge* Ponzi scheme, the penalty the Court imposed against Appellants was almost exactly proportional. In *Woodbridge*, the defendants were assessed a $100 Million penalty on a $1.2 Billion scheme, making the penalty about 8.3% of the funds raised from investor. Here, Appellants were assessed a $43.7 Million penalty against $550 Million raised from investors, which is about 8% of the amount raised – notwithstanding that Par was not a Ponzi and the SEC never pleaded otherwise.

318, 333 (E.D.N.Y. 2015), *aff'd sub nom. U.S. Sec. & Exch. Comm'n v. Knight*, 694 F. App'x 853 (2d Cir. 2017), as amended (June 7, 2017) (concluding it would be unduly penalizing to count each sale of an unregistered security to 350 different investors as a separate violation warranting a penalty, especially where the defendant was subject to a significant disgorgement award).

The Court's method of calculation was flawed in several ways. First, because the SEC had not requested that penalties be calculated in this manner, the Appellants had no opportunity to respond to this calculation and explain why it is improper – and, indeed, impermissible.

Second, there was no showing that each promissory note resulted from the wrongful conduct of *either* McElhone or LaForte. The imposition of Tier 2 or Tier 3 penalties required the Court to find that Appellants committed violations which "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *See* 15 U.S.C. § 78u(d)(3)(B)(ii). Although the allegations of the Amended Complaint (which were accepted as true for purposes of the Disgorgement Motion only) established that the promissory notes were unregistered securities, neither the Amended Complaint nor the evidence demonstrated that the Appellants had **deliberately** disregarded the securities laws.

Instead, the evidence affirmatively established that the Appellants relied on qualified legal counsel, who drafted the form of promissory note and sales

41

documents (offering memorandum). Furthermore, counsel issued several opinion letters concluding that the notes constituted debt instruments rather than securities. ECF 1329, P. 36-37, ECF 1330-24 and ECF 1330-25. The record evidence also showed that certain offering memoranda were prepared (in whole or in part) by the sales agents (or their counsel). Accordingly, the evidence establishes that the issuance of the promissory notes themselves does not justify Tier 2 or Tier 3 penalties. As such, the penalties imposed by the Court could only stem from the alleged misrepresentations – and only upon a showing that such misrepresentations involved "fraud, deceit, [or] manipulation[.]" *See* 15 U.S.C. § 78u(d)(3)(B)(ii). But, again, the Court made no effort to tie any of the outstanding promissory notes (let alone all of them) to the alleged misrepresentations, such that a Tier 3 penalty could be entered for each note as to each Appellant.

The Court's penalty assessment was particularly egregious with respect to McElhone. Based on the allegations of the Amended Complaint, the Court found – generally – that the Defendants had created a serious risk of loss to investors by making certain misrepresentations regarding Par's default rate and regulatory history, and LaForte's criminal record. ECF 1450 P. 34. The Court observed that the Amended Complaint "specifically ties" LaForte and two other Defendants to the alleged misrepresentations. *Id*. at FN 16.  The same cannot truthfully be said about McElhone ***because the Amended Complaint does not allege that she made any***

42

*misrepresentations whatsoever*.[8] Indeed, the SEC pointed only to McElhone's passive conduct as support for the requested penalty – asserting that she "authorized" marketing materials for distribution to investors, "approved" Par's filings with the SEC, had "control" over Par's bank accounts, and executed "some" of the promissory notes at issue. ECF 1252 P. 36-37.[9] On these facts, there was no basis for the Court to find that McElhone committed violations involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" – as required to establish Tier 2 or Tier 3 penalties.

The Court also did not point to any evidence to establish that Appellants' alleged violations created a "significant risk of substantial losses to other persons" – as required to justify Tier 3 penalties. *See* 15 U.S.C. § 78u(d)(3)(B)(iii). Instead, the Court noted that numerous investors remain unpaid – ignoring the fact that Par never missed a payment to investors prior to the Receivership, except for a brief payment

---

[8] The Amended Complaint contains no specific allegations of wrongdoing as to McElhone. Instead, it relies on general allegations that McElhone had ultimate decision making-authority for Par (as the President and CEO) and served as the public face of the company while her husband, LaForte, acted as the *de facto* head of Par. ECF 119. The Disgorgement Order discussed seven distinct categories of misrepresentations alleged in the Amended Complaint, and provided a detailed summary of the specific misrepresentations the various Defendants were alleged to have made. ECF 1450 P. 4-7. Notably, there are no allegations that McElhone made any misrepresentations whatsoever.

[9] Also, the Appellants established through record evidence that McElhone *did not* authorize the marketing materials, as alleged – so that attenuated conduct could not serve as a basis for the penalties against her. ECF 1329 P. 43.

moratorium during the peak of Covid lockdowns[10] – and then concluded that the "misrepresentations [alleged in the Amended Complaint] alone create a significant risk of substantial losses to investors." ECF 1432 P. 34. Respectfully, the Court's *ipso facto* reasoning does not establish a <u>significant</u> risk of <u>substantial</u> losses.

For all of these reasons, the Court had no basis to assess Tier 3 penalties – let alone a Tier 3 penalty for each of Par's 115 outstanding promissory notes, as the number of notes bears no connection to Appellants' alleged wrongful conduct. Indeed, the number of notes does not even reflect the number of ultimate investors.[11] Furthermore, the Court's decision to hold the Appellants jointly and severally liable for their combined penalty amount effectively subjected both McElhone and LaForte to two maximum Tier 3 Penalties per note – *without any showing of wrongful conduct as to any of the notes*. By subjecting Appellants to joint and several liability, the Court effectively assessed a penalty of $380,000 per violation – which makes the assessment illegal on its face. This outcome was not supported by the evidence or the law and constituted and abuse of the District Court's discretion.

---

[10] *See* Appellants' opposition to disgorgement motion, ECF 1329 P. 30-34.

[11] The outstanding notes represented money raised from 80 different creditors (*i.e.*, investors) controlled by 33 fund managers. ECF 1330-28. The Court assessed penalties based on its finding that Appellants' conduct created a risk of loss to investors through their misrepresentations. Even accepting this premise, *arguendo*, the Court ought to have assessed a penalty for each fund manager or investor, rather than each note.

The arbitrary and capricious nature of the penalty award is also evidenced by the fact that the Court employed different and inconsistent methods to determine penalties for the different defendants. While Appellants were held jointly and severally liable for 230 Tier 3 penalties (two per note), the Court decided to assess seven Tier 3 penalties against Par's CFO, Joseph Cole Barletta (one for each cause of action alleged in the Amended Complaint), and only one Tier 3 penalty against Michael Furman (even though a jury found he had made misrepresentations to numerous investors and was liable for four separate securities violations). The District Court did not articulate any reasoned basis for its disparate treatment of the Appellants as compared to the other defendants, which resulted in radically different penalty amounts. Notably, the penalty against McElhone is 33 times greater than the penalty against Cole (Par's CFO!) – even though the Court correctly observed that the Amended Complaint alleged Cole had made specific misrepresentations to investors,[12] but could point to no similar allegations against McElhone. Under these facts, the penalties against the Appellants – particularly McElhone – are an abuse of discretion.

Finally, and most egregiously, the Court also abused its discretion by holding McElhone and LaForte jointly and severally liable for a combined $43.7 Million in

---

[12] ECF 1450 P. 34, FN 16 and P. 42.

45

civil penalties.[13] Several Courts have expressly held that the clear language of 15 U.S.C. § 77t(d)(2) does not permit a civil penalty to be imposed jointly and severally. *See SEC v. Pentagon Capital Mgmt.,* 725 F.3d 279, 287–88 (2d Cir.2013) (reversing district court's decision to impose penalties jointly and severally as an error of law); *SEC v. iShopnomarkup.com, Inc.*, 126 F. Supp. 3d 318, 333 (E.D.N.Y. 2015), *aff'd sub nom. U.S. Sec. & Exch. Comm'n v. Knight*, 694 F. App'x 853 (2d Cir. 2017), *as amended* (June 7, 2017) (same); *Honeycutt v. US*, 581 U.S. 443, 444 (2017) (holding civil penalty under civil forfeiture statue cannot be joint and several based on similar statutory analysis).

While this Court has not expressly ruled that civil penalties under 15 U.S.C. § 77t(d)(2) cannot be joint and several, Courts in this Circuit have declined to impose joint and several liability based on the rationale espoused in *Pentagon Capital Mgmt. See SEC v. Watkins,* No. 1:16-CV-3298-SCJ, 2019 WL 13026037, at *7–8 (N.D. Ga. July 5, 2019); *see also SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1316 (S.D. Fla. 2007), *supplemented* (Jan. 4, 2008) (holding defendants jointly and severally liable for disgorgement, but imposing separate penalties); *SEC v. Wealth Strategies Partners, LLP*, No. 8:14-CV-2427-T-27TGW, 2019 WL 2504600, at *7

---

[13] The District Court's Disgorgement Order expressly states that Appellants are held jointly and severally liable for this amount. ECF 1450 P. 41 and 47. The Final Judgment states that "[Appellants] are liable for civil penalties in the amount of $21,850,000 each for a total of $43,700,000."

(M.D. Fla. May 17, 2019), *report and recommendation adopted sub nom. SEC v. Wealth Strategy Partners, LLP*, No. 8:14-CV-2427-T-27TGW, 2019 WL 2503206 (M.D. Fla. June 17, 2019) (same).

Here, the District Court articulated no rationale for holding Appellants jointly and severally liable – and by doing so, it has effectively held each of the Appellants liable for the same conduct twice, rendering their penalties clearly excessive. Accordingly, this Court should find that the District Court committed legal error by holding Appellants jointly and severally liable for their combined penalties.

## III.    This Case Should Be Reassigned If It Is Remanded

If the Court deems it appropriate to remand this case for further proceedings consistent with the Court's opinion, and/or to reverse the Expansion Order and remand to the District Court, with appropriate instructions, McElhone respectfully requests that the case be reassigned to a new district court judge who can be fair and impartial. McElhone adopts by reference, and incorporates as if set forth more fully herein, all factual statements and legal arguments presented in the Appellant brief filed by her husband, Joseph LaForte, in support of his request for reassignment.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should vacate the Expansion Order, the Receivership Order and the Final Judgment, remand this matter to the District Court

with appropriate instructions, and reassign this matter to a different district court judge.

## **CERTIFICATE OF COMPLIANCE**

I HEREBY CERTIFY that this brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B). This brief contains 11,778 words. The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Office in a 14-point Times New Roman font.

Dated: June 14, 2023

Respectfully submitted,

KAPLAN ZEENA LLP
*Attorneys for Appellant Lisa McElhone*
2 South Biscayne Boulevard
One Biscayne Tower
Suite 3050
Miami, Florida 33131
Tel: (305) 530-0800

By: */s/ James M. Kaplan*
JAMES M. KAPLAN
Florida Bar No. 921040
James.Kaplan@kaplanzeena.com
NOAH E. SNYDER
Florida Bar No. 107415
Noah.Snyder@kaplanzeena.com

## **CERTIFICATE OF SERVICE**

I certify that on June 14, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ *James M. Kaplan*
JAMES M. KAPLAN