**No. 23-10228-A**
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
_____

LISA MCELHONE AND JOSEPH LAFORTE,
*Appellants*

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,
*Appellee*

and

RYAN K. STUMPHAUZER, RECEIVER,
*Court-Appointed Receiver-Appellee*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
No. 9:20-CV-81205-RAR
HON. RODOLFO A. RUIZ

---

**APPELLANT JOSEPH LAFORTE'S BRIEF**

---

David L. Ferguson, Esq.
Seth D. Haimovitch, Esq.
KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
One West Las Olas Boulevard – Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100
Ferguson@kolawyers.com
Haimovitch@kolawyers.com
*Attorneys for Appellant Joseph LaForte*

## <u>APPELLANT'S CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to 11th Cir. R. 26.1-1, the undersigned, counsel for Appellant, Joseph LaForte, hereby certifies that the following is a complete list of the trial judge(s), attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

1. Alfano, Gaetan J., Counsel for Appellee, Ryan K. Stumphauzer, as Court-Appointed Receiver for Complete Business Solutions Group, Inc. d/b/a Par Funding and the other Receivership Entities;

2. Berlin, Amie Riggle, Counsel for Plaintiff/Appellee Securities and Exchange Commission;

3. Bowers, John J., counsel for Plaintiff/Appellee Securities and Exchange Commission;

4. Bradylyons, Morgan, counsel for Plaintiff/Appellee Securities and Exchange Commission;

5. Complete Business Solutions Group, Inc. d/b/a Par Funding, Defendant;

6. Conley, Michael A., Counsel for Plaintiff/Appellee Securities and Exchange Commission;

7. Ferguson, David, Counsel for Defendant/Appellant Joseph LaForte;

8. Froccaro, Jr. James, former Counsel for Defendant/Appellant Joseph LaForte;

9. Hardin, Tracey A., Counsel for Plaintiff/Appellee Securities and Exchange Commission;

10. Johnson, Alise, Counsel for Plaintiff/Appellee Securities and Exchange Commission;

11. Kaplan, James M., Counsel for Defendant/Appellant Lisa McElhone;

12. Kolaya, Timothy A., Counsel for Appellee, Ryan K. Stumphauzer, as Court-Appointed Receiver for Complete Business Solutions Group, Inc. d/b/a Par Funding and the other Receivership Entities;

13. Kopelowitz Ostrow Ferguson Weiselberg Gilbert, Counsel for Defendant/Appellant Joseph LaForte;

14. LaForte, Joseph, Defendant/Appellant;

15. L.M.E. 2017 Family Trust, Relief Defendant/Dismissed Appellant;

16. McElhone, Lisa, Defendant/Appellant;

17. Reinhart, Bruce, United States Magistrate Judge;

18. Ruiz, Rodolfo A., U.S. District Court Judge, Southern District of Florida;

19. Securities and Exchange Commission, Appellee;

20. Snyder, Noah E., Counsel for Appellants Lisa McElhone and the L.M.E. 2017 Family Trust;

21. Stumphauzer, Kolaya, Nadler & Sloman, PLLC, Counsel for Appellee Ryan K. Stumphauzer, Court-Appointed Receiver for Complete Business Solutions, Inc. d/b/a Par Funding and the other Receivership Entities;

22. Stumphauzer, Ryan K., Court-Appointed Receiver for Complete Business Solutions, Group, Inc. d/b/a Par Funding and the other Receivership Entities, Appellee; and

23. Pietragallo Gordon Alfano Bosick & Raspanti, LLP, Counsel for Appellee Ryan K. Stumphauzer, Court-Appointed Receiver for Complete Business Solutions Group, Inc. d/b/a Par Funding and the other Receivership Entities.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rules of Appellate Procedure 26.1 and 11th Cir. Rule 26.1-3(b), counsel for the Appellant certifies that no publicly traded company or corporation has an interest in the outcome of this appeal. This Certificate of Interested Persons does not include all persons or entities who may be claimants in the receivership proceedings or Trusts or privately held entities now contained within the Receivership.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Pursuant to 11th Cir. R. 28-1, Appellant requests oral argument because this is a complex multi-party case involving extensive factual issues and record evidence developed over nearly three years of vigorous litigation. Moreover, the issues addressed in this brief pertain to, *inter alia*, constitutional Due Process considerations, as well as core questions about the permissible basis to calculate disgorgement in an SEC enforcement action and the District Court's ability to assess statutory penalties on a joint and several basis. Accordingly, the Appellant believes that oral argument will benefit the Court in its determination of the factual and legal issues presented.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

CORPORATE DISCLOSURE STATEMENT ....................................................C-3

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF CITATIONS ........................................................................iv

JURISDICTIONAL STATEMENT ....................................................... vii

QUESTIONS PRESENTED AND STANDARD OF REVIEW ............................1

     I.    Questions Presented ................................................................1

     II.    Standard of Review ................................................................2

STATEMENT OF THE CASE....................................................................3

FACT STATEMENT..............................................................................8

     I.    The Receivership And Expansion Order................................8

     II.    The Order On Disgorgement And Penalties And The Final Judgment ........................................................................17

SUMMARY OF ARGUMENT ..............................................................23

ARGUMENT ....................................................................................25

     I.    The District Court Violated The Appellants' Due Process Rights When It Granted The Receiver's Expansion Motion Without First Permitting Discovery And An Evidentiary Hearing Or Oral Argument ..................................................25

          A.    Appellants Were Entitled To Discovery And An Evidentiary Hearing On The Receiver's Allegations Of "Commingling" .....27

B.     The District Court's Refusal to Permit A Response To The Sharp Report Unfairly Prejudices Appellants' Opposition To The Expansion Motion ........................................................... 29

C.     The District Court's Procedures Were Unequal To The Weight Of Appellants' Interests ................................................... 32

II.     The District Court's Calculation Of Disgorgement And Penalties Constituted An Abuse Of Discretion .................................. 35

III.     This Case Should Be Reassigned If It Is Remanded .......................... 35

CONCLUSION ................................................................................ 39

CERTIFICATE OF COMPLIANCE ...................................................... 41

CERTIFICATE OF SERVICE .............................................................. 42

# **TABLE OF CITATIONS**

**Cases**                                                          **Page(s)**

*Ameritas Variable Life Ins. Co. v. Roach*,
    411 F.3d 1328 (11th Cir. 2005) ....................................................2

*Bd. of Regents of State Colleges v. Roth*,
    408 U.S. 564 (1972).....................................................................25

*Boddie v. Conn.*,
    401 U.S. 371 (1971)...............................................................26, 35

*Chudasama v. Mazda Motor Corp.*,
    123 F. 3d 1353 (11th Cir. 1997) ...........................................36, 38

*Crawford & Co. v. Apfel*,
    235 F.3d 1298 (11th Cir. 2000) ....................................................2

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995) .......................................................31

*In re Huff*,
    109 B.R. 506 (S.D. Fla. 1989) ....................................................31

*In re Murchison*,
    349 U.S. 133 (1955).....................................................................26

*Kern v. TXO Prod. Corp.*,
    738 F.2d 968 (8th Cir. 1984) ........................................................2

*Liberte Capital Grp. v. Capwill*,
    421 F.3d 377 (6th Cir. 2005) ..................................................2, 26

*Mathews v. Eldridge*,
    424 U.S. 319 (1976).........................................................26, 33, 34

*Milam v. Comm'r.*,
    734 F. App'x 697 (11th Cir. 2018) ...............................................2

*Morrissey v. Brewer,*
    408 U.S. 471 (1972) .................................................................................35

*SEC v. Elliot,*
    953 F.2d 1560 (11th Cir. 1992) ...........................................25, 26, 27, 29, 33

*SEC v. Kaleta,*
    No. 09-cv-3674, 2011 WL 6016827 (S.D. Tex. Dec. 2, 2011) ....................30

*SEC v. Levin,*
    849 F.3d 995 (11th Cir. 2017) ....................................................................2

*SEC v. Monterosso,*
    756 F. 3d 1326 (11th Cir. 2014) ..................................................................2

*SEC v. Torchia,*
    922 F.3d 1307 (11th Cir. 2019) .............................................................26, 27

*SEC v. Warren,*
    534 F.3d 1368 (11th Cir. 2008) ...................................................................2

*Townsend v. Burke,*
    334 U.S. 736 (1948) .................................................................................32

*United States v. Ritchie Special Credit Investments,*
    620 F.3d 824 (8th Cir. 2010) .....................................................................31

*Windsor v. McVeigh,*
    93 U.S. 274 (1876) ..................................................................................35

**Rules**                                                                 **Page(s)**

11th Cir. R. 26.1-1 .................................................................................C-1

11th Cir. R. 26.1-3(b) ............................................................................C-3

11th Cir. R. 28-1 .......................................................................................i

Fed. R. App. P. 26.1 ...............................................................................C-3

Fed. R. App. P. 32(a)(5)............................................................41

Fed. R. App. P. 32(a)(6)............................................................41

Fed. R. App. P. 32(a)(7)(B) .......................................................41

Fed. R. Civ. P. 54(b) ................................................................ vii

## **Statutes**                                                         **Page(s)**

15 U.S.C. § 77t(b) .................................................................... vii

15 U.S.C. § 77t(d) .................................................................... vii

15 U.S.C. § 77v(a) .................................................................... vii

15 U.S.C. § 78u(d) .................................................................... vii

28 U.S.C. § 1331 ...................................................................... vii

28 U.S.C. § 2106......................................................................36

## **Other Authorities**                                         **Page(s)**

U.S. Const. Amend. V................................................................25

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, because this case arises under Sections 20(b), 20(d), and 22(a) of the Securities Act of 1934, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a) and Sections 21(d), 21(e), and Section 27 of the Exchange Act of 1934, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

This Court has jurisdiction of this appeal with respect to the District Court's Amended Final Judgment As To Defendants Lisa McElhone And Joseph LaForte (ECF 1451) and the Order producing that Final Judgment (ECF 1450) pursuant to 28 U.S.C. § 1331 because the Order and Final Judgment presented a full adjudication of all liability and damages issues as to the Appellant, and the District Court's decision was properly certified as final pursuant to Fed. R. Civ. P. 54(b). This Court also has jurisdiction of this appeal with respect to the District Court's interlocutory Order Granting Motion To Expand Receivership Estate (ECF 436) pursuant to the Collateral Order Doctrine.[1]

The District Court's Order and Final Judgment were entered on November 22, 2022, and the Appellant timely filed his Notice of Appeal on January 20, 2023. (ECF 1494).

---

[1] The Appellant incorporates, by reference, his Response to this Court's Jurisdictional Questions (DE 22), which presented a more fulsome discussion of this Court's jurisdiction over the Final Judgment and Orders at issue. Appellant also refers the Court to the Appellee's Response to this Court's Jurisdictional Questions (DE 24), which presents potential alternate grounds for this Court's jurisdiction.

## QUESTIONS PRESENTED AND STANDARD OF REVIEW

### I.     Questions Presented

1)      Whether LaForte's due process rights were violated when the District Court entered an order expanding the Receivership over his Trust, his personal residences, and his assets without permitting him to take discovery relating to the "commingling" allegations used to justify the expansion,  or to respond to a flawed and error-ridden report prepared by the Receiver's consultant (which presented an inaccurate financial analysis that served as an alternate justification for the expansion), and without granting LaForte's request for an evidentiary hearing or oral argument pertaining to the proposed expansion of the Receivership.

2)      Whether the District Court abused its discretion by finding the SEC met its burden of proof to provide a reasonable approximation of LaForte's ill-gotten gains, and by entering a disgorgement award which adopted an inaccurate revenue calculation and denied him deductions to which he was entitled.

3)      Whether the District Court abused its discretion by imposing a maximum Tier 3 penalty against both LaForte and his wife, Lisa McElhone, for each outstanding promissory note issued by their companies without a showing that they engaged in identical (or equivalent) wrongful conduct and without tying their wrongful conduct to *any* of the outstanding notes, and then holding LaForte and McElhone jointly and severally liable for the amount of the combined penalties.

1

## II.    Standard of Review

This Court reviews the amount of a monetary remedy under the securities laws – including disgorgement and penalty awards – for an abuse of discretion. *SEC v. Warren*, 534 F.3d 1368, 1369 (11th Cir. 2008) (per curiam); *see also SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017) (We review for abuse of discretion a district court's calculation of disgorgement) (citing *SEC v. Monterosso*, 756 F. 3d 1326, 1337 (11th Cir. 2014)).

> [A]n abuse of discretion "can occur in three principal ways: [1] when a relevant factor that should have been given significant weight is not considered; [2] when an irrelevant or improper factor is considered and given significant weight; and [3] when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment."

*Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328, 1330 (11th Cir. 2005) (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 970 (8th Cir. 1984)).

This Court's review of the Order Granting Motion To Expand Receivership Estate, and whether that Order violated Appellants' due process rights, is *de novo*. *See Milam v. Comm'r.*, 734 F. App'x 697, 699 (11th Cir. 2018) (Challenges to the constitutional sufficiency of a lower court's procedures are reviewed *de novo*) (citing *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1302 (11th Cir. 2000)); *see also Liberte Capital Grp. v. Capwill*, 421 F.3d 377, 382-83 (6th Cir. 2005).

2

## STATEMENT OF THE CASE

This appeal arises from an enforcement action the Securities and Exchange Commission ("SEC") brought against the Appellant, Jospeh LaForte and his wife, Lisa McElhone (collectively the "Appellants"), their businesses, including Complete Business Solutions Group, d/b/a Par Funding ("CBSG" or "Par") and Full Spectrum Processing, Inc. ("FSP"), and various other defendants. At the outset of this case, Par was a thriving and profitable merchant cash advance ("MCA") business. But Par's operations were abruptly halted when the SEC commenced this action in July of 2020 and filed an emergency motion to place Par and FSP into Receivership.

The SEC's Complaint focused on Par's practice of issuing promissory notes to raise capital to fund MCA contracts, alleging that the promissory notes were unregistered securities and that the Appellants – as the actual or *de facto* principals of Par – made misrepresentations and omissions to investors in connection with the promissory notes. Based on the SEC's one-sided and misleading presentation of evidence, the District Court entered an emergency asset freeze order and appointed Ryan K. Stumphauzer as the Receiver – directing him to assume exclusive "custody, control and possession" of all "records, documents, and materials" belonging to Par and FSP. ECF 36 P. 3.

During six subsequent months of intense litigation, the Receiver successfully resisted Appellants' repeated demands for access to the business and financial

records necessary for their defense. In late October 2020, the Receiver filed a motion to expand the Receivership to include virtually all personal assets of Appellants and the L.M.E. 2017 Family Trust (the "LME Trust") – of which Appellants were the sole trustees and beneficiaries. ECF 357. To support this inequitable expansion, the Receiver alleged – based on an incomplete analysis to which Appellants were not given a fair or adequate opportunity to respond – that LaForte and McElhone had purchased their homes and tens of millions of dollars in investment properties with commingled funds traced to the proceeds of the securities offerings. *Id.* at 2.

Because the Receiver had exclusive control of Par's books and records at that time – but had refused to provide them to Appellants – the Appellants had no meaningful opportunity to rebut these allegations regarding the source of funds. To make matters worse, just three days before the expansion motion was ruled upon, the Receiver filed a report from its consultant which implied – through careful wording and incomplete analysis – that Par was operating a Ponzi scheme. ECF 426-1 (the "Sharp Report"). This unpled and demonstrably false notion provided an alternative justification for the expansion of the Receivership Estate – one which the District Court appeared to embrace at a status conference held on December 15, 2020, at which the Receiver was permitted to make an extensive and one-sided presentation. The very next day, the District Court granted the expansion of the Receivership *without* permitting discovery or a hearing on the Receiver's allegations

of commingling or the allegations presented in the Sharp report. ECF 436 (the "Expansion Order").

Following the expansion of the Receivership, the Appellants continued to defend the case, but they faced a hostile Court which ruled against them at every opportunity. The Appellants eventually elected to enter bifurcated consent judgments, whereby they conceded liability and accepted the allegations of the SEC's Amended Complaint as true (for purposes of the consent judgment only) and agreed to litigate the SEC's entitlement to disgorgement and penalties before the Court. ECF 1008 and 1010.

In its motion seeking damages, the SEC presented a one paragraph disgorgement calculation – asserting that Appellants should be ordered to disgorge the full amount of the proceeds raised from Par's noteholders less the amount repaid (hereafter, the "Net-Raise"), and less the amounts Par paid to two other defendants against whom the SEC also sought disgorgement. ECF 1252 P. 30.  The SEC also asked the Court to impose a $100 Million penalty against the Appellants. *Id*. at P. 36. In response to the SEC's motion – which presented no reasoning or analysis whatsoever, and evidenced a clear punitive intent – the Appellants presented a thorough brief demonstrating that the SEC had failed to meet its burden, detailing the legitimate business expenses of Par and other equitable deductions which the District Court was required to deduct from the SEC's Net-Raise model of

5

disgorgement (assuming it embraced that model at all), and presenting a reasoned penalties analysis. ECF 1329.

After receiving the parties' submissions, the District Court conducted an evidentiary hearing during which the Court repeatedly spoke about the material defects with the SEC's brief. Indeed, Judge Ruiz stated: "**it would almost be impossible for me to write an order that will withstand appellate review if I didn't make the SEC go back and write it over again the right way**." (9.14.22 Tr., ECF 1419 at P. 110:21-23). But despite this observation, the Court *did not* make the SEC rewrite its brief, nor did it award the Appellants the full array of business deductions and offsets they were entitled to. Instead, the Court issued an Order Granting in Part Plaintiff's Amended Omnibus Motion for Final Judgment (the "Disgorgement Order"), which embraced the fiction that the SEC had "satisfied its burden to provide a reasonable approximation of the requested disgorgement" and granted Appellants only *some* of the legitimate deductions to which they were entitled. ECF 1450, P. 13.

As a result of all of these errors, the Appellants are now subject to a final judgment which holds them jointly and severally liable for $142,529,980 in disgorgement, $43,700,000 in civil penalties and $10,694,758.24 in pre-judgment interest – making their total obligation approximately $197 Million, excluding post-

judgment interest. ECF 1451 (the "Final Judgment").[2] To make matters worse, Appellants' personal assets remain under the Receivership pursuant to the Expansion Order and – according to the SEC, the Receiver, and the Court – cannot be used to satisfy the Final Judgment! ECF 1531, 1538, 1539 and 1540.

This appeal challenges both the Expansion Order and the Disgorgement Order and Final Judgment. As LaForte will demonstrate, the District Court denied Appellants a meaningful opportunity to defend their property rights by granting the Expansion Order without permitting discovery or a hearing on the Receiver's allegations of "commingling" or the Sharp Report. Because the District Court's procedures did not comport with due process, the Expansion Order should be reversed and the matter remanded with appropriate instructions.

LaForte will also demonstrate that the District Court's findings in its Disgorgement Motion resulted in an excessive and legally unsupportable award of disgorgement and civil penalties, and that the Final Judgment must therefore be vacated and remanded with appropriate instructions.

---

[2] The Court's first disgorgement order and final judgment (ECF 1432 and 1433) also overstated Appellants' disgorgement obligation by $20,554,206 due to an apparent mathematical error, which the Appellants had to correct by filing a motion to amend the Final Judgment (ECF 1444). While the Court acknowledged and corrected this discrepancy (ECF 1449), it's error is indicative of the Court's mindset and approach in assessing disgorgement and penalties against the Appellants.

## FACT STATEMENT

### I.    The Receivership And Expansion Order

The SEC's Complaint focused on Par's fundraising practices rather than its MCA operations. The SEC accused the Appellants and others of fraudulent "misrepresentations and omissions" connected to the "offer and sale of . . . [Par] promissory notes" and claimed that the sales of the notes violated the registration requirement of Section 5 of the Securities Act of 1933. ECF 1 at ¶¶ 48, 50, and 286-89; *see also* ECF 14 at P. 79. The SEC *did not* allege that the noteholders sustained losses related to their investment in the company or that Par was anything other than profitable. *See* 8/17/2020 Tr., ECF 193 at P. 46 (the Court acknowledges that Par's "many" investors received "their monthly payouts and . . . principal returns" from the company).

The SEC paired its Complaint with an emergency motion to place Par and other corporate defendants into receivership. ECF 4. The rationale that the SEC offered for seeking this draconian remedy was, if nothing else, straightforward. Relying on the Complaint's allegations and an incomplete examination of Par's bank accounts, the SEC wrote that "the appointment of a Receiver is a well-established equitable remedy available to the Commission in civil enforcement proceedings . . . [and] particularly appropriate in cases such as this where a corporation, through its management, has defrauded members of the investing public." *Id.* at P. 2-4.

8

The District Court granted the motion on July 27 (the day it was filed), before Appellants and their codefendants could submit a response to the SEC's application. ECF 36 and 42. Within days, the Receiver had secured exclusive "custody, control, and possession of" all Par's business and financial records. ECF 36 at 3; *see* ECF 84 at P. 6 (reporting, as of August 4, 2020, that all Par "employees [had been] barred from the business premises for the last week").

Just over two weeks later, the Court entered an Amended Order Appointing Receiver. ECF 141. The Amended Order imposed a broad "[f]reeze" on the Appellants' assets and granted the Receiver "exclusive . . . possession" of Receivership property. ECF 141 at P. 2, 13. It also directed the Receiver to "use reasonable efforts to determine the nature, location and value of all property interests of the Receivership Entities." *Id.* at P. 3.

On October 30, 2020, the Receiver filed a motion to "Expand the Receivership Estate," asserting that more than two dozen "additional entities and properties" – including the LME Trust and Appellants' personal residences – "should be added to the Receivership Estate." ECF 357 at P. 1. The Receiver's position boiled down to a generalized assertion of "commingling." Citing a trio of declarations from an SEC-retained accountant named Melissa Davis ("Davis Declarations"), he maintained that Par made payments to Appellants from bank accounts that held proceeds from the allegedly fraudulent sales of promissory notes. *Id*. at P. 8-9. Any entity that received

9

a payment from Par on Appellants' behalf, the Receiver argued, was "funded with commingled investor proceeds" and properly included in the Receivership. *Id.* at P. 5.

In fact, the Davis Declarations offered little or no support for the Receiver's sweeping allegations. The first Declaration, dated July 23, 2020, identified 14 bank accounts belonging to Par and reported that the company had received a total of $492,398,894 from the sale of promissory notes between 2015 and 2020. ECF 21-1 at ¶¶ 3(a), 10. It also identified transfers of $11.3 million and $14.3 million to McElhone and the LME Trust, respectively. *Id.* at ¶¶ 12, 16. The second Davis Declaration, dated August 4, 2020, provided further details concerning Par's bank accounts and identified $84,643,174 in transfers to McElhone-controlled entities, Heritage Business Consulting and Eagle Six Consulting. ECF 177-50 at ¶ 4.

Only the final Davis Declaration, dated August 26, 2020, attempted to trace funds Par received from the sales of promissory notes. This narrative was unconvincing. At the outset of her Declaration, Davis observed that the $492 million that Par had received from note-holders represented a modest fraction of the "$1.6 billion" deposited into the company's accounts since 2015. ECF 290-8 at ¶ 5. Davis went on to examine two discreet instances in which Par had transferred money to the LME Trust or McElhone. Her findings were as follows:

- Between July 19 and September 20, 2018, LME Trust received $10.5 million from Par accounts that contained $1.6 million traceable to sales of promissory

10

notes and *over $13 million* from Par's profit-generating activities. *Id.* at ¶¶ 7-18.

- In September 2019, McElhone received $4.3 million from Par accounts that contained approximately $22 million traceable to sales of promissory notes and *over $14.2 million* from Par's profit-generating activities. *Id.* at ¶¶ 19-24.

In both cases, then, the Par accounts in question had more than enough money from legitimate (*viz.* sources other than ill-gotten gains) to fund the transfers to McElhone and the Trust.

Undeterred by these facts, the Receiver's motion treated every penny Appellants received from Par as if it had been traced to so-called "commingled proceeds from the fraud scheme." ECF 357 at P. 11. On this reasoning, the Receiver declared that the LME Trust, along with the Appellants' personal residences and "over nineteen (19) real estate entities that purchased [on Appellants' behalf] twenty-six (26) income producing properties" should be "added to the Receivership Estate." *Id.* at 11-20.

Appellants' written opposition to the expansion motion pointed out the deficiencies in the Receiver's reasoning. *See* ECF 401 at P. 13 (observing that proceeds from Par's MCA business "exceeded [] deposits" from Par's fundraising activities in the relevant accounts). Appellants could not, however, directly refute the Receiver's allegations of commingling because, as Appellants' papers explained, the Receiver had not yet permitted them access to "Par Funding's books and

11

records." *Id.* at P. 13 fn.12.[3] Appellants urged the District Court to order "discovery and an evidentiary . . . hearing" before ruling on the expansion motion. *Id.* at P. 4.

The commingling issue was effectively mooted on December 13, 2020, when the Receiver presented his "report . . . regarding the financial status of the Receivership Entities." (*viz.* the Sharp Report, ECF 426-1 at P. 1). Filed on a Sunday in anticipation of a status conference scheduled two days later, the Sharp Report purported to set out "preliminary" findings and conclusions regarding Par's finances. *Id.* at ¶ 5. In reality, the report was an ambitious piece of advocacy that implied – without actually asserting – that Par was a Ponzi scheme.

The numbers presented in the Sharp Report were unremarkable. Looking only at Par's books for "calendar years 2012 through 2019," Sharp ventured "*preliminary* conclusions" about the business's performance. *Id.* at ¶ 13. For example, comparing the amount that Par had advanced to merchants to the amount of its collections "through 2019," the Report proclaimed that the company "generated only $6.6 million in cash from MCA activity" and had sustained a "cash loss from operations of $135.6 million." *Id.* at ¶¶ 6, 9. Whether these figures provided a useful means of

---

[3] Months later, after the Expansion Order was entered, the Appellants finally obtained access to Par's books and records and were able to have their own CPA expert, Joel D. Glick, perform an exhaustive flow of funds analysis which required an examination of over 3.8 million booked transactions between 2012 and 2020. Glick concluded that "consulting fees were not paid with Investor Funds" and that payments to note holders came exclusively from monies paid by MCA borrowers. ECF 1330-16 P. 4; ECF 1330-17, at P. 71-73 and 100.

measuring the profitability of a company that had well over $400 million in receivables and daily revenues of $1.5 million in 2020, the Report did not say.

The Report also noted that, as of the end of December 2019, Par had "only collected 86%" of funds advanced to ten of the largest merchants in its portfolio. *Id.* at ¶ 48. Treating the 86% figure as if it reflected the final outcome of all of Par's transactions with all of its merchants, Sharp opined that Par "would not have been able to continue to provide payments to investors, or to continue to operate, without additional funds from investors." *Id.* at ¶ 53. The Report failed to acknowledge that Par engaged in no fundraising activity after February 2020, yet it continued to collect an average of $1.5 million <u>per day</u> from merchants, including those in the so-called top ten. *See* ECF 84 at P. 9-10.

Blindsided by the Sharp Report, Appellants and several codefendants moved to postpone the status conference, which was scheduled for the next day. ECF 430. Citing a concern for "fundamental fairness and due process," the submission argued that "[d]efendants should be permitted to respond" to the Report "prior to its consideration by the [c]ourt and the discussion of its contents in open court." *Id.* at 1. In a paperless order posted to the docket later that day, the court denied the defense's request, reminding the parties that "the Receiver is an officer of the Court" and indicating that it would "not entertain oral argument regarding the disputed

13

contents of the [Sharp Report]." ECF 431 (internal quotation marks and modifications omitted).

Consistent with the paperless order, there was no oral argument at the conference. Instead, the court engaged in a lengthy discussion with the Receiver and his counsel about the Sharp Report, which the court characterized as "perhaps" the "clearest picture . . . of the financial state of [Par]" to date – although the Report had only been filed two days earlier and spoke only to select financial issues that were by then almost a year old. 12/15/2020 Tr., ECF 445 at P. 13. According to the Court, that "picture" depicted something "akin to . . . a Ponzi scheme." *Id.* at P. 14.

The Receiver made no effort to dispel the Court's misunderstanding of the Report. Instead, he made an impassioned presentation – lasting an uninterrupted 26 minutes – in which he directly accused the Appellants of deceit and other wrongdoing and stated that he would "stake [his] credibility" on the Sharp Report. *Id.* at P. 16-30. During this presentation, the Receiver initially asserted that Sharp had declined to explicitly characterize Par as a "Ponzi scheme" for clarity's sake, there being "no[] a single definition" for that term. *Id.* at P. 16-17. Only later did the Receiver note, in passing, that the Sharp Report was only "an analysis of cash in and cash out, which is not the same as profit." *Id.* at P. 19-20.

Heedless of this qualification, the Court expressed its frustration with what it characterized as the Appellants' attempt to create "alternative realities" that

14

conflicted with the "straight numbers" from the Receiver, who was "an extension of the Court." *Id.* at P. 32. In the immediate wake of the Sharp Report, the court jumped to the conclusion that the Appellants' arguments were "starting to fall apart." *Id.* at P. 33. The court opined that:

> [I]t doesn't take an economics major or CPA to look at Mr. Sharp's findings and figure out that at the very bottom, the model that we had here was not self-funding it just wasn't, and the loans were not over-performing. I don't even know if they can even say they were performing, period. *Id.*

Remarkably, the Appellants were neither invited nor permitted to comment on the Report. To the contrary, the Court repeatedly forbade the defense attorneys from intruding upon its long "discussion" with the Receiver – and even placed McElhone's counsel on "mute" to prevent "any [] interruptions." *Id.* at P. 36-37, 40, 44, 55. When Appellants' counsel finally were allowed to speak, it was only to address the Receiver's refusal to produce Par's books and records (which were the basis for the Sharp Report), and to implore the Court to give them an opportunity to test the Receiver's allegations and present their own expert report. *Id.* at P. 57-59, 60-62, 69-70 and 97-100. The District Court acknowledged that Appellants needed access to the records sought in order to provide "any kind of merit-based response" to the Receiver's allegations, before returning to the Receiver and soliciting his view on whether the expansion would "protect investors" and "enable us to make a larger potential recovery for all investors." *Id.* at P. 71, 72, 80, 83. Satisfied with the

Receiver's affirmative responses, the Court informed the parties that it would rule on the expansion "as soon as possible." *Id.* at P. 86.

Near the conclusion of the hearing, counsel for LME Trust ventured to point out that the defense had not yet been granted "access to the documents" necessary to respond to the Receiver's expansion motion. *Id.* at P. 97. Aside from the "due process" concerns implicated by the lack of discovery, counsel suggested that "since the receiver, and to some degree, the SEC has had an opportunity to weigh in" during the day's conference, "oral argument" on the expansion motion was appropriate. *Id.* at P. 99-100.  The court denied that application. Although it had earlier observed that the lack of discovery forced defendants to litigate with "one hand tied behind their back," the court explained that it "was trying to keep the train moving, making it fair and not spending too much more time and money when the pleadings are very thorough." *Id.* at P. 93, 101.

The day after the status conference, the court granted the expansion motion. ECF 436. The Expansion Order did not specify the grounds on which the motion was granted, remarking only that the "Receiver has made a sufficient and proper showing in support of the relief requested" and noting "that tainted funds, which **could** be the subject of disgorgement, **may** be found in the entities and properties identified herein." *Id.* at P. 2. (Emphasis supplied). Upon entry of the Order, the Receiver assumed the management of Appellants' commercial properties and took

16

possession and control of Appellants' three residences, requiring them to pay rent on their principal residence and carrying costs on all three properties as a condition of their being permitted to continue to reside in their principal residence.

## II.    The Order On Disgorgement And Penalties And The Final Judgment

Following the entry of the Expansion Order, the Appellants decided – for tactical reasons – to enter a bifurcated settlement, whereby they consented to liability and allowed the Court to determine disgorgement and penalties.

This agreement was memorialized in a Judgement of Permanent Injunction entered against LaForte and McElhone on November 21, 2021 (the "Consent Judgments"). ECF 1008 and 1010. The Consent Judgements provided that Appellants would "pay disgorgement of ill-gotten gains, prejudment interest on disgorgement, and a civil penalty" in an amount to be determined by the Court "upon motion of the Commission." *Id*. at 5.  They also provided that the allegations of the Amended Complaint would be deemed true "solely for the purposes of such motion[,]" and that the Court would be permitted to determine the issues raised in the motion "on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure." *Id*. The Consent Judgments also permitted the parties to take discovery, including from non-parties, in connection with the motion. *Id.*

17

Approximately five months after the Consent Judgements were entered, the SEC filed the first iteration of its motion for disgorgement and penalties, which was replete with unfounded and conclusory allegations that Par had been operating as a Ponzi scheme – allegations that *were not* pled in the Amended Complaint and were not properly at issue. ECF 1214. Faced with these new and unpled liability allegations (at a phase of the case where only damages were at issue), the Appellants filed a motion to strike the scurrilous Ponzi allegations or, alternatively, to be relieved from their Consent Judgments so they could contest these allegations at trial. ECF 1224.

After the motion to strike was fully briefed, the District Court conducted a hearing during which the Court acknowledged the Appellants' concerns and inquired why the SEC had waited until this juncture in the case to present Ponzi scheme allegations – observing that this issue had been a "third rail" no one wanted to touch, and that inserting the issue at this stage was "kind of lobbying [*sic*] a grenade into the disgorgement phase." 5.19.22 Tr., ECF 1272 at P. 27-28. Judge Ruiz acknowledged that these allegations were not raised in the pleadings (*id*. at P. 12), but stated that they had been "lurking in the ether" from the beginning of the case (*id*. at P. 7). Stressing that the case had been "a heavy lift for the Court" and that he was "trying to get it to some finish line" (*id*. at 30), the Court strongly suggested that the term "Ponzi scheme" should be stricken or excised from the SEC's motion, but

the SEC should be permitted to argue that Par had paid old investors with new investor money in its motion. The Court later denied Appellants' motion to strike as moot on the grounds that the SEC had agreed to file an amended motion for disgorgement which would omit the term "Ponzi scheme." ECF 1251.

A few days after this ruling, the SEC filed the Disgorgement Motion – which was materially the same as its predecessor except for the omission of the prohibited phrase. The motion included an 18-page summary of the Amended Complaint (ECF 1252, P. 3-21), but dedicated only one short paragraph to the disgorgement analysis. *Id.* at P. 30. The SEC asserted that Appellants should be ordered to disgorge the amount Par raised from investors (allegedly $550,325,596) minus the amount Par repaid in interest and principal (allegedly $300,108,117) – citing as support a two-page Declaration by the Receiver which purported to vouch for these figures. ECF 1214-1. The SEC also stated that the Court should deduct the amounts Par paid to defendants Cole and Abbonizio (allegedly $13,247,011 and $10,498,581, respectively), but provided no support whatsoever for these figures.

Because the SEC relied solely upon the Receivers' Declaration to support its disgorgement figures, the Appellants subpoenaed the Receiver for documents and deposition testimony. ECF 1289-1. After the Receiver objected to the subpoena, the dispute was submitted to Magistrate Judge Reinhardt. As Appellants explained in a joint submission to the Magistrate, they sought this discovery because the figures

contained in the Receiver's Declaration, which were the cornerstone of the SEC's disgorgement calculation, were in conflict with figures presented by the Receiver in his most recent quarterly report. ECF 1289 P. 4-5. This discrepancy was not inconsequential, as the most recent figures would result in $3.8 Million less in disgorgement (under the SEC's Net-Raise analysis). At a hearing on this discovery dispute, the Receiver's counsel represented to the Court that the most recent figures came from a more "in-depth" analysis which included a "reconciliation from bank account statements." *See* ECF 1330-2, P. 11:2-11 and P. 10:10-15. Given these facts, the Appellants clearly should have been permitted to depose the Receiver to inquire why he used the figures presented in his Declaration when he knew that more accurate figures – which could have reduced the Appellants' disgorgement obligation – existed.  However, the Magistrate found that this discovery was not "proportional to the needs of the case" (*id.* P. 19) and entered an order quashing the Appellants' subpoena. ECF 1292.

As a result of the Magistrate's ruling, Appellants were denied the opportunity to conduct discovery regarding the SEC's disgorgement calculation. Notwithstanding, Appellants presented the Court with a detailed brief demonstrating that the SEC had failed to meet its burden to provide a reasonable approximation of Appellants' alleged unjust-gains in its Disgorgement Motion. ECF 1329. Appellants' response brief presented a thorough analysis of Par's legitimate business

expenses (none of which had been addressed by the SEC) supported by ample record evidence, explained why the SEC's impermissible Net-Raise computation (if adopted by the Court) should have been based on the more recent and more accurate figures rather than the figures contained in the Receiver's Declaration, and analyzed several other equitable deductions which the District Court should have applied. *Id.* at P. 14-27. Appellants also presented a detailed and reasoned penalties analysis, which included an examination of all available civil penalty awards imposed by the District Courts of this Circuit since May of 1999 for comparison purposes. *Id.* at 29 to 49 and ECF 1330-27.

After receiving the parties' submissions, the District Court conducted an evidentiary hearing, during which it directly and repeatedly acknowledged that the SEC had not met its burden, and that the Disgorgement Motion was deficient:

> Reasonable approximations and estimates, which is your burden, does not mean taking shortcuts. **It does not mean giving me a motion that is substandard**. It requires you to point to evidence in the record to support your calculations.
>
> *        *        *
>
> I have to say, this motion, I think, had some glaring, glaring deficiencies in it, deficiencies that I have had a problem overcoming, and I'm getting a lot of gap filling today, some of which I think is well taken, some of which I really would have appreciated had it be [*sic*] formally or properly framed for me in the initial pleading… I am now being presented with a bunch of new points and evidentiary support that was never – I mean, I'm sorry – it was never in the SEC's motion. **I don't think objectively anyone can look at this SEC motion and think that it gave the Court what it needed to make a proper ruling**.
>
> *        *        *

I don't want to find myself rebooting and necessarily going all the way back to the beginning here after all this work. But at the same time, I have to say, **I have a pleading in front of me right now that I honestly find deficient**. I don't know any other way to put it. I do not believe that having a pleading like this, that is lacking record cites, that does not make use of an expert report fulsomely, and does not give me the opportunity to make sure that these numbers are supported is very, very challenging for the Court. Because without that, without someone framing it, not only can I cannot [sic] get the defense position clarified, but **I can't really feel comfortable with numbers that I believe are falling within the parameters of existing case law**.

9/14/22 Tr., ECF 1419 at P. 45:19-23; 81:10 to 82:3; 108:17 to 109:5.

Indeed, Judge Ruiz stated: "**it would almost be impossible for me to write an order that will withstand appellate review if I didn't make the SEC go back and write it over again the right way**." *Id*. at P. 110:21-23. Nevertheless, the Court **did not** make the SEC rewrite its brief, nor did it award the Appellants the full array of business deductions and offsets they were entitled to. Instead, the Court issued its Disgorgement Order, which embraced the fiction that the SEC had "satisfied its burden to provide a reasonable approximation of the requested disgorgement[,]" adopted the SEC's Net-Raise analysis (and inaccurate calculation of the Net-Raise), and denied Appellants numerous deductions they had demonstrated entitlement to. ECF 1450, P. 13.

Additionally, the District Court held that LaForte and McElhone should each be assessed the maximum Tier 3 penalty for each of Par's 115 outstanding promissory notes (230 Tier 3 penalties total), and that they should then be held

22

jointly and severally liable for the combined penalty amount ($43.7 Million). *Id*. at P. 42. Remarkably, the District Court came up with this analysis itself – since the SEC had simply asked the Court to impose a $100 Million penalty without providing any reasoned calculation. Moreover, the Court invented entirely different methods to calculate penalties for the other defendants in this case, which resulted in radically different penalties for the same alleged conduct.

As a result of the District Court's clear legal errors in its calculation of both disgorgement and penalties, Appellants are now jointly and severally liable for a $196,924,738.24 Final Judgment. ECF 1451.

## SUMMARY OF ARGUMENT

The Receiver, through its motion to expand the receivership estate, sought possession and control of virtually all of Appellants' earthly possessions, including their homes. Given the scope of the relief sought in the motion, due process principles obliged the court to afford Appellants a meaningful opportunity to contest the Receiver's allegation of commingling through discovery of relevant documents and, if necessary, an evidentiary hearing. To the extent the court granted the expansion motion on the basis that the alleged commingling had occurred, the failure to provide Appellants with an opportunity to conduct discovery on that claim violated due process. The Sharp Report's *soto voce* suggestion that Par was a Ponzi scheme gave the Court the cover it needed to grant the Receiver's expansion motion.

23

The court's refusal to permit Appellants to contest the Report – or even to voice a competing view of its conclusions – dispensed with concerns for accuracy and fairness that are at the root of due process's requirements in favor of expediency. Whatever the reasoning behind the Expansion Order, it was the product of gross deviations from all traditional notions of fair play and due process and cannot be permitted to stand.

Likewise, the District Court's calculation of Appellants' disgorgement and penalty obligations were marred by clear legal error and constituted an abuse of discretion. The Court's legal errors include: 1) erroneously holding that the SEC met its burden to provide a reasonable approximation of Appellants' unjust-gains; 2) using a demonstrably inaccurate Net-Raise figure as the starting point for its disgorgement calculation; 3) failing to deduct the disgorgement sought or entered against other defendants who participated in Par's note offering from the Net-Raise calculation; 4) calculating penalties using an arbitrary and capricious method (which the SEC had not advocated for) which yielded a clearly excessive penalty; and 5) holding the Appellants jointly and severally liable for a clearly excessive penalty without a shred of evidence demonstrating equivalent or identical conduct.

LaForte requests that the District Court's Expansion Order, Disgorgement Order and Final Judgement be vacated and remanded with instructions.  He also

request that, upon remand, this matter be reassigned to a different district court judge.

## **ARGUMENT**

### I.    The District Court Violated The Appellants' Due Process Rights When It Granted The Receiver's Expansion Motion Without First Permitting Discovery And An Evidentiary Hearing Or Oral Argument

The District Court's Expansion Order stripped Appellants of possessory rights in their residences and deprived them of control over tens of millions of dollars in assets. Given the extent of the interests at stake, Appellants were entitled to elementary procedural protections including discovery of the documents underlying the Receiver's claims and an adversarial hearing on disputed issues of fact. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571-72 (1972) (observing that "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money").

The requirements of due process constrain the "broad powers and wide discretion" of a district court in the administration of an equity receivership. *SEC v. Elliot*, 953 F.2d 1560, 1566 (11th Cir. 1992); U.S. Const. Amend. V (barring deprivations "of life, liberty, or property, without due process of law"). The requisite "process . . . varies according to the nature of the right and to the type of proceedings," but the basic demand remains the same: "[d]ue process essentially

requires that the procedures be fair." *Elliot*, 953 F.2d at 1566 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976); *In re Murchison*, 349 U.S. 133, 136 (1955)).

Where protected property interests are at stake, considerations of fairness generally dictate that the defense be permitted to conduct discovery, "present evidence" establishing facts and "make arguments regarding those facts." *Elliot*, 953 F.2d at 1567; *see Liberte Capital Grp. v. Capwill*, 421 F.3d 377, 383 (6th Cir. 2005) (observing that "a pre-deprivation hearing of some sort is generally required to satisfy the dictates of due process" with respect to property interests) (internal quotation marks omitted). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Eldridge*, 424 U.S. at 333 (internal quotation marks omitted); *Boddie v. Conn.*, 401 U.S. 371, 377 (1971) (reiterating that "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard").

In evaluating the sufficiency of procedures employed in adjudicating claims against a receivership, this Court has asked whether claimants were "provided[ ] with necessary information, a meaningful opportunity to argue the facts and their claims and defenses, and an adjudication of their claims and defenses." *SEC v.*

*Torchia*, 922 F.3d 1307, 1319 (11th Cir. 2019). Where these elements were missing, the Court has concluded that the proceedings "d[id] not afford due process." *Id.*

The same analysis should apply here, where the Receiver sought to acquire Appellants' property rights through proceedings ancillary to an SEC enforcement action. As set out below, the procedure by which the district court adjudicated the Receiver's expansion motion deprived Appellants of the "meaningful opportunity" that is the *sine qua non* of due process. *Elliot*, 953 F.2d at 1575. When reviewed *de novo* (or even for abuse of discretion) the lower court's refusal to afford Appellants an opportunity to conduct discovery, present evidence and make arguments regarding disputed facts constitutes reversible error.

### A.    Appellants Were Entitled To Discovery And An Evidentiary Hearing On The Receiver's Allegations Of "Commingling"

The Receiver sought expansion of his Receivership on the basis of "commingling." ECF 357 at P. 4. The claim, in substance, was that the payments Appellants received as compensation from Par were "derived substantially from the fraud" alleged in the SEC's complaint. *Id*. at 5. The Receiver contended that the Davis Declarations "proved" that "**$99.3 million** dollars" of the over $400 "million in investor funds… deposited into [Par's] fourteen different bank accounts" had been "distributed" to Appellants through their consulting companies. ECF 357 at P. 8-9 (emphasis original).

This was a blatant misrepresentation of Davis's conclusions. Although Davis did identify over $400 million in proceeds from the sales of promissory notes flowing into Par's accounts, she also reported gross deposits to those accounts of over $1.6 billion. ECF 290-8 at ¶ 5. As a result, it was anything but obvious that the disbursements Appellants received from Par included proceeds from the alleged fraud.

Attempting to plug this evidentiary gap, Davis's August 24 declaration had endeavored to show that, in two instances, Appellants received payments from Par accounts that held proceeds from the sale of notes. The results of this analysis were ambiguous at best because, as discussed above, in each instance the accounts in question had also held funds from other sources, including Par's MCA business, that were more than sufficient to cover the disbursements to Appellants.

While Appellants were able to point to the weaknesses of Davis' analysis in their opposition papers, they lacked the information necessary to provide their own countervailing analysis. As their opposition papers explained, the defense "issued a Request for Production to the Receiver in order to obtain Par's books and records" but had "yet to [receive] a single document" in response. ECF 401 at P. 13 fn.12. Without the necessary data, Appellants could not effectively refute the Receiver's claim of commingling. Instead, Appellants were consigned to a lame insistence that "the Receiver ha[d] failed to demonstrate whether any investor funds were used to

28

purchase" the assets in question. *Id.* at 14. The Receiver, who continued to enjoy a monopoly on the data contained in Par's books, confidently replied that the defense had "present[ed] absolutely no evidence to counter" the claims in his expansion motion. ECF 414 at P. 3. This assertion was, of course, unassailable so long as the Receiver was the only one with access to the evidence.

Given Ms. Davis' inability to definitively trace the funds disbursed from the Par accounts to the note holders – together with her finding that the accounts received over one billion dollars of deposits that were *not* attributable to the activity that was the subject of the SEC's complaint – Appellants were entitled to take discovery and present their findings at an evidentiary hearing. *Cf. Elliot*, 953 F.2d at 1570-71 (finding that summary procedure was sufficient where defendants were unable to point to "facts [that] might be disputed"). The court's refusal to permit Appellants to use these procedures constitutes reversible error. *See id.* at 1572 (lower court's failure to permit appellant "to discover and present facts" supporting valid defense was reversible error).

  **B.**  **The District Court's Refusal to Permit A Response To The Sharp Report Unfairly Prejudiced Appellants' Opposition To The Expansion Motion**

By the time the District Court decided the expansion motion on December 16, 2020, the issue of commingling had been overshadowed by the far more inflammatory insinuations of the Sharp Report. Presenting an "analysis of [Par's]

29

cash sources and uses" that arbitrarily ended on December 31, 2019, the Report's "preliminary conclusions" were incomplete, purely hypothetical, and without probative value. While the Report's observation that, as of December 2019, Par had collected just 86% of the funds it advanced may have been accurate, it was hardly useful when one considered that Par's collections continued into 2020. Only by ignoring that fact could Sharp conclude, "preliminar[ily]," that the company "would not have been able to continue to provide payments to investors, or to continue to operate, without additional funds from investors." ECF 426-1 at ¶ 53.

By refusing the defense's request for the time and discovery necessary to respond to the Report – and even precluding Appellants' attorneys from commenting on the Report at the December 15 conference – the court willfully turned a blind eye to the Report's shortcomings and proceeded on the false assumption that the Report provided a "clear[] picture[]" of a company that was "akin to a Ponzi scheme . . . . taking from new investors to pay old investors." 12/15/2020 Tr., ECF 445 at P. 14-15.

The court's misapprehensions clearly colored its view of the expansion motion. A Ponzi scheme is, by definition, "insolvent from inception," every dollar it distributes is "presumptively tainted." *SEC v. Kaleta*, No. 09-cv-3674, 2011 WL 6016827, at *4 (S.D. Tex. Dec. 2, 2011). Accepting Sharp's disingenuous insinuation that Par was a Ponzi scheme, a factfinder would necessarily conclude

that there was no need to trace the funds the company had disbursed to Appellants since every payment from the company was tainted. *See id.* Once the Court accepted the Sharp Report's distorted view of reality, granting the Receiver's expansion motion was inevitable.

Appellants might well have convinced the Court to abandon the notion that the Receiver had uncovered a Ponzi scheme, had they been permitted to speak against the Sharp Report at the December 15 conference. For instance, Appellants could have pointed out that Ponzi schemes typically engage in no "operation or revenue-producing activity other than the continual raising of new funds." *United States v. Ritchie Special Credit Investments*, 620 F.3d 824, 827 (8th Cir. 2010); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 n.3 (2d Cir. 1995) (describing a Ponzi scheme as "a scheme whereby a corporation operates and continues to operate at a loss" while creating "the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors") (quoting *In re Huff*, 109 B.R. 506, 512 (S.D. Fla. 1989)). The Receiver's own figures – which indicated that Par had already collected over $1 billion from merchants and was, at the time the SEC commenced its suit, in the process of collecting over $400 million in additional receivables at a rate of $1.5 million every day (ECF 426-1 at ¶¶ 6-7) – debunked the notion that Par was in the

business of "taking from new investors to pay old investors." 12/15/2020 Tr., ECF 445 at P. 15.

The district court apparently viewed the Sharp Report's allegations as highly probative of the merits of the expansion motion. Thus, the court's refusal even to permit Appellants to comment upon the Report before rendering a decision on the motion dispensed with the need for "fair play" that is a prerequisite to any "scrupulous and diligent search for truth." *Townsend v. Burke*, 334 U.S. 736, 739 (1948).

### C.    The District Court's Procedures Were Unequal To The Weight Of Appellants' Interests

Premised on an assertion that every penny Appellants received in compensation from Par was "tainted by the fraud scheme" alleged in the SEC's complaint (ECF 357 at P. 19), the expansion motion proposed extending the scope of the Receivership beyond Par to reach Appellants' personal interests and investments, including Appellants' residences and their contents. In the months following the Expansion Order, the Receiver extended his reach even further, gaining possession of the couple's primary vehicles, amongst other personalty. *See* ECF 517 at P. 2.

The district court recognized the breadth of the expansion at the December 15 conference, commenting that it would be:

a very significant development in the case. If the Court goes ahead and

> expands the receiver [*sic*], as requested, it will, I think, and I think defense lawyers recognize, dramatically shift the case in the sense of scope and breadth regarding what the receiver is going to be able to control. I am very much aware of that.

12/15/2020 Tr., ECF 445 at P. 78. Despite this "awareness," the court denied Appellants' request for discovery and oral argument on the basis of the supposed "thorough[ness of the parties'] briefing," and a stated concern for "keep[ing] the train moving" at a minimal expenditure of "time and money." *Id.* at P. 101.

This Court's precedents, however, require a more thorough "balancing" of the interests. *Elliot*, 953 F.2d at 1566 (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1955)). The District Court recognized the magnitude of Appellants' "private interests," but failed to accurately account for the "risk of erroneous deprivation, the probable value" of additional process and the costs that providing that process would entail. *Eldridge*, 424 U.S. at 335.

The Court's decision to grant the expansion motion before Appellants obtained discovery of Par's books and financial records created an unacceptable risk of "erroneous deprivation." *Id.* at 335. As discussed above, the import and veracity of both the Receiver's assertion of "commingling" and the Sharp Report's analysis were dubious at best. Had Appellants been allowed access to Par's accounting data, Appellants could have debunked the commingling theory, tracing each disbursement they received to profits from the company's legitimate MCA business. The same data would have enabled Appellants to illustrate the flaws in the Sharp Report's

methodology, demonstrating that the consultant's truncated analysis of "net cash" failed to provide visibility into the company's profitability. In other words, the discovery process would have permitted Appellants to meaningfully contest the proposition "that tainted funds, which could be the subject of disgorgement, [would] be found in the entities and properties" that were the subject of the expansion motion. ECF 436 at P. 2. There is, then, little room to doubt the "probable value" of additional process in this case. *Eldridge*, 424 U.S. at 335.

The costs of affording this process to Appellants would, moreover, have been negligible. The day before it granted the expansion motion, the District Court effectively ended the Receiver's embargo on discovery, declaring that the Appellants had been forced to "litigat[e with] one hand tied behind their back . . . . for long enough" and ordering the parties to "exchange" information "in a way that lets everybody look at the veracity of the [Receiver's] numbers." 12/15/2020 Tr., ECF 445 at P. 93. Had this same pronouncement come in November, Appellants would have had the ammunition they needed to effectively oppose the Receiver's expansion motion. No savings were achieved by depriving Appellants of this information until after the Court granted the draconian expansion.

By any reckoning, the cost of more fulsome fact-finding procedures was minute in comparison to the devastating burdens the expansion of the Receivership placed on Appellants. In the midst of what was sure to be a long and costly battle

34

with the SEC, the Receiver sought to strip Appellants of tens of millions of dollars in assets and *dispossess them of their homes*. With so much at stake, Appellants should not have been forced to litigate with "one hand tied behind their back[s]." *Id.*; *see Morrissey v. Brewer,* 408 U.S. 471, 481 (1972) (observing that the availability and extent of "procedural protections [ ] depends on the extent to which an individual will be condemned to suffer grievous loss") (internal quotation marks omitted). The Court's calculated refusal to permit Appellants to fight with both hands – through discovery and an evidentiary hearing – violated the most basic precept of our constitutional system: "'(w)herever one is assailed in his person or his property, he may defend.'" *Boddie*, 401 U.S. at 377 (quoting *Windsor v. McVeigh*, 93 U.S. 274, 277 (1876)). It follows that the Expansion Order must be vacated.

## II.    The District Court's Calculation Of Disgorgement And Penalties Constituted An Abuse Of Discretion

LaForte adopts by reference, and incorporates as if set forth more fully herein, all factual statements and legal arguments presented in the Appellant brief filed by his wife, Lisa McElhone, regarding the Disgorgement Order and the District Court's abuse of its discretion in calculating and imposing a disgorgement and penalties award, jointly and severally, against the Appellants.

## III.    This Case Should Be Reassigned If It Is Remanded

If the Court deems it appropriate to remand this case for further proceedings consistent with the Court's opinion, and/or to reverse the Expansion Order and

remand to the District Court, with appropriate instructions, the Appellants respectfully request that the case be reassigned to a new district court judge who can be fair and impartial. It is well established that the Court has the power to grant this relief pursuant to 28 U.S.C. § 2106. *See Chudasama v. Mazda Motor Corp.*, 123 F. 3d 1353, 1373 (11th Cir. 1997). This Court considers three factors when deciding whether to reassign a case on remand: "(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; (3) whether reassignment would entail waste and duplication out of proportion to the gains realized from reassignment." *Id*.

Here, the record establishes that the District Judge would have difficulty putting his previous views and findings aside if this Court disagrees with his reasoning and remands the case, and that reassignment is needed to preserve the appearance of justice. The District Judge's comments in open Court make clear that he is eager to get to the end of this case, and is unwilling to do anything that would not advance his ultimate goal of making distributions to noteholders:

> [W]e have a lot of investors that have been waiting for this day. We've all worked very diligently to get here. The Court is not interested in prolonging this case. We need to get to the last phase of this case, which is putting the Receiver in a position to begin the claims handling process so that we can make people whole.
>
> *      *      *
>
> Listen, nobody wants to see the end of this litigation more than me. We've carried this for two years. I want to get to the end because the

36

investors deserve it. I've done everything I can to marshal assets. My
Receiver has been consumed with going after everything he can.

9.14.22 Tr., ECF 1419 at P. 108:7-12; 114:25 to 115:4; *see also* 5.19.22 Tr., ECF

1272 at P. 30.

Unfortunately, the Court's eagerness to make investors whole has come at the

expense of the Appellants' due process rights, and fundamental principles of

fairness. The plain proof of this is found in the Court's vehement criticism of the

SEC's disgorgement brief in open Court, followed by his incongruous embrace of

the SEC's arguments in his Disgorgement Order – which resulted in a $197 Million

Judgement against Appellants, and allowed the Court to get to the claims distribution

phase it has been eagerly awaiting.

Furthermore, the record reflects the lower Court's bias against the Appellants,

as the Court has routinely sided with "his receiver" and ruled in the Receiver's favor

without affording the Appellants an opportunity to be heard. Examples of this

include his denial of the Appellants' request to be heard in connection with the initial

appointment of the Receiver (ECF 19 P. 4 and ECF 36), the Sharp Report (ECF 430

and ECF 431) and the Expansion Order (as discussed in Section I. of this brief). [4]

---

[4] The Court's bias against the Appellants and partiality towards the Receiver was
described in greater detail in a Motion for Recusal Appellants filed on June 23, 2021.
ECF 630. Judge Ruiz denied the Motion to Recuse the very next day. ECF 631.
Appellants also filed a Motion to Discharge the Receiver, which demonstrated that
the Receiver had breached his duties by presenting inaccurate and misleading
information regarding Par's finances to the Court. ECF 649. Judge Ruiz denied that

The Court's unwillingness to hear the Appellants' arguments (and to afford due consideration of their fundamental rights) has become even more pronounced since the Final Judgment was entered. For example, the Receiver filed a motion to compel the Appellants to pay certain sums which they allegedly owed – on pain of eviction from their residence – at 6:56 p.m. on January 10, 2023. The motion was granted less than six hours later (at 12:31 a.m. on Jan. 11, 2023) without affording the Appellants any opportunity to file a response. ECF 1484 and 1486. Most recently, on May 16, 2023, the Appellants filed a thorough and reasoned motion to modify the District Court's injunction and asset freeze (which is currently set at $482 Million, even though the Final Judgment is only $197 Million). ECF 1565. Only a few hours later, the Court denied the Appellants' motion in a paperless Order, characterizing it as a "motion for reconsideration by another name" – which it assuredly was not. ECF 1566. For all of these reasons, it strongly appears that the District Judge would have difficulty putting aside his previous views and findings, and that reassignment is required to preserve the appearance of justice (and to make sure that justice is, in fact, done).

With respect to the third *Chudasama* factor, Appellants submit that their request to reassign this case would not entail waste and duplication out of proportion

---

motion as well. ECF 739. These filings and orders provide additional support for Appellants' request for reassignment to a new district court judge.

to the gains to be realized from reassignment. First, the gains to be realized from reassignment are enormous based on the District Judge's manifest bias against the Appellants, and his entrenched views on this case. Accordingly, the risk of waste or duplication would have to be very great to outweigh the benefits of reassignment. Second, it does not appear that reassignment would entail significant waste or duplication – especially with respect to the order on disgorgement and penalties, since these issues were decided principally on written submissions to the Court and, with the benefit of this Court's instructions, would most likely only require a review of the motions, exhibits and case law. Admittedly, this case involves complex factual and legal issues, but these issues will not be simplified by keeping the case with Judge Ruiz. Instead, his familiarity with this case will serve only to reinforce his existing biases.

For all of these reasons, LaForte respectfully submits that a new Judge is needed to perform a fair and impartial analysis of the Appellants' disgorgement and penalties, and to afford Appellants a fair hearing on the Receiver's motion to expand the Receivership.

## **CONCLUSION**

For the foregoing reasons, this Court should vacate the Expansion Order, the Receivership Order and the Final Judgment, remand this matter to the District Court

with appropriate instructions, and reassign this matter to a different district court judge.

## <u>CERTIFICATE OF COMPLIANCE</u>

I HEREBY CERTIFY that this brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B). This brief contains 9,633 words. The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Office in a 14-point Times New Roman font.

Dated: June 14, 2023

Respectfully submitted,

KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
*Attorneys for Appellant Joseph LaForte*
One West Las Olas Boulevard – Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100

By: */s/ David L. Ferguson*
DAVID L. FERGUSON
Florida Bar No. 0981737
Ferguson@kolawyers.com
SETH D. HAIMOVITCH
Florida Bar No. 85939
Haimovitch@kolawyers.com

41

## **CERTIFICATE OF SERVICE**

I certify that on June 14, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ *David L. Ferguson*
DAVID L. FERGUSON