No. 23-10228

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

SECURITIES AND EXCHANGE COMMISSION,
*Plaintiff-Appellee*,

and

RYAN K. STUMPHAUZER, RECEIVER,
*Court-Appointed Receiver-Appellee*,

v.

LISA MCELHONE and JOSEPH W. LAFORTE,
*Defendants-Appellants*,

COMPLETE BUSINESS SOLUTIONS GROUP, INC., et. al.,
d/b/a PAR FUNDING,
*Defendants*.

---

Appeal from the U.S. District Court for the
Southern District of Florida
Hon. Rodolfo A. Ruiz II
9:20-cv-81205-RAR

---

**BRIEF OF THE SECURITIES AND EXCHANGE
COMMISSION, PLAINTIFF-APPELLEE**

---

*SEC v. McElhone*, No. 23-10228

## SECURITIES AND EXCHANGE COMMISSION'S
## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1-1, undersigned counsel for appellee Securities and Exchange Commission submits the following list of all persons and entities known to the Securities and Exchange Commission to have an interest in the outcome of this appeal:

1)    Alfano, Gaetan J., counsel for court-appointed receiver;

2)    Augustini, Hope Hall, counsel for appellee Securities and Exchange Commission;

3)    Barbero, Megan, counsel for appellee Securities and Exchange Commission;

4)    Berlin, Amie, counsel for appellee Securities and Exchange Commission;

5)    Bradylyons, Morgan, counsel for appellee Securities and Exchange Commission;

6)    Conley, Michael A., counsel for appellee Securities and Exchange Commission;

7)    Ferguson, David, counsel for appellant Joseph LaForte;

8)    Fields, Alexis, counsel for appellant Joseph LaForte;

9)    Froccaro, Jr. James, former counsel for appellant Joseph LaForte;

10)    Futerfas, Alan S., *Pro Hac Vice* counsel for appellant Lisa McElhone;

11)    Haimovitch, Seth D., counsel for appellant Joseph LaForte;

12)    Hardin, Tracey A., counsel for appellee Securities and Exchange Commission;

*SEC v. McElhone*, No. 23-10228

13) Healey, Martin F., counsel for appellee Securities and Exchange Commission;

14) Johnson, Alise Meredith, counsel for appellee Securities and Exchange Commission;

15) Kaplan, James M., counsel for appellants Lisa McElhone and the L.M.E. 2017 Family Trust;

16) Kaplan Zeena LLP, counsel for appellants Lisa McElhone and the L.M.E. 2017 Family Trust;

17) Kelley, Shannon, paralegal specialist for appellee Securities and Exchange Commission;

18) Kolaya, Timothy A., counsel for court-appointed receiver;

19) Kopelowitz Ostrow Ferguson Weiselberg Gilbert, counsel for appellant Joseph LaForte;

20) LaForte, Joseph, appellant;

21) Law Offices of Alan S. Futerfas, *Pro Hac Vice* counsel for appellant Lisa McElhone;

22) Levenson, Robert Kent, counsel for appellee Securities and Exchange Commission;

23) L.M.E. 2017 Family Trust, appellant;

24) McElhone, Lisa, appellant;

25) Pietragallo Gordon Alfano Bosick & Raspanti, LLP, counsel for court-appointed receiver;

26) Reinhart, Bruce, United States Magistrate Judge, Southern District of Florida;

27) Ruiz II, Rodolfo A., United States District Court Judge, Southern District of Florida;

28) Salup-Schmidt, Linda, counsel for appellee Securities and Exchange

*SEC v. McElhone*, No. 23-10228

Commission;

29) Securities and Exchange Commission, appellee;

30) Snyder, Noah E., counsel for appellants Lisa McElhone and the L.M.E. 2017 Family Trust;

31) Stumphauzer Kolaya Nadler & Sloman, PLLC, counsel for court-appointed receiver;

32) Stumphauzer, Ryan K., court-appointed receiver for the receivership entities;[1] and

33) Wagner, Brooke, counsel for appellee Securities and Exchange Commission.

---

[1] The receivership entities, which are not implicated on this appeal, include: Complete Business Solutions Group, Inc. d/b/a Par Funding; Full Spectrum Processing, Inc.; ABetterFinancialPlan.com LLC d/b/a A Better Financial Plan; ABFP Management Company, LLC f/k/a Pillar Life Settlement Management Company, LLC; ABFP Income Fund, LLC; ABFP Income Fund 2, L.P.; ABFP Income Fund 3, LLC; ABFP Income Fund 4, LLC; ABFP Income Fund 6, LLC; ABFP Income Fund Parallel LLC; ABFP Income Fund 2 Parallel; ABFP Income Fund 3 Parallel; ABFP Income Fund 4 Parallel; ABFP Income Fund 6 Parallel; Retirement Evolution Group, LLC; RE Income Fund LLC; RE Income Fund 2 LLC; ABFP Multi-Strategy Investment Fund LP; ABFP Multi-Strategy Investment Fund 2 LP; MK Corporate Debt Investment Company LLC; 20 N. 3rd St. Ltd; 118 Olive PA LLC; 135-137 N. 3rd St. LLC; 205 B Arch St Management LLC; 242 S. 21st St. LLC; 300 Market St. LLC; 627-629 E. Girard LLC; 715 Sansom St. LLC; 803 S. 4th St. LLC; 861 N. 3rd St. LLC; 915-917 S. 11th LLC; 1223 N. 25th St. LLC; 1250 N. 25th St. LLC; 1427 Melon St. LLC; 1530 Christian St. LLC; 1635 East Passyunk LLC; 1932 Spruce St. LLC; 4633 Walnut St. LLC; Beta Abigail, LLC; Capital Source 2000, Inc.; Eagle Six Consultants, Inc.; Fast Advance Funding LLC; Heritage Business Consulting, Inc.; Liberty Eighth Avenue LLC; New Field Ventures, LLC; L.M.E. 2017 Family Trust; Blue Valley Holdings, LLC; LWP North LLC; 500 Fairmount Avenue, LLC; Recruiting and Marketing Resources, Inc.; Contract Financing Solutions, Inc.; Stone Harbor Processing LLC; LM Property Management LLC; and ALB Management, Inc. *See* D. Ct. Dkt. Nos. 141, 238, 436, 484, 579, 1156.

*SEC v. McElhone*, No. 23-10228

In accordance with this Court's Rule 26.1-3(b), the Securities and Exchange Commission certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.  This Certificate of Interested Persons does not include all persons or entities who may be claimants in the receivership proceeding.

## STATEMENT REGARDING ORAL ARGUMENT

The Commission does not believe oral argument is necessary, as the issues are adequately presented by the briefs and the record below.

# TABLE OF CONTENTS

SECURITIES AND EXCHANGE COMMISSION'S
   CERTIFICATE OF INTERESTED PERSONS ............................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ................................. i

TABLE OF AUTHORITIES ................................................................. iv

COUNTERSTATEMENT OF JURISDICTION .................................... 1

COUNTERSTATEMENT OF ISSUES PRESENTED ........................... 2

STATEMENT OF THE CASE ................................................................ 2

     A.    Nature of the Case .............................................................. 2

     B.    Facts ................................................................................... 5

     C.    Proceedings Below ............................................................. 7

          1.    The Expansion Order ................................................. 8

          2.    The Final Judgment ................................................. 11

STANDARD OF REVIEW ................................................................. 16

SUMMARY OF ARGUMENT ............................................................ 16

ARGUMENT ..................................................................................... 18

I.    This Court lacks jurisdiction to review appellants' challenge to the
    Expansion Order; alternatively, it fails on the merits. ............................... 18

     A.    The Court lacks jurisdiction over the Expansion Order. ................... 18

     B.    Alternatively, the challenge fails on the merits because
         appellants received due process. ....................................... 19

          1.    Appellants received necessary information. ........................... 20

2. Appellants were heard concerning the Expansion Motion. . ... 23

3. The process provided was appropriate to the
circumstances. ................................................................. 26

II. The disgorgement order should be affirmed.  .............................................. 27

A. The district court reasonably accepted the SEC's approximation of
ill-gotten gains. ................................................................. 28

B. The district court properly declined to deduct sums already
omitted from the disgorgement calculation........................................ 34

III. The district court acted within its discretion in imposing $21.85
million in penalties against each defendant. .............................................. 36

A. Third-tier penalties were appropriate. .............................................. 36

B. The district court reasonably assessed $21.85 million in
penalties against each defendant. ....................................................... 40

C. Clarification of the Final Judgment or a limited remand
concerning joint and several liability for the civil penalties is
appropriate. ................................................................. 46

IV. Reassignment is not necessary. ................................................................. 48

CONCLUSION ................................................................. 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Akin v. PAFEC Ltd.*,

   991 F.2d 1550 (11th Cir. 1993) ........................................................... 19

*Chudasama v. Mazda Motor Corp.*,

   123 F.3d 1353 (11th Cir. 1997) ........................................................... 48

*Crawford & Co. v. Apfel*,

   235 F.3d 1298 (11th Cir. 2000) ........................................................... 16

*CSX Transp., Inc. v. State Bd. of Equalization*,

   521 F.3d 1300 (11th Cir. 2008) ........................................................... 51

*Fowler v. SEC*,

   142 S. Ct. 590 (2021) ........................................................................ 42

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,

   999 F.3d 1247 (11th Cir. 2021) ............................................. 48, 49, 50

*Liu v. SEC*,

   140 S. Ct. 1936 (2020) ...................................................................... 30

*SEC v. Arias*,

   No. 12-cv-2937, 2023 WL 1861641 (E.D.N.Y. Feb. 9, 2023) ......................... 29

*SEC v. Arias*,

   No. 12-cv-2937, 2021 WL 7908041 (E.D.N.Y. Nov. 11, 2021) ...................... 29

*SEC v. Calvo,

  378 F.3d 1211 (11th Cir. 2004) ............................................................ 16, 28, 29

SEC v. Complete Bus. Sols. Grp., Inc.,

  44 F.4th 1326 (11th Cir. 2022) ............................................................ 3

SEC v. Complete Bus. Sols. Grp., Inc.,

  No. 22-13811, 2023 WL 4196949 (11th Cir. June 27, 2023) ...................... 39-40

SEC v. de Maison,

  No. 18-2564, 2021 WL 5936385 (2d Cir. Dec. 16, 2021) .......................... 41, 44

*SEC v. Elliot,

  953 F.2d 1560 (11th Cir. 1992) ...................................................... 16, 19, 25, 50

SEC v. Fowler,

  6 F.4th 255 (2d Cir. 2021) .................................................................. 42

SEC v. Huff,

  455 F. App'x 882 (11th Cir. 2012) ............................................................ 29, 40

SEC v. Huff,

  758 F. Supp. 2d 1288 (S.D. Fla. 2010) .............................................. 40

SEC v. Husain,

  70 F.4th 1173 (9th Cir. 2023) .............................................................. 47

SEC v. Johnson,

  43 F.4th 382 (4th Cir. 2022) .............................................................. 47

*SEC v. Lauer*,

  478 F. App'x 550 (11th Cir. 2012) ...................................................... 32

*SEC v. Merch. Cap., LLC*,

  486 F. App'x 93 (11th Cir. 2012) ............................................... 16, 32

*SEC v. Milan Grp., Inc.*,

  595 F. App'x 2 (D.C. Cir. 2015) ....................................................... 47

*\*SEC v. Monterosso*,

  557 F. App'x 917 (11th Cir. 2014) ........................................ 28, 36, 39, 40, 46

*SEC v. Murphy*,

  50 F.4th 832 (9th Cir. 2022) ......................................................... 41, 43

*SEC v. Pentagon Cap. Mgmt. PLC*,

  725 F.3d 279 (2d Cir. 2013) .......................................................... 47

*SEC v. Revolutionary Concepts, Inc.*,

  No. 21-10984, 2022 WL 386085 (11th Cir. Feb. 9, 2022) ......................... 40, 43

*SEC v. Torchia*,

  922 F.3d 1307 (11th Cir. 2019) ....................................................... 19, 21

*SEC v. Vali Mgmt. Partners*,

  No. 21-453, 2022 WL 2155094 (2d Cir. June 15, 2022) ................................ 43

*SEC v. Voight*,

  No. 21-20511, 2023 WL 1778178 (5th Cir. Feb. 6, 2023) ................................ 29

*SEC v. Voight*,

    No. H-15-2218, 2021 WL 5181062 (S.D. Tex. June 28, 2021) ........................ 29

*SEC v. Warren*,

    534 F.3d 1368 (11th Cir. 2008) .................................................................. 37, 40

*Sovereign Mil. Hospitaller Ord. of Saint John of Jerusalem of Rhodes*

    *& of Malta v. Fla. Priory of the Knights Hospitallers of the*

    *Sovereign Ord. of Saint John of Jerusalem, Knights of Malta,*

    *The Ecumenical Ord.*, 809 F.3d 1171 (11th Cir. 2015) ............................. 49, 50

*Stargel v. SunTrust Banks, Inc.*,

    791 F.3d 1309 (11th Cir. 2015).......................................................................... 48

*United States v. Gupta*,

    572 F.3d 878 (11th Cir. 2009) ........................................................................... 49

*United States v. LaForte*,

    2:23-cr-198 (E.D. Pa. May 18, 2023) ................................................................ 4

*United States v. LaForte*,

    2:23-cr-198 (E.D. Pa. June 2, 2023) .................................................................. 4

*VanCook v. SEC*,

    653 F.3d 130 (2d Cir. 2011) ............................................................................. 46

## Statutes

Securities Act of 1933, 15 U.S.C. §§ 77a, et seq.

    Section 17, 15 U.S.C. § 77q ................................................................ 38

    Section 20(b), 15 U.S.C. § 77t(b) .......................................................... 1

    Section 20(d), 15 U.S.C. § 77t(d) .................................................... 1, 37

    Section 20(d)(2), 15 U.S.C. § 77t(d)(2) ......................................... 37, 40

    Section 22(a), 15 U.S.C. § 77v(a) .......................................................... 1

Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, et seq.

    Section 10(b), 15 U.S.C. § 78j(b) .........................................................38

    Section 21(d), 15 U.S.C. § 78u(d) .......................................................... 1

    Section 21(d)(3), 15 U.S.C. § 78u(d)(3) .............................................. 37

    Section 21(d)(3)(B), 15 U.S.C. § 78u(d)(3)(B) ............................... 37, 40

    Section 21(e), 15 U.S.C. § 78u(e) .......................................................... 1

    Section 27, 15 U.S.C. § 78aa ................................................................. 1

28 U.S.C. § 1291 ......................................................................................... 2

## Rules and Regulations

Federal Rule of Civil Procedure 54(b) ................................................. 1, 4

Rules Under the Securities Exchange Act of 1934, 17 C.F.R. §§ 240.0-1, et seq.

    Rule 10b-5, 17 C.F.R. § 240.10b-5 .....................................................38

## COUNTERSTATEMENT OF JURISDICTION

The district court had jurisdiction over this civil law enforcement action brought by the Securities and Exchange Commission ("Commission" or "SEC") pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a); and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.  On July 27, 2020, the district court appointed as receiver appellee Ryan K. Stumphauzer, D. Ct. Dkt. 36; AII at 175,[2] and on December 16, 2020, it entered an interlocutory order expanding the receivership, D. Ct. Dkt. 436 ("Expansion Order"); AIV at 19.  In November 2021, appellants Lisa McElhone ("McElhone") and Joseph W. LaForte ("LaForte") consented to entry of judgments on liability and imposition of a permanent injunction and other relief.  D. Ct. Dkt. 1002, 1003, 1008, 1010; AV at 168, 176.  On November 22, 2022, the court entered a comprehensive decision imposing relief and a final judgment as to McElhone and LaForte pursuant to Federal Rule of Civil Procedure 54(b).  D. Ct. Dkt. 1450, 1451 ("Final Judgment"); AIX at 8, 58.[3]

---

[2] "D. Ct. Dkt. [ ]" refers to the district court docket entries.  "A[ ]" refers to the relevant volume of Appellants' Appendix.  "LaForte Br. [ ]" refers to LaForte's opening brief.  "McElhone Br. [ ]" refers to McElhone's opening brief.

[3] The court first issued a decision on October 25, 2022, which was subsequently amended to correct a clerical error.  *See* D. Ct. Dkt. 1432, 1449; AVIII at 160, 228.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 over McElhone and LaForte's timely appeal from the Final Judgment. *See* Dkt. 27. As detailed in the Commission's response to the Court's jurisdictional question, this Court lacks jurisdiction over their appeal from the Expansion Order. Dkt. 24.

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.      Whether appellants, who had access to relevant information and opportunities to be heard, were afforded due process in connection with the Expansion Order.

2.      Whether the district court reasonably exercised its discretion in ordering appellants to disgorge the net proceeds of Par Funding's unregistered securities offerings, as established by the receiver's sworn declaration and a multi-year expert analysis of Par Funding's financial records.

3.      Whether the district court reasonably exercised its discretion in imposing third-tier penalties of $21.85 million against McElhone and LaForte in light of their orchestration of an extensive fraudulent scheme and their egregious, recurrent violations of the securities laws.

## STATEMENT OF THE CASE

### A.      Nature of the Case

In July 2020, the Commission brought this civil enforcement action alleging violations of the securities laws by Complete Business Solutions Group, Inc.

("CBSG") d/b/a Par Funding ("Par Funding"), a "merchant cash advance" business, and several of its officers, employees, and agents, including individual defendants and spouses McElhone and LaForte.  D. Ct. Dkt. 1; AI at 190.[4]  CBSG was founded by McElhone and LaForte in 2011 and solely owned by a family trust—the L.M.E. 2017 Family Trust (the "Trust")—whose trustees are McElhone and LaForte.  D. Ct. Dkt. 119 at 5; AIII at 13.  The Commission alleged that the defendants operated a scheme of unregistered, fraudulent securities offerings that raised nearly half a billion dollars from over a thousand investors nationwide.  D. Ct. Dkt. 119 at 2; AIII at 10.

On July 27, 2020, the district court granted the Commission's motion for the appointment of a receiver and appointed Ryan Stumphauzer as receiver over certain corporate defendants.  D. Ct. Dkt. 36, 141; AII at 175, AIII at 72.  On October 30, 2020, the receiver filed a motion to expand the receivership to include additional entities and properties, including the Trust.  D. Ct. Dkt. 357 ("Expansion Motion"); AIII at 114.  The district court granted that motion on December 16, 2020.  D. Ct. Dkt. 436; AIV at 19.  LaForte and McElhone appealed from the Expansion Order at that time, but the appeal was dismissed for lack of jurisdiction. *See SEC v. Complete Bus. Sols. Grp., Inc.*, 44 F.4th 1326 (11th Cir. 2022).

---

[4] The Commission filed an Amended Complaint on August 10, 2020.  D. Ct. Dkt. 119; AIII at 8.

3

Following discovery, McElhone and LaForte consented to judgment as to liability, reserving for later determination the imposition of any monetary remedies. D. Ct. Dkt. 1008, 1010; AV at 168, 176. The district court subsequently issued an order finding McElhone and LaForte liable for disgorgement, prejudgment interest, and civil penalties. D. Ct. Dkt. 1432; AVIII at 160. It later entered an amended order and amended final judgment pursuant to Federal Rule of Civil Procedure 54(b), ordering McElhone and LaForte to pay a total of $196,924,738.24—$142,529,980 in disgorgement, $10,694,758.24 in prejudgment interest, and $21,850,000 each in civil penalties—to the receiver. D. Ct. Dkt. 1450, 1451; AIX at 8, 58. The district court then administratively closed the case, while retaining jurisdiction to enforce the judgments and oversee the receivership. D. Ct. Dkt. 1453.[5]

---

[5] A grand jury has since returned a superseding indictment criminally charging McElhone and LaForte in connection with their conduct at Par Funding. *See United States v. LaForte*, 2:23-cr-198 (E.D. Pa. May 18, 2023), Dkt. 3. McElhone is charged with several conspiracy and tax crimes, and LaForte is charged with 56 felony counts, including conspiracy to commit securities and wire fraud, securities fraud, wire fraud, extortionate collection of credit, tax crimes, perjury, and obstruction. The charged conduct includes LaForte's use of threats of violence against Par Funding's merchant-customers, as well as aiding and abetting the assault of a lawyer representing the receiver in this action. *See also United States v. LaForte*, 2:23-cr-198 (E.D. Pa. June 2, 2023), Dkt. 30.

**B.     Facts[6]**

McElhone and LaForte founded CBSG in 2011, shortly after LaForte was released from prison on criminal charges.[7]  D. Ct. Dkt. 119 at 5; AIII at 13.  From August 2012 until the court's entry of a temporary restraining order and asset freeze in 2020, Par Funding operated a "merchant cash advance" business in which it provided opportunistic short-term loans to small businesses.  D. Ct. Dkt. 119 at 2, 14; AIII at 10, 22.  McElhone was Par Funding's President, CEO, and sole employee.[8]  She was a signatory on Par Funding's bank accounts and had ultimate decision-making authority for Par Funding.  D. Ct. Dkt. 119 at 5–6; AIII at 13–14. LaForte also acted as a de facto CEO, conducting day-to-day operations.  D. Ct. Dkt. 119 at 7; AIII at 15.

---

[6] These facts are taken from the allegations in the Commission's Amended Complaint.  D. Ct. Dkt. 119; AIII at 8.  As provided in the parties' consent judgments, these allegations must be accepted as true for purposes of the Commission's motion for monetary remedies.  D. Ct. Dkt. 1002, 1003.

[7] In 2006, LaForte was convicted of state charges in New York for grand larceny and money laundering, and in 2007, he was sentenced to three to ten years in prison and ordered to pay $14.1 million in restitution.  In 2009, he pled guilty to federal criminal charges in the District of New Jersey for conspiracy to operate an illegal gambling business.  D. Ct. Dkt. 119 at 7, 38; AIII at 15, 46.

[8] Par Funding was solely owned by the Trust and operated after 2017 by an entity called Full Spectrum Processing, Inc., which was owned by McElhone.  D. Ct. Dkt. 119 at 5–6; AIII at 13–14.

5

To fund its merchant cash advances, Par Funding raised nearly half a billion dollars from an estimated 1,200 investors nationwide in a series of unregistered securities offerings.  D. Ct. Dkt. 119 at 2; AIII at 10.  From August 2012 until approximately December 2017, Par Funding primarily issued promissory notes that were offered to the investing public directly and through sales agents.  *Id.*  But in January 2018, Par Funding learned that it was under investigation by the Pennsylvania Department of Banking and Securities for violating state securities laws through its use of unregistered agents.  So Par Funding began using "Agent Funds" created for the purpose of issuing their own notes to the public while directing the proceeds back to Par Funding.  *Id.*  Investors, told they were investing in Par Funding, in fact received promissory notes in an Agent Fund; the Agent Fund then sent the funds to Par Funding in exchange for a Par Funding promissory note, which offered a higher rate of return as compensation for the agent.  *Id.*; D. Ct. Dkt. 119 at 16–17; AIII at 24–25.

The Par Funding notes purportedly generated returns through the interest paid on the company's small business loans.  The profitability of the notes therefore depended on Par Funding's customers paying back their loans with interest rather than defaulting.  But the defendants and their sales agents misrepresented, *inter alia*, the underwriting process undertaken by Par Funding before issuing loans, the quality of Par Funding's loan portfolio, and the success

6

and profitability of the loan programs.  D. Ct. Dkt. 119 at 29–36; AIII at 37–44.

They also failed to disclose that Par Funding had been sanctioned by state

regulators, concealed LaForte's identity and criminal history, made false

statements in Par Funding's Form D filed with the SEC, and commingled and

diverted investor funds to, among others, McElhone and the Trust.  D. Ct. Dkt. 119

at 38–43; AIII at 46–51.

### C.     Proceedings Below

The Commission brought this action in July 2020, alleging, *inter alia*, that

LaForte, McElhone, and others violated various provisions of the federal securities

laws and misused investor funds.  D. Ct. Dkt. 119; AIII at 8.  Shortly after, the

district court granted the Commission's motion for the appointment of a receiver

over the corporate defendants, finding that a receivership was "necessary and

appropriate for the purposes of marshaling and preserving all assets . . . that: (a) are

attributable to funds derived from investors or clients of the Defendants; (b) are

held in constructive trust for the Defendants; and/or (c) may otherwise be

includable as assets of the estates of the Defendants . . . ."  D. Ct. Dkt. 36, 141 at 1;

AII at 175, AIII at 73.  The court also granted the Commission's motion for a

temporary restraining order, imposed an asset freeze, and ordered a preliminary

injunction hearing, sworn accountings, and expedited discovery.  D. Ct. Dkt. 14,

42; AII at 81, 180.

In connection with these motions and hearings, the Commission presented a variety of evidence regarding defendants' use of commingled investor funds. In particular, the Commission filed several declarations by Melissa Davis—CPA at an advisory firm retained by the Commission to analyze CBSG's banking activity—setting forth evidence of payments that included commingled investor funds to entities related to LaForte and McElhone. *See* D. Ct. Dkt. 21-1, 89-1, 290-8. It also produced a chart summarizing evidence concerning numerous properties purchased with commingled investor funds (the "Summary Chart") along with an evidentiary declaration by Raymond Andjich ("Andjich Declaration"). D. Ct. Dkt. 177-51. And it made its entire investigative file, including bank records demonstrating defendants' use of commingled investor funds, available to all parties.[9]

### 1. The Expansion Order

On October 30, 2020, the receiver filed the Expansion Motion.[10] The motion sought to expand the receivership to include the Trust, several companies and real estate entities affiliated with defendants that received commingled funds,

---

[9] During a December 15, 2020 status conference, counsel for the Commission reminded all parties that the Commission's entire investigative file was available upon request, without the need to serve a discovery request. D. Ct. Dkt. 445 at 106; AIV at 131.

[10] The scope of the receivership had also been addressed on several occasions prior to the Expansion Motion. *See, e.g.*, D. Ct. Dkt. 73, 84, 92.

and certain properties purchased by McElhone with commingled funds.  D. Ct. Dkt. 357; AIII at 114.  In support, it attached Davis's declarations, the Summary Chart and Andjich Declaration, another chart of property-related evidence, and McElhone's financial statements, among other documents.  McElhone and LaForte sought and obtained additional time to "review various documents and multilayered transfers to assess the veracity of these allegations," D. Ct. Dkt. 367 at 2, before submitting a joint opposition on November 18, 2020.  In that filing, they primarily argued that the commingled funds identified by the receiver should not be disgorged and did not warrant expansion of the receivership.  D. Ct. Dkt. 401; AIII at 198.

Meanwhile, on December 13, 2020, the receiver filed a status report, unrelated to the Expansion Motion.  That filing included a declaration by Bradley Sharp ("Sharp Declaration"), financial advisor to the receiver, which presented "preliminary findings" with respect to defendants' business operations and "sources and uses of cash through 2019."  D. Ct. Dkt. 426, 426-1 ¶¶ 2, 5; AIII at 235, 241 ¶¶ 2, 5.  Among other findings, Sharp concluded that CBSG "would not have been able to continue to provide payments to investors, or to continue to operate, without additional funds from investors."  D. Ct. Dkt. 426-1 ¶ 53; AIII at 259 ¶ 53.

On December 15, 2020, the district court held a status conference via Zoom, during which the court heard from the parties regarding the status report, Expansion Motion, and related discovery issues. D. Ct. Dkt. 445 at 97–100; AIV at 122–25. After hearing from appellants' counsel, including their request for oral argument, the court noted that the issue of expanding the receivership had been the subject of "very thorough briefing" and likely would not require additional argument. D. Ct. Dkt. 445 at 101–02; AIV at 126–27 (explaining that there should be no "lack of due process argument" in light of the "fulsome" briefing and the court's ongoing dialogue with the parties, though the court would "take a second look before ultimately I rule and if I feel I cannot make an effective ruling or determination without oral argument, I will contact the parties to set one").

The next day, the district court granted the Expansion Motion, concluding that the related entities and properties identified by the receiver contained commingled investor funds that could be the subject of disgorgement and therefore should be brought into the receivership. D. Ct. Dkt. 436 at 2, 5; AIV at 21, 24. The court "d[id] not take this decision lightly," but found that given "the Receiver's findings—as well as Defendants' overall conduct to date," "the existing asset freeze will [not] sufficiently safeguard the property at issue . . . , thereby necessitating the requested expansion." D. Ct. Dkt. 436 at 2–3; AIV at 21–22.

10

Notably, the concerns regarding dissipation of assets underlying the Expansion Order would prove to be well-founded.  As later became clear, McElhone had already transferred one of the properties, which was included in the Expansion Motion because it had been purchased with commingled funds, to another company in which she had an ownership interest.  D. Ct. Dkt. 482.  The transfer occurred shortly after the receiver had asked McElhone to agree to the filing of *lis pendens* to preserve the asset, and despite defendants' representations to the court that none of the relevant properties had been sold.  D. Ct. Dkt. 482 at 11–14; D. Ct. Dkt. 367 at 3.

## 2.  The Final Judgment

In November 2021, the parties stipulated to, and the court entered, consent judgments against McElhone and LaForte, in which both consented to entry of judgment on liability as well as a permanent injunction and other relief.  D. Ct. Dkt. 1008, 1010; AV at 168, 176.  The consent judgments provided for additional proceedings at which the court would determine any monetary remedies, and McElhone and LaForte agreed that, for the purpose of those proceedings, the court would accept as true the allegations in the Amended Complaint.  *Id.*

Consistent with the consent judgments, the Commission subsequently moved for final judgment against McElhone and LaForte, seeking: (1) approximately $226.5 million in disgorgement, reflecting the amount Par Funding

11

raised from investors minus the amounts paid out to investors and Agent Funds (i.e., the net total Par Funding received from the unregistered offerings), based on the receiver's sworn declaration and a multi-year expert analysis of Par Funding's financial records, along with certain deductions; (2) approximately $11 million in prejudgment interest; and (3) $50 million from each defendant in civil penalties. D. Ct. Dkt. 1252 at 1; AVI at 32.  McElhone and LaForte argued instead for disgorgement of approximately $49 million, disputing the SEC's calculation of the offering proceeds and seeking myriad deductions.  D. Ct. Dkt. 1329 at 13–26; AVI at 116–29.  They also proposed civil penalties of approximately $5 million, or 10-15% of their requested disgorgement.  D. Ct. Dkt. 1329 at 47; AVI at 150.

The district court held an evidentiary hearing on September 14, 2022, at which it heard from all parties and the receiver.  D. Ct. Dkt. 1419; AVIII at 8. During the hearing, the court expressed some frustration with the SEC's briefing and pressed the SEC to clarify and identify the support for its positions, emphasizing that it would order remedies only when assured that doing so was equitable and grounded in the record.  *Id.*  After the hearing, on October 25, 2022, the court issued a comprehensive decision that closely scrutinized the parties'

evidence and arguments and that generally imposed relief in amounts less than the

SEC's proposals but greater than defendants'. D. Ct. Dkt. 1432; AVIII at 160.[11]

    After reviewing the applicable legal standards, the district court first found

that disgorgement was warranted for each defendant, observing that defendants

"violated the securities laws numerous times over several years, and the SEC is

entitled to disgorgement of their ill-gotten gains[,] . . . [which] will be distributed

to the victim investors by the Receiver at a later time." D. Ct. Dkt. 1450 at 13;

AIX at 21. With respect to McElhone and LaForte, the court found that the SEC's

calculation of the net offering proceeds satisfied its burden to provide a reasonable

approximation of the couple's ill-gotten gains. In particular, the court rejected

McElhone and LaForte's bid to use a lower figure from the receiver's latest

quarterly status report rather than that provided by the SEC. As the court

explained, the SEC's calculation was derived from an "intensive and multi-year

analysis of Par Funding's QuickBooks records" that had been subject to expert

review by both parties, whereas defendants' figures came from "unsworn analysis"

that "did not undergo nearly the same level of scrutiny" and that "contradict[ed]

the QuickBooks figures that both the SEC and Defendants' expert reports relied

on." D. Ct. Dkt. 1450 at 15–16; AIX at 23–24. The court also declined McElhone

---

[11] The court later issued an amended order that corrected an error in tabulating
McElhone and LaForte's disgorgement but was otherwise unchanged. D. Ct. Dkt.
1449, 1450; AVIII at 228, AIX at 8.

and LaForte's request to deduct amounts disgorged by other defendants because those amounts had already been excluded from the SEC's calculation.  D. Ct. Dkt. 1450 at 17–18; AIX at 25–26.  It did, however, grant their request for tens of millions in deductions for consulting fees, business expenses, and taxes over the SEC's objection, ultimately reducing their disgorgement obligation to approximately $142 million.  D. Ct. Dkt. 1450 at 19–26; AIX at 27–34.

The district court next considered what civil penalties were suitable. Rejecting appellants' argument for, at most, second-tier penalties, the court pointed to the significant risk of substantial losses to investors created by the "litany of serious misrepresentations" made by defendants in finding third-tier penalties appropriate.  D. Ct. Dkt. 1450 at 34–35; AIX at 42–43 (stating that defendants "made multiple serious misrepresentations to investors—notably, misleading investors as to Par Funding's actual default rate, concealing Par Funding's sordid regulatory history, and concealing LaForte's criminal history—and have left hundreds of millions of investor returns unpaid").  It found the couple's conduct egregious, noting that "[a]t every turn, LaForte and McElhone (the ultimate decisionmaker at Par Funding) materially misled investors" and "withheld or lied about critical information that investors rely on in making investment decisions." D. Ct. Dkt. 1450 at 38; AIX at 46 ("Without question, the frequency and severity of their misrepresentations and omissions warrant significant penalties.").  The

court also found the record "replete" with "examples of a deliberate intent to deceive the investing public" on the part of McElhone and LaForte and noted that the violations were recurrent "over the life of the company." D. Ct. Dkt. 1450 at 37–39; AIX at 45–47.

In light of these and other findings, the court determined that "significant penalties" were appropriate. D. Ct. Dkt. 1450 at 38; AIX at 46. It nevertheless declined to impose the $50 million sanction requested by the SEC or to assess penalties for each of the potentially thousands of violations in the case. Instead, citing the impossibility of identifying the exact number of violations at issue, the court chose to multiply the maximum statutory penalty by the number of outstanding unpaid Par Funding promissory notes. D. Ct. Dkt. 1450 at 41–42; AIX at 49–50. This approach grounded the penalty in the facts of the case while "equitably captur[ing] the nature and scope of McElhone and LaForte's wrongdoing." D. Ct. Dkt. 1450 at 41; AIX at 49. As a result, the court assessed a penalty of $21.85 million against each defendant, which it decided to impose jointly and severally. D. Ct. Dkt. 1450 at 42; AIX at 50.

McElhone and LaForte now appeal from the Expansion Order and the Final Judgment.[12] Dkt. 1, 2.

---

[12] On April 28, 2023, this Court dismissed McElhone and LaForte's challenge to a July 1, 2022 order issued by the magistrate judge and dismissed the appeal insofar as McElhone and LaForte purported to appeal on behalf of the Trust. Dkt. 27.

## STANDARD OF REVIEW

A "district court has broad powers and wide discretion to determine relief in an equity receivership." *SEC v. Elliot*, 953 F.2d 1560, 1566 (11th Cir. 1992).  The constitutional sufficiency of a lower court's procedures is reviewed *de novo*. *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1302 (11th Cir. 2000).

The district court's imposition of remedies is reviewed for an abuse of discretion.  *See SEC v. Calvo*, 378 F.3d 1211, 1216–17 (11th Cir. 2004) (per curiam).  "The abuse of discretion standard gives a district court a range of choice, so long as that choice does not constitute a clear error of judgment." *SEC v. Merch. Cap., LLC*, 486 F. App'x 93, 95 (11th Cir. 2012) (per curiam).

## SUMMARY OF ARGUMENT

1.  Appellants' due process challenge to the Expansion Order should be dismissed, as the Court lacks jurisdiction to review that interlocutory order.  If the Court nonetheless reaches the merits, the challenge should be rejected because the proceedings afforded appellants sufficient information and opportunity to be heard before the Expansion Order—which sought to preserve the status quo and forestall dissipation of assets—was issued.

2.  The district court reasonably exercised its discretion in calculating appellants' disgorgement.  As the court found, the SEC provided a reasonable approximation of appellants' ill-gotten gains by establishing the net total Par

Funding received from its unlawful offerings.  The court's considered decision to rely on the SEC's tabulation of that amount, presented in a sworn declaration reflecting a longstanding analysis of the company's records—rather than on a new and untested figure preferred by appellants—was well within its discretion.  And its decision not to deduct certain payments by others, on the ground that those sums had already been omitted from the SEC's calculation, was likewise supported by the record.

3.  The district court also acted within its discretion in imposing third-tier penalties against McElhone and LaForte in the amount of $21.85 million. Although appellants seek to minimize their conduct and criticize the court's methodology, the court properly assessed a number of factors, including the nature and scope of appellants' wrongdoing, their scienter, and the risk of substantial loss they created, before fashioning a penalty that reflected their significant misconduct and the facts of the case.  Clarification or a limited remand with instructions to ensure the Final Judgment holds appellants individually liable for their civil penalties is appropriate, however.

4.  Finally, reassignment of the case to another judge on any remand is not warranted.  Appellants have not shown that the case cannot be fairly resolved by the district court or that the appearance of justice has been imperiled, and

17

reassignment of this complex action at this late stage would entail waste and duplication.

## ARGUMENT

I.  **This Court lacks jurisdiction to review appellants' challenge to the Expansion Order; alternatively, it fails on the merits.**

The Expansion Order does not finally determine the disposition of any assets or require LaForte or McElhone to pay out any money or property.  It merely expands the receivership to include assets that appear to contain or to have been purchased with commingled investor funds, preventing the dissipation of those assets pending their final disposition.  As such, this Court lacks jurisdiction over appellants' appeal of the Expansion Order, which should instead await the conclusion of the receivership.  But if the Court exercises jurisdiction, appellants' due process challenge to the order should be rejected on the merits because appellants were provided access to relevant information and opportunities to be heard prior to the Expansion Order's issuance.  Particularly in light of the Expansion Order's provisional nature, no further process was required.

### A.    The Court lacks jurisdiction over the Expansion Order.

As an initial matter, this Court should not reach appellants' challenge to the Expansion Order.  As set forth in the Commission's response to the Court's Jurisdictional Question, the Court lacks jurisdiction over this appeal because the Expansion Order is interlocutory and did not "produce" the Final Judgment.  *See,*

*e.g.*, *Akin v. PAFEC Ltd.*, 991 F.2d 1550, 1563 (11th Cir. 1993) (explaining that the "Court has jurisdiction to review a district court's non-final orders only when those orders merge into a final judgment of the district court" and lacks jurisdiction when the rulings "played no role in the entry of the final judgment" and cannot "be characterized as having 'produced' the judgment"). Rather, the Expansion Order is more appropriately appealed when there is a final order in the receivership providing for the distribution of assets. *See* Dkt. 24.

**B.    Alternatively, the challenge fails on the merits because appellants received due process.**

In any event, appellants' challenge fails on the merits because appellants received sufficient process in connection with the Expansion Motion. Due process essentially requires notice, an opportunity to be heard, and that the procedures be fair. *See Elliott*, 953 F.2d at 1566; *see also SEC v. Torchia*, 922 F.3d 1307, 1319 (11th Cir. 2019) (calling for "necessary information, a meaningful opportunity to argue the facts and their claims and defenses, and an adjudication of their claims and defenses"). The appropriate process varies according to the nature of the right and the type of proceeding, and courts must weigh the strength of the private interest, the risk of erroneous deprivation, the probable value of additional or substitute safeguards, and the government interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requisites would entail." *Elliot*, 953 F.2d at 1566 (internal quotation

19

marks omitted).  Summary proceedings are particularly appropriate in the

receivership context, as they help to "reduce[] the time necessary to settle disputes,

decrease[] litigation costs, and prevent[] further dissipation of receivership assets."

*Id.*  Ultimately, the Court "must look at the actual substance, not the name or form,

of the procedure [used] to see if the claimants' interests were adequately

safeguarded . . . [and] appellants must show how they were prejudiced by the

summary proceedings."  *Id.* at 1567.

Appellants here claim that they were deprived of due process in connection

with the Expansion Order, but the record demonstrates that they received relevant

information and opportunities to be heard.  In light of both the substantial interest

in preserving the status quo and minimizing costs in order to maximize the funds

available to return to injured investors, and the limited deprivation suffered by

appellants (namely, temporary loss of control over assets linked to commingled

investor funds while their ultimate disposition is determined), the court afforded

appellants sufficient process.

### 1.  Appellants received necessary information.

LaForte and McElhone claim that by granting the Expansion Order "without

permitting discovery," the district court denied them "a meaningful opportunity to

defend their property rights."  LaForte Br. at 7; *see also id.* at 3–4 (claiming that

"[d]uring six subsequent months of intense litigation [after the Commission filed

the Complaint], the Receiver successfully resisted Appellants' repeated demands for access to the business and financial records necessary for their defense"). But they had access to relevant evidence before the Expansion Order was issued.

To support the Expansion Motion, the receiver relied largely on declarations from Davis and Andjich, the Summary Chart, and the underlying property-related evidence to show that investor funds had been used to purchase the properties at issue. D. Ct. Dkt. 357, Exs. F, G, J, L; AIII at 153, 159, 171, 188. Based on this evidence, the district court reasonably concluded that the properties had been purchased with "tainted funds" and could therefore be subject to disgorgement, rendering expansion of the receivership appropriate. D. Ct. Dkt. 436 at 2; AIV at 21. As noted, these materials were made available to defendants in advance of the motion. The Commission also made its entire investigative file (including bank records demonstrating the relevant use of commingled investor funds) available to all parties. *See supra.* Appellants accordingly had access to the information that formed the basis for the Expansion Order. *Cf. Torchia*, 922 F.3d at 1318 (concluding that investors were not provided sufficient process where the receiver "never provided . . . any evidence whatsoever" of the payments made, nor did he "set out the methodology" for his calculations).

Appellants claim that they could not "directly refute the Receiver's allegations of commingling because . . . the Receiver had not yet permitted them

access to 'Par Funding's books and records,'" LaForte Br. at 11–12, but they made no effort to refute the receiver's allegation of commingling using the records and declarations relied on by the receiver and ultimately the court. For example, they entirely failed to address the Andjich Declaration and Summary Chart, which summarized the purchase of properties by McElhone, the Trust, and the related entities after each had received commingled investor funds from Par Funding. And though they dismiss the import of the first two Davis Declarations, Davis described appellants' receipt and commingling of $492 million of "Investors and Agent funds" in Par Funding accounts, followed by a series of transfers to McElhone, the Trust, and a number of related entities from "Par Funding accounts containing commingled Investor Funds." D. Ct. Dkt. 21-1 ¶¶ 6–20; 89-1 ¶¶ 4–10; 290-8 ¶¶ 5, 7–24.

Moreover, appellants fail to acknowledge that they were initially responsible for the very records of which they claim ignorance, as they had controlled Par Funding's books and records and directed the flow of its funds.[13] Yet despite this fact—and despite now having had several years of access to, and expert review of, the Par Funding books and data—they make broad complaints about lack of

_____

[13] They also fail to explain why the receiver had initially "resisted" providing them renewed access to Par Funding's books and records—namely, the parties' inability to agree on a protective order and to resolve a dispute concerning defendants' unauthorized retention and use of the company's records. *See* D. Ct. Dkt. 445 at 42–44; AIV at 67–69; *see also, e.g.*, D. Ct. Dkt. 464.

22

discovery, offering little to show how specific records would have refuted all the receiver's claims or altered the district court's decision. *See* LaForte Br. at 12 n.3 (including one footnote stating only that defendants' expert concluded "consulting fees were not paid with Investor funds"). Appellants accordingly were not deprived of essential information concerning the Expansion Motion.

### 2. Appellants were heard concerning the Expansion Motion.

Before issuing its decision, the district court considered appellants' 23-page opposition, which they submitted after obtaining additional time to review and brief the issue, along with written submissions by all other parties and one non-party entity. *See* D. Ct. Dkt. 367, 376, 399, 401, 414. Notably, appellants' opposition did not meaningfully contest the receiver's evidence regarding the flow of funds, nor did it highlight the discovery issues they now assert. It focused instead on whether the assets in question were properly subject to disgorgement. But the district court did not need to determine the nature and scope of any assets to be disgorged to resolve the preliminary issue at the heart of the Expansion Motion—namely, whether to preserve the status quo by preventing dissipation of assets that appeared to have been obtained with commingled investor funds.

In addition, although the district court did not hold a separate hearing on the Expansion Motion, the parties were given an opportunity to address it orally at the December 15 status conference. D. Ct. Dkt. 445 at 97–100; AIV at 122–25. The

court heard from counsel regarding the Expansion Motion and their due process

concerns before observing that the issue had been subject to "very thorough

briefing" and could be decided fairly and promptly.  D. Ct. Dkt. 445 at 101; AIV at

126; *see also id.* ("I don't think that anyone could make a lack of due process

argument in that the Court is going to review all the pleadings, we have allowed

this to be fully briefed before the Court even considers it. . . . So, to me, I should be

able to rule on the papers and part and parcel is to your exact point, I'm trying to

keep the train moving, making it fair and not spending too much more time and

money when the pleadings are very thorough.").  The court emphasized that it

would "take a second look" to ensure it could "make an effective ruling or

determination without oral argument" and would "entertain oral argument if I think

it is necessary."  D. Ct. Dkt. 445 at 101–02; AIV at 126–27; *see also* D. Ct. Dkt.

445 at 107; AIV at 132 (promising to "get down to brass tacks, take a look at the

expansion motion for the third or fourth time" and "debate over whether [to] set an

oral argument" before issuing "an order one way or the other").  But after

considering hundreds of pages of briefing and its colloquy with the parties, the

court found no further argument was necessary before issuing its ruling.

Appellants argue that they were entitled to an "evidentiary hearing," but a

hearing—let alone a full-blown evidentiary hearing—is not always required in

summary proceedings, and appellants fail to explain, even with the benefit of years

of additional proceedings, how a separate hearing would have changed the mix of information before the district court. *Elliott*, 953 F.2d at 1566. Appellants also complain that defense counsel was muted at certain points during that conference. *See, e.g.*, LaForte Br. at 15. But that is a red herring. While the district judge muted defense counsel during the course of a discussion of ongoing discovery disputes between defendants and the receiver after several interruptions by defense counsel, he heard from defense counsel later in the hearing. D. Ct. Dkt. 445 at 57–58, 60–62; AIV at 82–83, 85–87.

Finally, appellants argue that "the District Court's refusal to permit a response to the Sharp report unfairly prejudiced Appellants' opposition to the Expansion Motion," LaForte Br. at 29, but this argument also lacks merit. The Sharp Declaration was not filed in connection with the Expansion Motion, not cited by the receiver in urging expansion, and, importantly, not relied on by the district court in its order. Instead, the Expansion Order was based on the district court's review of written submissions by all parties and the evidence attached to the motion, available to all parties, that established defendants' misuse of commingled investor funds. Moreover, while the Sharp Declaration offered Sharp's provisional finding that Par Funding "would not have been able to continue to provide payments to investors, or to continue to operate, without additional funds from investors," D. Ct. Dkt. 426-1 ¶ 53; AIII at 259 ¶ 53, that

25

finding was merely preliminary. And while it was potentially relevant to the Commission's claims and certain issues in the pending litigation, it was not involved in the court's decision to expand the receivership.

### 3. The process provided was appropriate to the circumstances.

In evaluating the Expansion Motion and the process concerning it, the district court weighed a number of different factors, including the evidence of diverted commingled investor funds, the burdens that an expanded receivership would entail, the adequacy of other measures, the value of saving time and expense, the protection of harmed investors, and the need to act quickly to prevent dissipation of assets. *See* D. Ct. Dkt. 436 at 2–3, AIV at 21–22; D. Ct. Dkt. 445 at 78–86, 101–02, AIV at 103–11, 126–27; *see also* D. Ct. Dkt. 482 at 12–14 (describing undisclosed transactions used to transfer property subject to the Expansion Motion). The court made clear that it did not "take this decision lightly." D. Ct. Dkt. 436 at 2; AIV at 21. But balancing the substantial interest in preserving the status quo and in maximizing the funds available to return to injured investors against defendants' limited deprivation—provisional loss of control over assets linked to commingled investor funds pending subsequent determination as to ownership of those assets—and in light of the briefing and input from the parties, the court reasonably determined that expansion of the receivership was necessary at that time to protect receivership assets from potential dissipation. The level of

process it afforded was appropriate to those circumstances.  Appellants' challenge to the Expansion Order should therefore be rejected.

## II.    The disgorgement order should be affirmed.

In determining McElhone and LaForte's disgorgement obligation, the district court engaged in a thorough analysis informed by the allegations in the Amended Complaint, the receiver's sworn declaration, and expert analysis of Par Funding's books and records.  It closely scrutinized the Commission's proposal, the defendants' arguments, and the evidentiary record before performing its own independent review of the facts and law.  Ultimately, the district court employed the SEC's baseline disgorgement figure, incorporated about $80 million in deductions requested by appellants over the SEC's objection, and ordered disgorgement in an amount greater than defendants proposed but less than the SEC sought.

McElhone and LaForte take issue with the district court's calculation, arguing that it should have used a different starting figure and that it erred in rejecting one of their proposed deductions.  Both determinations, however, were well considered, supported by the record, and within the court's discretion. Appellants' challenges to the disgorgement order accordingly fail.

**A.**  **The district court reasonably accepted the SEC's approximation of ill-gotten gains.**

"The SEC is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains. The burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) (per curiam). "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.* (cleaned up).  This Court reviews the district court's findings concerning the amount of disgorgement and the reasonableness of the SEC's approximation for abuse of discretion. *Id.* at 1217–18; *see also, e.g.*, *SEC v. Monterosso*, 557 F. App'x 917, 928 (11th Cir. 2014) (per curiam).

Here, the district court reasonably found that the SEC satisfied its burden to approximate appellants' ill-gotten gains by establishing the net proceeds of the unregistered offerings.  McElhone and LaForte jointly controlled Par Funding and the unlawful offerings on which Par Funding relied to fund its "merchant cash advance" business. *See, e.g.*, D. Ct. Dkt. 119 at 2–3, 5–7, 14, 54–55; AIII at 10–11, 13–15, 22, 62–63; *see also* D. Ct. Dkt. 1002, 1003 (allegations of complaint must be accepted as true for remedies determination).  They were also responsible for the fraudulent scheme that pervaded the offerings. *See* D. Ct. Dkt. 119 at 2–5, 14–15, 29–43; AIII at 10–13, 22–23, 37–51 (alleging that defendants induced

investment in unregistered offerings through misrepresentations and omissions concerning, *inter alia*, Par Funding's underwriting processes, default rate, leadership, regulatory history, and use of funds).  And they refused to provide sworn accountings or respond to discovery concerning their personal receipt of funds, impeding any other measure of their unjust enrichment.  D. Ct. Dkt. 1450 at 13 n.4; AIX at 21 n.4.  Under these circumstances, it was well within the district court's discretion to order McElhone and LaForte to disgorge the net proceeds of the unregistered offerings.  *See, e.g.*, *Calvo*, 378 F.3d at 1217–18 (affirming disgorgement award of proceeds received by company for illegal sales of unregistered securities); *SEC v. Arias*, No. 12-cv-2937, 2021 WL 7908041, at *5 (E.D.N.Y. Nov. 11, 2021) (collecting cases calculating disgorgement by "subtracting the amount returned to investors . . . from the total amount raised through the fraudulent offerings"), *report and recommendation adopted*, No. 12-cv-2937, 2023 WL 1861641 (E.D.N.Y. Feb. 9, 2023); *SEC v. Voight*, No. H-15-2218, 2021 WL 5181062, at *10 (S.D. Tex. June 28, 2021) ("Because all of the promissory note offerings described in the Complaint were unlawful, all of the profits of those offerings are subject to disgorgement."), *aff'd*, No. 21-20511, 2023 WL 1778178 (5th Cir. Feb. 6, 2023) (per curiam); *cf. SEC v. Huff*, 455 F. App'x 882, 884 (11th Cir. 2012) (per curiam) ("[W]here the record shows the fraud to have been pervasive, we cannot say it was an abuse of the district court's broad

29

discretion to order that the profits associated with the fraudulent scheme be disgorged." (internal quotation marks omitted)).

Appellants dispute the court's "decision to use the SEC's Net-Raise calculation as the baseline for Appellants' disgorgement," arguing that the amount was not "causally connected" to their wrongful conduct and that the court's "focus was solely on the amount needed to make Par's investors whole, rather than on ill-gotten gains." McElhone Br. at 29–31. But the offering proceeds were the direct result of appellants' Section 5 violations, to which they consented, and, as explained above, represented a reasonable approximation of their unjust enrichment. Appellants, moreover, did not meaningfully contest the nature of this baseline before the district court, instead focusing on the calculation of the amount and their various requested deductions. D. Ct. Dkt. 1329 at 13–26; AVI at 116–29. And, contrary to their assertions, the court did not confuse restitution and disgorgement, but rather focused on the standards for disgorgement and the need to "restrict disgorgement awards to 'net profits from wrongdoing.'" D. Ct. Dkt. 1450 at 9; AIX at 17 (quoting *Liu v. SEC*, 140 S. Ct. 1936, 1946 (2020)); *see* D. Ct. Dkt. 1450 at 19–26; AIX at 27–34 (granting appellants' requests for over $80 million in deductions for expenses, fees, and taxes in effort to limit award to wrongful gains).

Taking the net offering proceeds as a reasonable approximation of appellants' ill-gotten gains, the court then reasonably adopted the SEC's

30

calculation of that amount.  The SEC's calculation, the court explained, derived

"from an in-depth analysis of Par Funding's QuickBooks records memorialized in

the sworn declaration of the Receiver . . . and the SEC's expert report."  D. Ct.

Dkt. 1450 at 15; AIX at 23.  As the product of forensic review and reconciliation

of company records to which "[b]oth parties had access . . . for nearly two years"

and based on which "both parties produced expert reports," the SEC's figure

offered a substantiated accounting of the net proceeds and thus a reasonable

approximation of appellants' ill-gotten gains.  D. Ct. Dkt. 1450 at 16; AIX at 24.

Appellants maintain that the district court should have used a slightly lower

tabulation of the offerings' net proceeds, one found in a quarterly status report filed

by the receiver shortly after the Commission moved for remedies.  *See* McElhone

Br. at 31 (arguing for a calculation of $246,400,000 instead of $250,217,479).  The

court, however, reasonably rejected that argument after careful consideration.  As

it explained, while the status report "might have been produced later in time," it

was unsworn, untested, "did not undergo nearly the same level of scrutiny" as the

SEC's report, and "contradict[ed] the QuickBooks figures that both the SEC and

Defendants" had relied on throughout the case.  D. Ct. Dkt. 1450 at 16; AIX at 24;

*see also* D. Ct. Dkt. 1419 at 17–18; AVIII at 25–26 (explaining that the quarterly

status report reflected variances that did not appear in the company's QuickBooks

and were not properly recorded by prior management); D. Ct. Dkt. 1419 at 25, 28;

31

AVIII at 33, 36 (noting that, based on the QuickBooks, "the numbers were not in dispute about how much was raised and how much was returned"). Contrary to appellants' contentions, the court thus could not conclude that the report's calculation was "more reliable" or accurate than that provided by the SEC. At best, it observed, the report raised a possibility that the SEC's calculation was imperfect—a risk insufficient to warrant discarding that calculation, particularly given that the risk stemmed from appellants' poor recordkeeping. *See, e.g.*, *SEC v. Merch. Cap. LLC*, 486 F. App'x 93, 96 (11th Cir. 2012) (per curiam) ("As long as the SEC's estimate is reasonable, any risk of error falls on the wrongdoer whose illegal conduct created the uncertainty."); *SEC v. Lauer*, 478 F. App'x 550, 557 (11th Cir. 2012) (per curiam) (defendant "bore the risk of any remaining uncertainty being construed against him" where the "financial records were lacking essential information"). Under these circumstances, the district court acted within its discretion in resolving this evidentiary dispute by employing the SEC's figure.

Appellants try to make hay out of the court's comments at the remedies hearing, implying that some of the court's inquiries and concerns somehow undermine its written opinion. *See* McElhone Br. at 21–22, 33–34. But review of the court's dialogue with the parties affords more, rather than less, confidence in its decision. Namely, the hearing transcript makes clear that the court was keenly aware of its "independent obligation" to closely scrutinize the record and impose a

32

disgorgement award only where equitable and grounded in evidence.  D. Ct. Dkt. 1419 at 45; AVIII at 53; *see also, e.g.*, D. Ct. Dkt. 1419 at 42; AVIII at 50 ("[I]t would just be a complete abdication of my responsibility under the case law to just look at what the SEC's given to me in a declaration and rubber stamp it."); D. Ct. Dkt. 1419 at 111; AVIII at 119 ("I don't award a government agency millions of dollars . . . unless I feel certain that I got record evidence to back it up.").  And through the court's colloquies at the hearing, it received the additional clarifications or citations that it needed to issue a disgorgement order consistent with those obligations.  *See, e.g.*, D. Ct. Dkt. 1419 at 46–47; AVIII at 54–55 ("Today . . .  I am hearing where you are drawing these numbers from.  And, yes, I would agree that there is support for them."); D. Ct. Dkt. 1419 at 97; AVIII at 105 ("There's just a lot more here that fills in a lot of blanks that I was struggling with."); D. Ct. Dkt. 1419 at 105; AVIII at 113 ("So the Court has gone through all of my questions, certainly has been provided with a lot of what I would deem to be new information, albeit information that existed in the record . . . . [W]here I found myself necessitating additional information . . . a lot of the questions today have facilitated that."); *see also* D. Ct. Dkt. 1419 at 115, 117, 128 –29; AVIII at 123, 125, 136–37 (explaining that the court would review the transcript to ensure it resolved his concerns and only then issue an appropriate order).  The hearing

transcript thus confirms the thoroughness and thoughtfulness of the court's decision.

Appellants also attempt to shoehorn their dispute with a discovery ruling into their challenge to the disgorgement order, arguing that the magistrate judge's denial of late-sought discovery concerning the quarterly status report impeded their efforts to "prove that the SEC's figure is inaccurate." McElhone Br. at 36. But, as this Court has ruled, that discovery dispute has not been preserved for review, as appellants failed to object to the magistrate judge's decision below. Dkt. 27. In any event, as the magistrate judge found in denying the discovery sought as not proportional to the needs of the case, appellants already had the records underlying the quarterly status report and were free to present any arguments and analysis to the district court based on those records. D. Ct. Dkt. 1313 at 11, 17, 19–20. Appellants' dissatisfaction with the magistrate judge's ruling thus in no way diminishes the reasonableness of the district court's decision.

## B.    The district court properly declined to deduct sums already omitted from the disgorgement calculation.

Finally, McElhone and LaForte contend that the district court erred in declining to deduct certain disgorgement awards entered against other defendants and non-parties who operated Agent Funds. McElhone Br. at 37. They are incorrect. As the district court explained, any disgorgement the SEC sought or obtained from those sources was "based on their [own] net profits—the difference

34

between the payments Par Funding made to the Agent Funds and the amount the Agent Funds disbursed to their investors—" and thus did not factor into McElhone and LaForte's disgorgement obligation.  D. Ct. Dkt. 1450 at 17; AIX at 25.[14] While Par Funding's payments to the Agent Funds were relevant to McElhone and LaForte's disgorgement, the SEC already "deducted all distributions made [by Par Funding] to Agent Funds from their initial calculation."  *Id.*

Contrary to appellants' suggestions, that conclusion was adequately supported by the record.  *See* D. Ct. Dkt. 1214-1 at 2; AV at 233 (receiver's sworn declaration summarizing QuickBooks data stating that the amount at issue reflects the amount the "company repaid to investors, including the 'Agent Funds'"); *see also* D. Ct. Dkt. 1252 at 30, AVI at 61; D. Ct. Dkt. 1341 at 2, 5–6; D. Ct. Dkt. 1419 at 36–39; AVIII at 44–47 (SEC counsel explicating demonstrative exhibit detailing deductions); D. Ct. Dkt. 1419 at 40; AVIII at 48 (acknowledging that the information "[wa]s in the record, [though] I needed the SEC to show me where it is").  And appellants—who, as the magistrate judge noted, have the records

---

[14] That these disgorgement awards were not deducted while disgorgement awards entered against Cole and Abbonizio were is not arbitrary, as appellants suggest. McElhone Br. at 37.  Rather, it reflects the difference in the nature of the payments giving rise to the specific disgorgement awards.  Cole and Abbonizio were paid through commissions and consulting fees, rather than by payments to a fund; as a result, the SEC's accounting for payments to funds did not cover those defendants' disgorgement awards.  *See* D. Ct. Dkt. 1450 at 18 n.11, AIX at 26 n.11; D. Ct. Dkt. 1252 at 30, AVI at 61; D. Ct. Dkt. 1341 at 2, 5–6.

underlying the receiver's and SEC's calculation—offer no evidence to the contrary. *See* McElhone Br. at 37 (arguing only that the SEC's briefing was "lacking").

This Court should accordingly affirm the district court's disgorgement order.

## III. The district court acted within its discretion in imposing $21.85 million in penalties against each defendant.

The district court also did not abuse its discretion in imposing third-tier penalties against McElhone and LaForte and in setting the amount of those penalties at $21.85 million for each defendant. As the court found, that significant sanction properly reflected the significant misconduct at issue: namely, the couple's spearheading of an extended fraudulent scheme that used "a litany of serious misrepresentations" to collect and jeopardize hundreds of millions of dollars of investor funds. This Court should accordingly reject appellants' attempts to downplay their violations and to curtail the court's broad discretion in fashioning civil penalties. Clarification of the Final Judgment or a limited remand, however, is appropriate to address the court's decision to hold appellants jointly and severally liable for the penalties.

### A. Third-tier penalties were appropriate.

"Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." *Monterosso*, 557 F. App'x at 929. To obtain such penalties, "the Commission need only make 'a proper

showing' that a violation has occurred and a penalty is warranted." *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008) (per curiam) (quoting 15 U.S.C. §§ 77t(d), 78u(d)(3)).  Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize three tiers of monetary penalties for statutory violations: first-tier penalties for any violation; second-tier penalties for violations that "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and third-tier penalties for violations that satisfy the second-tier requirements and that "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B).  For each violation warranting third-tier penalties, the court may impose a penalty up to a set amount or the gross amount of pecuniary gain, whichever is greater.  *Id.*

The district court properly assessed third-tier penalties against McElhone and LaForte.  As the court found, the couple orchestrated a fraudulent scheme in which they and others induced investors to participate in unlawful securities offerings by means of "a litany of serious misrepresentations."  D. Ct. Dkt. 1450 at 34; AIX at 42; *see also* D. Ct. Dkt. 119 at 2–4; AIII at 10–12.  These misrepresentations and omissions—about Par Funding's default rate, underwriting practices, "sordid regulatory history," leadership (and its criminal history), and its diversion of funds to insiders—went to the heart of Par Funding's business and any

37

decision to invest in it.  D. Ct. Dkt. 1450 at 34–35, 37–38; AIX at 42–43, 45–46.

And they threatened hundreds of millions of dollars of investor funds.  *See id.*

(finding that defendants "made multiple serious misrepresentations to investors" in

service of unregistered securities offerings that "have left hundreds of millions of

investor returns unpaid").  Because McElhone and LaForte "materially misled

investors" "[a]t every turn," "with[holding] or [lying] about critical information

that investors rely on in making investment decisions[ and] placing the money of

the investing public at risk," their misconduct warranted third-tier penalties.  D. Ct.

Dkt. 1450 at 38; AIX at 46.

Appellants insist that "the [c]ourt had no basis to assess Tier 3 penalties,"

disputing that McElhone committed any fraud whatsoever and that their

misconduct created a significant risk of substantial losses.  McElhone Br. at 44.

Both contentions lack merit.  McElhone accepted liability for committing fraud in

violation of Section 17 of the Securities Act, Section 10(b) of the Exchange Act,

and Rule 10b-5, and the Amended Complaint—which McElhone agreed to accept

as true—alleges that she committed scienter-based violations of the securities laws

through her roles as co-architect of the fraudulent scheme and as Par Funding's

CEO and ultimate decisionmaker.  Her attempt to disclaim that liability now and

imply that she somehow had no responsibility for any deceit not only runs counter

to her consent judgment, but it beggars belief.  To suggest, for instance, that

38

McElhone played no part in the deception concerning her husband's criminal history—even though he co-founded the company with her shortly after his release from prison, operated as de facto CEO of the company she claimed to run, and used a fake name and email within her company to conceal his true identity—is not credible. Rather, taking the allegations of the complaint as a whole, McElhone's involvement in the myriad frauds for which she accepted liability is readily inferred.

Appellants' argument about risk of loss fares no better. As the district court found, the misrepresentations here concerned core elements of Par Funding's operation and profitability, which in turn were fundamental to investors and to the success of their investment in the company. *See* D. Ct. Dkt. 1450 at 34–35; AIX at 42–43. "For example, the 'low' default rate touted by Defendants was information investors depended on in deciding whether to invest," but in fact "Par Funding was barely breaking even." D. Ct. Dkt. 1450 at 35; AIX at 43; *see, e.g.*, *Monterosso*, 557 F. App'x at 929 (affirming that a fraudulent scheme created a substantial risk of loss where it involved "revenue overstatements [that] would have been important to any reasonable shareholder"). Though appellants protest that "Par never missed a payment to investors," McElhone Br. at 43, this Court has already rejected the argument that Par Funding's alleged "profitability [was] . . . sufficient to disprove a *risk* of substantial losses." *SEC v. Complete Bus. Sols. Grp., Inc.*,

39

No. 22-13811, 2023 WL 4196949, at *2 (11th Cir. June 27, 2023) (per curiam) (emphasis added) (rejecting similar argument from co-defendant); *see also, e.g.*, *SEC v. Revolutionary Concepts, Inc.*, No. 21-10984, 2022 WL 386085, at *11 (11th Cir. Feb. 9, 2022) (per curiam) ("[A]ctual loss isn't required.").  The district court thus did not abuse its discretion in imposing third-tier penalties against McElhone and LaForte.

**B.    The district court reasonably assessed $21.85 million in penalties against each defendant.**

Having established that third-tier penalties were warranted, the district court was free to determine the "amount of the penalty . . . in light of the facts and circumstances."  15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B); *see, e.g.*, *Monterosso*, 557 F. App'x at 929 ("The statutes leave the amount to be imposed to the discretion of the district judge."); *Warren*, 534 F.3d at 1369.  To do so, the court carefully considered a number of factors designed to align the monetary sanction with the facts of the case.  *See* D. Ct. Dkt. 1450 at 37–40; AIX at 45–48 (assessing (1) the egregiousness of defendants' violations, (2) their scienter, (3) the repeated nature of the violations, (4) any admission of wrongdoing, (5) any risk of substantial loss, (6) any cooperation with authorities, and (7) any evidence of defendants' financial condition); D. Ct. Dkt. 1450 at 11–12; AIX at 19–20 (quoting *SEC v. Huff*, 758 F. Supp. 2d 1288, 1364 (S.D. Fla. 2010), *aff'd*, 455 F. App'x 882 (11th Cir. 2012) (per curiam)).  Citing the "frequency and severity" of defendants' violations, the

40

ample evidence of their scienter, and the risk of substantial loss caused by their misconduct, the court found that "[w]ithout question" "significant penalties" were warranted.  D. Ct. Dkt. 1450 at 37–40; AIX at 45–48 (also weighing appellants' limited admissions of wrongdoing and giving no weight to the remaining factors).  But it rejected as excessive the Commission's proposal of a $50 million penalty for each defendant.  Instead, seeking to "ground[] its penalty calculations in the facts of this case" and to "more equitably capture[] the nature and scope of McElhone and LaForte's wrongdoing," the district court crafted its own penalty by multiplying the statutory maximum ($190,000) by the number of promissory notes issued by defendants to investors that remained unpaid (115), ultimately assessing $21.85 million in penalties for each.  D. Ct. Dkt. 1450 at 41–42; AIX at 49–50.

Appellants challenge the district court's decision to hold them accountable for 115 statutory violations based on the unpaid notes.  But district courts "enjoy[] wide discretion in devising civil penalties" and in identifying the number of violations that will yield an appropriate penalty.  *SEC v. de Maison*, No. 18-2564, 2021 WL 5936385, at *2 (2d Cir. Dec. 16, 2021) (internal quotation marks omitted).  In particular, because the term "violation" is not defined by the statutory scheme, "[d]istrict courts have discretion to determine what constitutes a 'violation' and have relied on various proxies" to produce a fitting result.  *SEC v. Murphy*, 50 F.4th 832, 848 (9th Cir. 2022) (collecting cases and citing as possible

41

proxies, *inter alia*, the number of victims, the number of fraudulent transactions, the number of fraudulent schemes, the number of statutes violated, and the number of months defendants engaged in unlawful activity); *see also SEC v. Fowler*, 6 F.4th 255, 264–66 (2d Cir.) (emphasizing the district court's "wide discretion" in classifying violations to formulate a civil penalty), *cert. denied*, 142 S. Ct. 590 (2021).

The court's thoughtful penalty determination here fell within that broad ambit, notwithstanding appellants' complaints.  Noting that third-tier violations "involve[] fraud, deceit, [or] manipulation," they first criticize the court for not linking each note and violation to a specific misrepresentation.  But the notes clearly "involved fraud": they were the centerpiece of appellants' fraudulent scheme, one structured to deceive regulators; they were procured by fraud, issued on the back of misrepresentations to the Commission; and they were promoted and sold to the investing public by means of a host of misrepresentations and omissions.

Moreover, as the Commission noted, the court could have held defendants responsible for an even greater number of violations based on the myriad examples of fraudulent conduct available in the Amended Complaint and the record.  D. Ct. Dkt. 1252 at 36–37; AVI at 67–68.  It likewise could have imposed a higher penalty based on their gross pecuniary gain.  D. Ct. Dkt. 1252 at 39; AVI at 70.

42

And, as the court observed, "the exact number of violations committed by the Defendants" in their multi-year, multi-fraud scheme "is nearly impossible to determine." D. Ct. Dkt. 1450 at 41; AIX at 49 (cleaned up). Under these circumstances, it was no abuse of discretion for the court to use a proxy to fashion a smaller penalty that in its view better reflected the scope of the misconduct. *See, e.g.*, *Murphy*, 50 F.4th at 848 (affirming decision to base penalty on number of months defendant acted as an unregistered broker where "the district court could have found thousands of violations if it had relied on the number of transactions [the defendant] made as an unregistered broker"); *SEC v. Vali Mgmt. Partners*, No. 21-453, 2022 WL 2155094, at *3 (2d Cir. June 15, 2022) (affirming lump-sum penalty in amount less than the Commission sought where the court could have "count[ed] each transaction or series of transactions as a violation" to "produce a staggering penalty in light of the millions of transactions at issue" (cleaned up)).

Appellants' objection that the penalty amount was "excessive and unduly punitive," McElhone Br. at 40, fails for the same reason. As in the cases they cite, the district court here was in fact authorized to impose a higher sanction but specifically declined to do so, finding $21.85 million a more "equitable civil penalty supported by the facts of this case." D. Ct. Dkt. 1450 at 36; AIX at 44; *cf. Revolutionary Concepts*, 2022 WL 386085, at *11 (explaining that a fine is excessive only "if it is grossly disproportional to the gravity of a defendant's

43

offense" and that "courts should be hesitant to substitute their opinion for that of [Congress and] the people" as reflected in the statutory maximums (internal quotation marks omitted)).  It is worth noting, moreover, that appellants argued below that a fair penalty should comprise 10-15% of the disgorgement ordered.  D. Ct. Dkt. 1329 at 47; AVI at 150 (claiming to have surveyed civil penalties and that second-tier penalties were on average 15% of disgorgement and third-tier penalties on average 43% of disgorgement).  $21.85 million is approximately 15% of the $142 million the court ordered in disgorgement—hardly excessive even by appellants' own metric.[15]

Appellants also complain that the court's penalty calculation was unanticipated because neither party had proposed it.  McElhone Br. at 41.  But they cite no case holding that the court was somehow limited to the options presented by the parties or foreclosed from constructing its own penalty—nor could they, given courts' "wide discretion in devising civil penalties."  *de Maison*, 2021 WL 5936385, at *2 (internal quotation marks omitted).  And, indeed, appellants themselves are the ones who raised the concept of basing a penalty calculation on the 115 unpaid notes in their briefing below.  D. Ct. Dkt. 1329 at 48; AVI at 151.  In any event, appellants had ample opportunity to present their views to the court

---

[15] Even appellants' collective penalty amount represents considerably less than 43% of their joint disgorgement obligation.

as to the appropriate penalty, how it should be calculated, and the substantive factors underlying its determination.

Appellants similarly object that the district court used different methods to impose different penalties on different defendants.  McElhone Br. at 45.  Again, however, they offer nothing to suggest that this was impermissible.  Rather, the court properly curated each penalty determination to reflect the relevant defendant's role in the scheme, the scope of his misconduct, and his financial circumstances.  *See* D. Ct. Dkt. 1450 at 44–45; AIX at 52–53 (explaining that, "compared to the civil penalties imposed above against McElhone and LaForte," Cole's penalty "accurately captures [his] role in the Par Funding scheme," reflecting his "relative culpability" and "the fact that Cole profited far less from the scheme"); D. Ct. Dkt. 1450 at 46–47; AIX at 54–55 (devising Furman's penalty in light of his "limited ability to pay" and "relatively small role" in the scheme).

Notwithstanding McElhone and LaForte's efforts on appeal to minimize their culpability, the court reasonably found that McElhone and LaForte deserved significantly higher penalties to match their more significant roles as architects and leaders of the scheme, their persistent misconduct, and their extensive ill-gotten gains.  *See* D. Ct. Dkt. 1450 at 37–41; AIX at 45–49; *see also* D. Ct. Dkt. 1252 at 24; AVI at 55 (describing hundreds of millions of dollars received by defendants and related companies); D. Ct. Dkt. 482 (describing properties purchased with

45

commingled investor funds and defendants' attempts to evade the receivership).

The court accordingly and reasonably fashioned these sanctions for McElhone and LaForte, while crafting different penalties to suit their co-defendants. *Cf. Monterosso*, 557 F. App'x at 930 (rejecting argument that penalty was disproportionate compared to other defendants where judge "evaluate[d defendant's] involvement" and "activities in the fraudulent scheme" and determined "he had a different role"); *VanCook v. SEC*, 653 F.3d 130, 144 (2d Cir. 2011) (affirming sanction as not disproportionate to "other players in [the] . . . scheme" where defendant, "unlike the other individuals, designed the . . . scheme, marketed it to select customers, and orchestrated its execution").

The district court's imposition of a $21.85 million sanction for each defendant was thus a reasonable exercise of its discretion and should be upheld.

### C. Clarification of the Final Judgment or a limited remand concerning joint and several liability for the civil penalties is appropriate.

Although the Commission did not seek joint and several liability for appellants' civil penalties, the district court's decision stated that "McElhone and LaForte are to be held jointly and severally liable for this [penalty] amount." D. Ct. Dkt. 1450 at 42; AIX at 50. The Final Judgment itself, however, does not expressly impose joint and several liability for appellants' penalties. *Compare* D. Ct. Dkt. 1451 at 2; AIX at 60 (ordering that "Defendants are jointly and severally

liable for disgorgement . . . together with prejudgment interest thereon"), *with id.* ("Defendants are also liable for civil penalties in the amount of $21,850,000 each for a total of $43,700,000 . . . .").

As appellants observe, this Court has not yet addressed whether or in what circumstances civil penalties may be imposed jointly and severally. As other courts have indicated, however, the relevant civil penalty statutes do not appear to permit joint and several liability against individuals in the particular circumstances presented here.[16] *See SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287–88 (2d Cir. 2013) (reversing the imposition of joint and several liability for civil penalties as an error of law, because the "statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the 'gross amount of pecuniary gain *to such defendant*'" and "does not provide room for the district court's interpretation that the civil penalty be imposed jointly and severally"); *cf. SEC v. Husain*, 70 F.4th 1173, 1190 (9th Cir. 2023) (Wardlaw, J., dissenting); *SEC v. Johnson*, 43 F.4th 382, 393 (4th Cir. 2022); *SEC v. Milan Grp., Inc.*, 595 F. App'x 2, 4 (D.C. Cir. 2015) (per curiam).

But the court's decision concerning joint and several liability does not affect the court's substantive penalty determination. Its decision to impose $21.85

---

[16] The circumstances here do not involve, for instance, civil penalties imposed against defendants that are alter egos, where joint and several liability may be appropriate.

million in penalties against each defendant is independently justified (*see supra*) and stands apart from its indication of joint and several liability, which was included only at the very conclusion of its opinion and not otherwise discussed. As a result, this Court should clarify that the Final Judgment, which does not reference joint and several liability, orders appellants to pay civil penalties individually. Alternatively, a limited remand instructing the district court not to impose joint and several liability, without otherwise reopening the penalty determination or Final Judgment, would be appropriate.

## IV.    Reassignment is not necessary.

Finally, appellants' request for reassignment on any remand should be rejected. "Reassignment is a severe remedy, which is only appropriate where the trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1272 (11th Cir. 2021) (internal quotation marks omitted). "The propriety of doing so is informed by three factors: '(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; (3) whether reassignment would entail waste and duplication out of proportion to the gains realized from reassignment.'" *Stargel v. SunTrust Banks, Inc.*, 791 F.3d 1309, 1311–12 (11th Cir. 2015) (per

48

curiam) (quoting *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 (11th Cir. 1997)).

These factors do not support reassignment here. This Court is generally reluctant to find that a district judge is unable to put aside his prior views and fairly adjudicate a dispute. *See, e.g.*, *Sovereign Mil. Hospitaller Ord. of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Ord. of Saint John of Jerusalem, Knights of Malta, The Ecumenical Ord.* ("SMOM"), 809 F.3d 1171, 1193 (11th Cir. 2015) (rejecting reassignment where missteps were "more akin to garden-variety errors of law than . . . direct defiance or stalemated posture" (internal quotation marks omitted)); *United States v. Gupta*, 572 F.3d 878, 891 (11th Cir. 2009) ("Reassignment is necessary when a district judge adheres to erroneous views after multiple remands . . . or when a judge questions the wisdom of the substantive law he has to apply . . . ." (cleaned up)). Here, by contrast, "the record indicates [the judge] corrects his mistake and amends his orders when he thinks he reached the wrong result." *In re Equifax*, 999 F.3d at 1272; *see, e.g.*, D. Ct. Dkt. 1449; AVIII at 228 (amending judgment to correct error).

That the district court has issued prompt decisions, particularly in connection with motions concerning the receivership and the receiver's efforts to forestall dissipation of assets, likewise does not imperil the appearance of justice or compel

49

reassignment.  LaForte Br. at 37.[17]  Rather, the court has reasonably sought to ensure an efficient resolution of the action, to limit litigation costs, and to preserve and maximize assets to be returned to investors, while affording appellants sufficient process.  *Cf. Elliot*, 953 F.2d at 1566 (appropriate aims in receivership proceedings include "reduc[ing] the time necessary to settle disputes, decreas[ing] litigation costs, and prevent[ing] further dissipation of receivership assets"); *see supra* at I.B; *see also, e.g.*, D. Ct. Dkt. 1488 (staying order to provide opportunity for briefing).

Finally, reassignment would entail waste and duplication.  The district judge has supervised this complex, multi-defendant case for over three years, during which time he has presided over an eight-day trial of a co-defendant, engaged in close oversight of the receivership, and managed the action through nearly 1700 docket entries.  Reassignment of the case at this late stage is not warranted.  *See, e.g.*, *In re Equifax*, 999 F.3d at 1272 (rejecting reassignment in "colossal multidistrict litigation case with over 1200 docket entries in the District Court over the course of just a few years"); *SMOM*, 809 F.3d at 1194 (rejecting reassignment

---

[17] Notably, while appellants criticize the district court for proceeding directly from the evidentiary hearing to the Final Judgment, they urged the court not to "prolong[] this case" and instead promptly issue a decision, because "there is evidence there that should be able to guide you and allow you to finish this out like we've all been working so hard to do."  D. Ct. Dkt. 1419 at 113; AVIII at 121; *see also* D. Ct. Dkt. 1419 at 107–08, 111; AVIII at 115-16, 119.

where judge had "unique familiarity with this complex, fact-intensive case" (internal quotation marks omitted)); *CSX Transp., Inc. v. State Bd. of Equalization*, 521 F.3d 1300, 1301 (11th Cir. 2008) (per curiam) (rejecting reassignment where "judge presided over an eight-day trial that concerned a complicated subject and drafted a thorough 27-page opinion, a significant portion of which was not affected").

## CONCLUSION

For the foregoing reasons, the Court should reject appellants' challenge to the Expansion Order, affirm the district court's imposition of approximately $142 million in disgorgement and $21.85 million each in civil penalties, and clarify that the Final Judgment imposes civil penalties individually.

Respectfully submitted,

MEGAN BARBERO
*General Counsel*

MICHAEL A. CONLEY
*Solicitor*

TRACEY A. HARDIN
*Assistant General Counsel*

MORGAN BRADYLYONS
*Bankruptcy Counsel*

*/s/ Brooke Wagner*
BROOKE WAGNER
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5292
wagnerbr@sec.gov

September 12, 2023

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the type-volume limitation set forth in Fed. R. App. P. 27 because it contains 12,329 words, and complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally-spaced Times New Roman 14-point typeface.

*/s/ Brooke Wagner*
BROOKE WAGNER
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5292
wagnerbr@sec.gov

September 12, 2023

## CERTIFICATE OF SERVICE

I certify that on September 12, 2023, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the Court's CM/ECF system. Service will be accomplished by the CM/ECF system.

/s/ Brooke Wagner
BROOKE WAGNER
*Appellate Counsel*

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-9040
(202) 551-5292
wagnerbr@sec.gov

September 12, 2023